**CLINTON & CLINTON**                          ATTORNEY FOR PLAINTIFF,
BY:  JOHN F. MCDEVITT, JR., ESQ.              AG-EIP 1 GEOFFREY DRIVE, LLC
Identification No.: 18695
JFM@ClintonLaw.com
CLINTON & CLINTON
1315 WALNUT STREET
SUITE 601
PHILADELPHIA, PA 19107
(267) 800-2097

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AG-EIP 1 GEOFFREY DRIVE, LLC,<br>          *Plaintiff*<br><br>v.<br><br>ZURICH AMERICAN INSURANCE CO.;<br>AMAZON.COM, INC.,<br>          *Defendants* | :<br>:<br>:   CASE NO.:<br>:<br>:<br>:<br>:<br>:<br>: |

## COMPLAINT

AG-EIP 1 Geoffrey Drive, LLC, by and through its attorneys, Clinton & Clinton, requests that the Court grant the following relief in its favor and against Defendants, Zurich American Insurance Company and Amazon.com, Inc., or either Defendant, based upon the following:

### JURISDICTION

1.      At all times relevant hereto, Plaintiff, AG-EIP 1 Geoffrey Drive, LLC (hereinafter "AG-EIP"), was and is a corporate entity organized and existing under the laws of the State of Delaware and maintaining its principal place of business at 245 Park Avenue, 25th Floor, New York, NY 10167.

2.      At all times material hereto, AG-EIP was the owner of a commercial property situated at 1 Geoffrey Drive, Falls Township, Bucks County, Pennsylvania.

3.      Defendant, Zurich American Insurance Company (hereinafter "Zurich American"), is an insurance company organized and existing under the laws of the State of New York and at all times material hereto, maintained business headquarters at 1299 Zurich Way, 5th Floor, Schaumberg, IL 60196-1056.

4.      At all times material hereto, Defendant, Amazon.com, Inc. (hereinafter "Amazon"), was and is a corporate entity organized and existing under the laws of the State of Delaware and at all times material hereto, maintained business headquarters at 410 Terry Avenue, N., Seattle, WA 98109.

5.      At all times material hereto, Amazon was the lessee of the building and commercial property situated at 1 Geoffrey Drive, Falls Township, Bucks County, Pennsylvania.

6.      The present action is within the jurisdiction of this Court pursuant to 28 U.S.C. §1332 and 28 U.S.C. § 2201.

## ZURICH AMERICAN CGL POLICY

7.      Defendant, Zurich American, issued a commercial general liability insurance policy to Amazon (hereinafter "the Zurich American CGL Policy").  The Zurich American CGL Policy is identified by Policy No. GLO-7367714-01, with effective dates of April 1, 2020 to April 1, 2021.  The said Policy was issued to the named insured, Amazon.com, Inc. at its mailing address at 2121 7th Avenue, Seattle, WA 98121.  A true and correct copy of the Zurich American CGL Policy is appended as Exhibit "A".

8.      The Zurich American CGL Policy affords coverage in **SECTION I – COVERAGE A** for bodily injury and property damage liability.  Under that Section of the Policy, Zurich is obligated to pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which the insurance applies.  Zurich is further obligated under that coverage section to defend the insured against any "suit" seeking those damages.

9.      Under **SECTION I – COVERAGE B** of the Policy, Zurich American is obligated to pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which the insurance applies (Exh."A")   Additionally, Zurich American is obligated under **SECTION I – COVERAGE B** to defend the insured against any "suit" seeking those damages.  (Exhibit "A")

10.     The Zurich American CGL Policy includes an Endorsement titled **ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES** that affords coverage to any person or organization to whom or to which Amazon is required to provide additional insured status in a written contract or written agreement executed prior to loss, except where such contract or agreement is prohibited by law.  The additional insured Endorsement pertains to "all leased premises". (Exh. "A").

**UNDERLYING CONTRACTS**

11.     On or about September 24, 2020, AG-EIP and Amazon entered into a Lease Agreement for Amazon's occupancy of the commercial building and property situated at 1 Geoffrey Drive, Falls Township, Bucks County, Pennsylvania.  A true and correct copy of the said Lease Agreement is appended as Exhibit "B".

12.      The Lease Agreement between AG-EIP and Amazon for occupancy of the commercial property and warehouse at 1 Geoffrey Drive, Falls Township, Bucks County, Pennsylvania had a lease commencement date of October 1, 2020 ( Exh. "A", Notice of Lease Terms).

13.     Section 9 of the Lease Agreement (Exh. "B"), titled **Insurance**, provides in subparagraph (b) the following:

> (b)  <u>Tenant's insurance</u>.  From and after the Commencement date or any other earlier
> date upon which Tenant enters or occupies the Premises or any portion thereof, Tenant
> will maintain, at its expense, all risk (or "special form") property insurance covering the

full replacement of all initial improvements, Tenant-Made Alterations and Tenant's Property installed or placed in the Premises by Tenant at Tenant's expense; workers compensation insurance with no less than the minimum limits required by law; employer's liability insurance with limits of $1,000,000 each accident; and commercial general liability insurance covering the Premises and Tenant's use thereof against claims for bodily injury or death and property damage, which commercial general liability insurance will include the Landlord and mortgage lienholder as an additional insured.  Landlord may from time to time require reasonable increases in any such limits consistent with the insurance being required by institutional owners of similar projects in the area.

14.  Section 9.(c) of the Lease Agreement (Exh. "B") provides the following with respect to the coverage afforded under the commercial general liability policy(ies):

Tenant may meet all insurance requirements in this Lease through any combination of primary, excess or self-insurance coverage (subject to and in accordance with subsection (e) below).  All insurance policies will be issued by insurers authorized to do business in the jurisdiction in which the Premises are located and have a Best's Rating of not less than A-.  Each party will endeavor to give the other party thirty (30) days' prior notice before any cancellation or lapse of such coverage.  Landlord will deliver a certificate evidencing such policies to Tenant upon Tenant's request, at the commencement of the Lease Term or at each renewal of said insurance.  For evidence of Tenant's policies and the required inclusions, if applicable, of Landlord and mortgage lienholder as loss payee and/or additional insured, Tenant's memorandum of insurance can be located at www.amazon.com/moi.

15.     Additionally, on or about August 31, 2020, Amazon and AG-EIP entered into an Early Access Letter Agreement under which Amazon was granted early access by AG-EIP to the leased property for the purpose of performing onsite work, surveys, studies and due diligence.  A true and correct copy of the Early Access Lease Agreement between Amazon and AG-EIP is appended hereto as Exhibit "C".

16.     The Early Access Letter Agreement imposes the following obligations upon Amazon with respect to procurement and maintenance of insurance:

> Amazon will maintain worker's compensation, employer's liability and commercial general liability insurance coverage with limits not less than the minimum amounts required by law.  Amazon's commercial general liability insurance policy will cover claims for bodily injury, death and property damage and will include Landlord as an additional insured and such policy shall be considered primary and non-contributory to insurance coverage or self-insurance maintained by Landlord.  Visit www.amazon.com/moi to view a memorandum of insurance as proof of Amazon's insurance coverage and limits.

17.     The Zurich American CGL policy (Exh. "A"), the Lease Agreement (Exh. "B") and the Early Access Letter Agreement (Exh. "C") are confidential documents in the related Civil Action titled Greta Roubert v. Amazon, AG-EIP, et al.; U.S.D.C., Eastern District, PA, Case No. 2:21-CV-03091-CMR ( hereinafter referred to as "the Roubert Lawsuit").  Accordingly, Exhibits "A", "B", and "C" shall be deemed Confidential Documents in this Declaratory Judgment Lawsuit and will receive the same treatment as documents that are protected under a Confidentiality Agreement and Protective Order approved by the Court in that Lawsuit.

## THE ROUBERT LAWSUIT

18.     On June 1, 2021, Plaintiff, Greta Roubert, instituted a civil action against Defendants, Amazon, Equity Industrial Partners, Gilbane Building Company and Kellermeyers Bergenson Services, LLC.  The Lawsuit filed in the Philadelphia Common Pleas Court was thereafter removed to the United States District Court for the Eastern District of Pennsylvania and is currently pending in this Court under Case No. 2:21-CV-03091-CMR.

19.     Following removal of the Roubert Lawsuit to this Court, Plaintiff, Roubert, filed an Amended Complaint, a true and correct copy of which is appended hereto as Exhibit "D".

20.     The Amended Complaint filed by and on behalf of Plaintiff, Greta Roubert, alleges that on October 2, 2020, she was an employee of an independent contractor invited upon the premises of the Defendants when she slipped, tripped, stumbled, and fell as a result of a defective and dangerous condition on the property in the form of a cut-off lag bolt left haphazardly and inconspicuously on Defendants' walking surface which caused Plaintiff to suffer serious and permanent injuries, the extent of which will be described more fully hereinafter.

21. The Amended Complaint filed in the Roubert Lawsuit alleges separate claims against each Defendant based upon the allegation that the particular Defendant owned, maintained, controlled, leased, operated and/or was contractually obligated to clean, repair and/or make safe the property located at 1 Geoffrey Drive, Fairless Hills, PA 19030.

22.     The Amended Complaint filed in the Roubert Lawsuit recites separate Counts of negligence against each Defendant for failing to maintain the property located at 1 Geoffrey Drive, Fairless Hills, PA 19030 in a safe condition, failing to properly inspect for unsafe conditions, failing to erect and maintain barriers or safeguards around the defective condition, failing to properly train employees to recognize dangerous and defective conditions, negligent selection of employees,

workmen and/or supervisors, failing to set forth adequate, proper and reasonable safety standards, failing to properly supervise employees' actions, conduct and job performance.

23.     The Amended Complaint alleges that Plaintiff has suffered injuries, loss of wages, and suffering and future disability as a result of the slip and fall accident.

**COUNT I – DECLARATORY JUDGMENT AGAINST ZURICH AMERICAN INSURANCE COMPANY**

24.     Preceding paragraphs 1-23 are incorporated by reference herein and made a part hereof.

25.     AG-EIP qualifies as an additional insured under the Zurich American CGL Policy by virtue of the provisions of the additional insured Endorsement titled **ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES**.

26.     As an additional insured under the Zurich American CGL Policy, AG-EIP is entitled to defense and indemnification from Zurich American for the causes of action asserted against it in the Amended Complaint filed in the Roubert Lawsuit.

27.     The Zurich American CGL Policy imposes upon the insurer the obligation to defend any "suit" against the additional insured and to provide indemnification for any verdict award entered against AG-EIP or any settlement paid on behalf of AG-EIP up to the Zurich American CGL Policy limits of the Policy's per occurrence limit of $8,000,000.

28.     Additionally, Zurich American is obligated under the terms of the Policy to pay for any legal expenses, defense costs, expert fees, consulting fees, and legal costs incurred by Plaintiff in connection with the defense of the Roubert Lawsuit.

29.     AG-EIP is entitled to an order from the Court declaring that the Zurich American CGL Policy affords coverage to AG-EIP as an additional insured for the liability claims asserted against AG-

EIP in the Roubert Lawsuit and that Zurich American is obligated under the terms of its CGL Policy to immediately assume all obligations for the defense and indemnification of AG-EIP in the Roubert Lawsuit.

30.     On October 14, 2022, counsel for AG-EIP in the Roubert Lawsuit issued a letter to Zurich American tendering all obligations for defense and indemnification of AG-EIP to Zurich American under the terms of the Zurich American CGL Policy and, in particular, the additional insured Endorsement included in that Policy.  A true and correct copy of the tender letter is appended hereto as Exhibit "E".

31.     Zurich American has not to date issued any response to the October 14, 2022 tender letter sent by counsel for AG-EIP (Exh. "E").

**WHEREFORE**, Plaintiff, AG-EIP 1 Geoffrey Drive, LLC, requests that this Court enter a declaratory judgment in its favor and against Defendant, Zurich American Insurance Company, declaring (1) that the Zurich American CGL Policy affords coverage to AG-EIP as an additional insured for defense and indemnification of the liability claims brought against AG-EIP in the Roubert Lawsuit; (2) that Zurich American shall immediately assume all responsibility for defense of AG-EIP in the Roubert Lawsuit and for indemnification for any verdict, award rendered against AG-EIP or any settlement entered into by AG-EIP, in the Roubert Lawsuit; (3) that Zurich American Insurance Company is obligated to reimburse AG-EIP and/or its liability insurer, for all amounts paid by AG-EIP, or on behalf of AG-EIP, to date for defense of the causes of action asserted against AG-EIP in the Roubert Lawsuit; and (4) all other relief that this Court deems just and proper.

## COUNT II – DECLARATORY JUDGMENT AGAINST AMAZON

32.     Preceding paragraphs 1-23 are incorporated by reference herein and made a part hereof.

33.     Under the terms of the Lease Agreement (Exh. "B") and the Early Access Letter Agreement (Exh. "C"), Amazon was obligated to procure and maintain commercial general liability insurance covering the premises and Tenant's use thereof against claims for bodily injury and to include AG-EIP as an additional insured.

34.     Amazon attempted to satisfy its obligations under the Lease Agreement (Exh. "B") and the Early Access Letter Agreement (Exh. "C") by procuring the Zurich American CGL Policy which includes an Endorsement adding  Lessors as additional  insureds.

35.     The Zurich American Policy includes an Endorsement that is titled **Self Insured Retention – with Qualifying Deductible Amount** which modifies the commercial general liability coverage part by placing responsibility upon Amazon for payment of a $2,000,000 self-insured retention and all defense costs incurred both within and excess of the self-insured retention amount.

36.     The requirements set forth in the self-insured retention Endorsement included in Zurich American CGL Policy apply to the named insured, Amazon, and not to an additional insured.

37.      Plaintiff asserts that the obligations contained in the self-insured retention Endorsement are between the named insured and the insurer and do not impact Zurich American's obligations to defend and indemnify AG-EIP as an additional insured.

38.     However, if this Court determines that the Self-Insured Retention Endorsement obligates Amazon to defend AG-EIP in the Roubert Lawsuit and to pay for any verdict award or award of damages entered against AG-EIP in that litigation, or any settlement made by AG-EIP to resolve that litigation, up to Amazon's SIR retention limit of $2,000,000, then AG-EIP is entitled to an Order declaring that Amazon is obligated under the terms of the Lease Agreement, Early Access Agreement

and the Self-Insured Retention Endorsement in the Zurich American Policy, to defend AG-EIP with respect to the causes of action asserted in the Amended Complaint filed in the Roubert Lawsuit, and to indemnify for any judgment or award entered against AG-EIP in the Roubert Lawsuit, or any settlement paid to resolve the Roubert Lawsuit.

39. AG-EIP sent  letters to Amazon's attorneys under dates of October 4, 2021, November 22, 2021 and October 11, 2022, tendering to Amazon all obligations for defense and indemnity for the causes of action asserted against AG-EIP in the Roubert Lawsuit. Opies of all three tender letters are appended hereto as Exhibit "E".

40. Amazon has to date failed to submit a reply to any of the tender letters sent by AG-EIP ( Exh. "E")


**WHEREFORE**, Plaintiff, AG-EIP 1 Geoffrey Drive, LLC, requests that this Court enter a declaratory judgment in its favor and against Amazon declaring (1)  that  Amazon is obligated under the terms of its contracts with AG-EIP and the Self-Insured Retention Endorsement included in the Zurich American CGL Policy to indemnify and to afford a defense to AG-EIP with respect to the claims asserted against AG-EIP in the Amended Complaint filed in the Roubert Lawsuit; (2) that Amazon shall immediately assume all responsibility for defense of AG-EIP in the Roubert Lawsuit and for indemnification for any verdict, award rendered against AG-EIP, or any settlement paid out to resolve the causes of action asserted against AG-EIP up to the Self-Insured limit set forth in the Endorsement; (3) that Amazon is obligated to reimburse AG-EIP, and its liability insurer, for all past and future defense fees, legal costs, expert fees, consultant fees, and investigation expenses incurred to date for the defense of AG-EIP in the Roubert Lawsuit; and (4) all other relief that this Court deems just and proper.

Respectfully submitted,

Date:   11/18/22               **CLINTON & CLINTON**

BY:   *John F. McDevitt, Jr.*
      John F. McDevitt, Jr., Esq.
      Attorney for Plaintiff,
      AG-EIP 1 Geoffrey Drive, LLC

## <u>CERTIFICATE OF SERVICE</u>

I, John F. McDevitt, Jr., Esq., attorney for Plaintiff, AG-EIP 1 Geoffrey Drive, LLC, hereby certifies that a true and correct copy of the Complaint was sent on ___11/18/22___ by certified mail, return receipt requested to the following:

Amazon.com, Inc.
251 Little Falls Drive
Wilmington, DE 19808

Zurich American Insurance Company
4 World Trade Center
150 Greenwich Street
New York, NY 10007

Zurich American Insurance Company
1299 Zurich Way
5th Floor
Schaumberg, IL 60196-1056

Submitted by: *John F. McDevitt, Jr.*
John F. McDevitt, Jr., Esq.
Attorney for Plaintiff,
AG-EIP 1 Geoffrey Drive, LLC
Attorney No. 18695

Exhibit "A"

AMAZON_00328

# Disclosure Statement



**NOTICE OF DISCLOSURE FOR AGENT & BROKER COMPENSATION**

If you want to learn more about the compensation Zurich pays agents and brokers visit:

http://www.zurichnaproducercompensation.com

or call the following toll-free number:  (866) 903-1192.

This Notice is provided on behalf of Zurich American Insurance Company

and its underwriting subsidiaries.

AMAZON_00328

AMAZON_00329

**ZURICH**

**COMMERCIAL INSURANCE**

## COMMON POLICY DECLARATIONS

| | |
|---|---|
| Policy Number   GLO 7367714-01 | Renewal of Number   GLO 7367714-00 |

| Named Insured and Mailing Address | Producer and Mailing Address |
|---|---|
| AMAZON.COM, INC.<br>2121 7TH AVE<br>SEATTLE WA 98121 | MARSH USA INC.<br>1301 FIFTH AVE<br>SUITE 1900<br>SEATTLE WA 98101 |

Producer Code    73797-000

Policy Period:  Coverage begins   04-01-2020  at 12:01 A.M.;  Coverage ends  04-01-2021  at 12:01 A.M.

The name insured is   ☐ Individual    ☐ Partnership    ☒ Corporation

☐ Other:

This insurance is provided by one or more of the stock insurance companies which are members of the Zurich-American Insurance Group.  The company that provides coverage is designated on each Coverage Part Common Declarations.  The company or companies providing this insurance may be referred to in this policy as "The Company", we, us, or our.  The address of the companies of the Zurich-American Insurance Group are provided on the next page.

### THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE(S):

| | |
|---|---|
| GENERAL LIABILITY COVERAGE<br>issued by ZURICH AMERICAN INSURANCE COMPANY | PREMIUM  $ ███████ |
| KY SURCHARGE | $ ███████ |
| NJ PROP LIAB INS GUAR ASSOC SURCHARGE  ██████████ | $ ███████ |
| | $ ███████ |
| WV SURCHARGE | $ ███████ |

| | | | |
|---|---|---|---|
| **THIS PREMIUM MAY BE SUBJECT TO AUDIT.**<br>This premium does not include Taxes and Surcharges. | **TOTAL** | $ ███████ | |
| | | SEE INSTALLMENT SCHEDULE | |
| **Taxes and Surcharges** | **TOTAL** | $ ███████ | |
| | | SEE INSTALLMENT SCHEDULE | |

The Form(s) and Endorsement(s) made a part of this policy at the time of issue are listed on the **SCHEDULE of FORMS and ENDORSEMENTS.**

Countersigned this        day of

Authorized Representative

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART FORM(S), FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

AMAZON_00329

AMAZON_00330



# Important Notice – In Witness Clause

In return for the payment of premium, and subject to the terms of this policy, coverage is provided as stated in this policy.

IN WITNESS WHEREOF, this Company has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly Authorized Representative(s).

*President*

*Corporate Secretary*

---

**QUESTIONS ABOUT YOUR INSURANCE?**   Your agent or broker is best equipped to provide information about your insurance.  Should you require additional information or assistance in resolving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich in North America
Customer Inquiry Center
1299 Zurich Way
Schaumburg, Illinois  60196-1056
**1-800-382-2150** (Business Hours:  8am - 4pm [CT])
**Email**: info.source@zurichna.com

---

AMAZON_00330

**COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS**

Policy Number: GLO 7367714-01

# ZURICH AMERICAN INSURANCE COMPANY

Named Insured AMAZON.COM, INC.

Policy Period: Coverage begins 04-01-2020 at 12:01 A.M.; Coverage ends 04-01-2021 at 12:01 A.M.

Producer Name: MARSH USA INC.                    Producer No. 73797-000

**Item 1.**  Business Description: ONLINE RETAIL AND GROCERY STORES

**Item 2.**  Limits of Insurance

| | |
|---|---|
| GENERAL AGGREGATE LIMIT | $ 16,000,000 |
| PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT | $ 16,000,000 |
| EACH OCCURRENCE LIMIT | $ 8,000,000 |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $ 8,000,000   Any one premises |
| MEDICAL EXPENSE LIMIT | NOT COVERED   Any one person |
| PERSONAL AND ADVERTISING INJURY LIMIT | $ 8,000,000   Any one person or organization |

**Item 3.**  Retroactive Date **(CG 00 02 ONLY)**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" offense which occurs before the Retroactive Date, if any, shown here: NONE

(Enter Date or "None" if no Retroactive Date applies)

**Item 4.**  Form of Business and Location Premises

Form of Business: CORPORATION

Location of All Premises You Own, Rent or Occupy: **See Schedule of Locations**

**Item 5.**  Schedule of Forms and Endorsements

Form(s) and Endorsement(s) made a part of this Policy at time of issue:
**See Schedule of Forms and Endorsements**

**Item 6.**  Premiums

Coverage Part Premium: ▉▉▉▉▉▉▉

Other Premium:

Total Premium: ▉▉▉▉▉▉▉

U-GL-0334-B CW (9/04)

AMAZON_00332

**Policy Number**
**GLO 7367714-01**

**ENDORSEMENT**

# ZURICH AMERICAN INSURANCE COMPANY

Named Insured   AMAZON.COM, INC.

Effective Date:   04-01-20

12:01 A.M., Standard Time

Agent Name   MARSH USA INC.

Agent No.   73797-000

## ENDT A-BROAD FORM NAMED INSURED – MORE THAN 50% OWNERSHIP

ANY SUBSIDIARY COMPANY AS NOW FORMED OR CONSTITUTED, AND ANY OTHER COMPANY OVER WHICH THE NAMED INSURED HAS ACTIVE CONTROL SO LONG AS THE NAMED INSURED OR ANY SUBSIDIARY COMPANY HAS MORE THAN 50% OWNERSHIP INTEREST.

**U-GL-1114-A CW (10/02)**

AMAZON_00333

| | **Policy Number**<br>**GLO 7367714-01** |
|---|---|
| **ENDORSEMENT** | |
| **ZURICH AMERICAN INSURANCE COMPANY** | |

| Named Insured | AMAZON.COM, INC. | Effective Date: | 04-01-20 |
|---|---|---|---|
| | | 12:01 A.M., Standard Time | |
| Agent Name | MARSH USA INC. | Agent No. | 73797-000 |

## ENDT F –ADDL INSD–AUTOMATIC OWNERS, LESSEES, CONTRACTORS

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.   SECTION II – WHO IS AN INSURED IS AMENDED TO INCLUDE AS AN ADDITIONAL INSURED ANY PERSON OR ORGANIZATION WHOM YOU ARE REQUIRED TO ADD AS AN ADDITIONAL INSURED ON THIS POLICY UNDER A WRITTEN CONTRACT OR WRITTEN AGREEMENT.  SUCH PERSON OR ORGANIZATION IS AN ADDITIONAL INSURED ONLY WITH RESPECT TO LIABILITY FOR "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" CAUSED, IN WHOLE OR IN PART, BY:

1.   YOUR ACTS OR OMISSIONS; OR

2.   THE ACTS OR OMISSIONS OF THOSE ACTING ON YOUR BEHALF, IN THE PERFORMANCE OF YOUR ONGOING OPERATIONS OR "YOUR WORK" AS INCLUDED IN THE "PRODUCTS-COMPLETED OPERATIONS HAZARD", WHICH IS THE SUBJECT OF THE WRITTEN CONTRACT OR WRITTEN AGREEMENT. HOWEVER, THE INSURANCE AFFORDED TO SUCH ADDITIONAL INSURED ONLY APPLIES TO THE EXTENT PERMITTED BY LAW.

B.   WITH RESPECT TO THE INSURANCE AFFORDED TO THESE ADDITIONAL INSUREDS, THE FOLLOWING ADDITIONAL EXCLUSION APPLIES:
THIS INSURANCE DOES NOT APPLY TO:

"BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" ARISING OUT OF THE RENDERING OF, OR FAILURE TO RENDER, ANY PROFESSIONAL ARCHITECTURAL, ENGINEERING OR SURVEYING SERVICES INCLUDING:

A.   THE PREPARING, APPROVING OR FAILING TO PREPARE OR APPROVE MAPS, SHOP DRAWINGS, OPINIONS, REPORTS, SURVEYS, FIELD ORDERS, CHANGE ORDERS OR DRAWINGS AND SPECIFICATIONS; OR

B.   SUPERVISORY, INSPECTION, ARCHITECTURAL OR ENGINEERING ACTIVITIES.

THIS EXCLUSION APPLIES EVEN IF THE CLAIMS AGAINST ANY INSURED ALLEGE NEGLIGENCE OR OTHER WRONGDOING IN THE SUPERVISION, HIRING, EMPLOYMENT, TRAINING OR MONITORING OF OTHERS BY THAT INSURED, IF THE "OCCURRENCE" WHICH CAUSED THE "BODILY INJURY" OR "PROPERTY DAMAGE", OR THE OFFENSE WHICH CAUSED THE "PERSONAL AND ADVERTISING INJURY", INVOLVED THE RENDERING OF OR THE FAILURE TO RENDER ANY PROFESSIONAL ARCHITECTURAL, ENGINEERING OR SURVEYING SERVICES.

C.   THE FOLLOWING IS ADDED TO PARAGRAPH 2. DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT OF SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS:
THE ADDITIONAL INSURED MUST SEE TO IT THAT:

1. WE ARE NOTIFIED AS SOON AS PRACTICABLE OF AN "OCCURRENCE" OR OFFENSE THAT MAY RESULT IN A CLAIM;

AMAZON_00333

AMAZON_00334

**Policy Number**
**GLO 7367714-01**

**ENDORSEMENT**

# ZURICH AMERICAN INSURANCE COMPANY

Named Insured   AMAZON.COM, INC.                    Effective Date:   04-01-20

12:01 A.M., Standard Time

Agent Name   MARSH USA INC.                    Agent No.   73797-000

## ENDT F –ADDL INSD–AUTOMATIC OWNERS, LESSEES, CONTRACTORS

2.  WE RECEIVE WRITTEN NOTICE OF A CLAIM OR "SUIT" AS SOON AS
    PRACTICABLE; AND

3.  A REQUEST FOR DEFENSE AND INDEMNITY OF THE CLAIM OR "SUIT"
    WILL PROMPTLY BE BROUGHT AGAINST ANY POLICY ISSUED BY ANOTHER
    INSURER UNDER WHICH THE ADDITIONAL INSURED MAY BE AN INSURED
    IN ANY CAPACITY.  THIS PROVISION DOES NOT APPLY TO INSURANCE
    ON WHICH THE ADDITIONAL INSURED IS A NAMED INSURED IF THE
    WRITTEN CONTRACT OR WRITTEN AGREEMENT REQUIRES THAT THIS
    COVERAGE BE PRIMARY AND NON-CONTRIBUTORY.

D.  FOR THE PURPOSES OF THE COVERAGE PROVIDED BY THIS ENDORSEMENT:

1.  THE FOLLOWING IS ADDED TO THE OTHER INSURANCE CONDITION OF
    SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS:
    PRIMARY AND NON CONTRIBUTORY INSURANCE
    THIS INSURANCE IS PRIMARY TO AND WILL NOT SEEK CONTRIBUTION
    FROM ANY OTHER INSURANCE AVAILABLE TO AN ADDITIONAL INSURED
    PROVIDED THAT:

    A.  THE ADDITIONAL INSURED IS A NAMED INSURED UNDER SUCH
        OTHER INSURANCE; AND

    B.  YOU ARE REQUIRED BY WRITTEN CONTRACT OR WRITTEN AGREEMENT
        THAT THIS INSURANCE BE PRIMARY AND NOT SEEK CONTRIBUTION
        FROM ANY OTHER INSURANCE AVAILABLE TO THE ADDITIONAL
        INSURED.

2.  THE FOLLOWING PARAGRAPH IS ADDED TO PARAGRAPH 4.B. OF THE
    OTHER INSURANCE CONDITION OF SECTION IV – COMMERCIAL GENERAL
    LIABILITY CONDITIONS:

    THIS INSURANCE IS EXCESS OVER:

    ANY OF THE OTHER INSURANCE, WHETHER PRIMARY, EXCESS,
    CONTINGENT OR ON ANY OTHER BASIS, AVAILABLE TO AN ADDITIONAL
    INSURED, IN WHICH THE ADDITIONAL INSURED ON OUR POLICY IS
    ALSO COVERED AS AN ADDITIONAL INSURED ON ANOTHER POLICY
    PROVIDING COVERAGE FOR THE SAME "OCCURRENCE", OFFENSE, CLAIM
    OR "SUIT".  THIS PROVISION DOES NOT APPLY TO ANY POLICY IN
    WHICH THE ADDITIONAL INSURED IS A NAMED INSURED ON SUCH OTHER
    POLICY AND WHERE OUR POLICY IS REQUIRED BY A WRITTEN CONTRACT
    OR WRITTEN AGREEMENT TO PROVIDE COVERAGE TO THE ADDITIONAL
    INSURED ON A PRIMARY AND NON-CONTRIBUTORY BASIS.

E.  THIS ENDORSEMENT DOES NOT APPLY TO AN ADDITIONAL INSURED WHICH
    HAS BEEN ADDED TO THIS POLICY BY AN ENDORSEMENT SHOWING THE
    ADDITIONAL INSURED IN A SCHEDULE OF ADDITIONAL INSUREDS, AND
    WHICH ENDORSEMENT APPLIES SPECIFICALLY TO THAT IDENTIFIED
    ADDITIONAL INSURED.

F.  WITH RESPECT TO THE INSURANCE AFFORDED TO THE ADDITIONAL INSUREDS
    UNDER THIS ENDORSEMENT, THE FOLLOWING IS ADDED TO SECTION III –
    LIMITS OF INSURANCE:

**U-GL-1114-A CW (10/02)**

AMAZON_00335

**Policy Number**
**GLO 7367714-01**

**ENDORSEMENT**

# ZURICH AMERICAN INSURANCE COMPANY

Named Insured  AMAZON.COM, INC.          Effective Date:  04-01-20

12:01 A.M., Standard Time

Agent Name   MARSH USA INC.          Agent No.  73797-000

### ENDT F —ADDL INSD—AUTOMATIC OWNERS, LESSEES, CONTRACTORS

THE MOST WE WILL PAY ON BEHALF OF THE ADDITIONAL INSURED IS THE AMOUNT OF INSURANCE:

1. REQUIRED BY THE WRITTEN CONTRACT OR WRITTEN AGREEMENT REFERENCED IN PARAGRAPH A. OF THIS ENDORSEMENT; OR
2. AVAILABLE UNDER THE APPLICABLE LIMITS OF INSURANCE SHOWN IN THE DECLARATIONS, WHICHEVER IS LESS.

THIS ENDORSEMENT SHALL NOT INCREASE THE APPLICABLE LIMITS OF INSURANCE SHOWN IN THE DECLARATIONS.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

**U-GL-1114-A CW (10/02)**

AMAZON_00335

AMAZON_00336

Endorsement G

# Additional Insured – Owners, Lessees Or Contractors – Scheduled Person Or Organization



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer No. | Add'l. Prem | Return Prem. |
|---|---|---|---|---|---|---|
| | | | | | | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**Named Insured**:  AMAZON.COM, INC.

**Address (including ZIP Code)**:  P.O. Box 81226

Seattle, WA 98108

This endorsement modifies insurance provided under the:

**Commercial General Liability Coverage Part**

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Covered Operations |
|---|---|
| ONLY THOSE WHERE REQUIRED BY WRITTEN CONTRACT | ONLY THOSE WHERE REQUIRED BY WRITTEN CONTRACT |
| | |

**A.** Section **II – Who Is An Insured** is amended to include as an additional insured the person or organization shown in the Schedule above, whom you are required to add as an additional insured on this policy under a written contract or written agreement. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**1.** Your acts or omissions; or

**2.** The acts or omissions of those acting on your behalf,

in the performance of  your ongoing operations or "your work" as included in the "products-completed operations hazard", which is the subject of the written contract or written agreement at the Location designated and described in the Schedule above.

However, the insurance afforded to such additional insured only applies to the extent permitted by law.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusion applies:

This insurance does not apply to:

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering or failure to render any professional architectural, engineering or surveying services including:

**a.** The preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**b.** Supervisory, inspection, architectural or engineering activities.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

AMAZON_00336

AMAZON_00337

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved, the rendering of or the failure to render any professional architectural, engineering or surveying services.

**C.** The following is added to Paragraph **2.** Duties In The Event Of Occurrence, Offense, Claim Or Suit of Section **IV – Commercial General Liability Conditions**:

The additional insured must see to it that:

**1.** We are notified as soon as practicable of an "occurrence" or offense that may result in a claim;

**2.** We receive written notice of a claim or "suit" as soon as practicable; and

**3.** A request for defense and indemnity of the claim or "suit" will promptly be brought against any policy issued by another insurer under which the additional insured may be an insured in any capacity.  This provision does not apply to insurance on which the additional insured is a Named Insured, if the written contract or written agreement requires that this coverage be primary and non-contributory.

**D.** For the purpose of the coverage provided by this endorsement:

**1.** The following is added to the Other Insurance Condition of Section **IV – Commercial General Liability Conditions**:

**Primary and Noncontributory insurance**

This Insurance is primary to and will not seek contribution from any other insurance available to an additional insured provided that:

**a.** The additional insured is a Named Insured under such other insurance; and

**b.** You are required by written contract or written agreement that this insurance be primary and not seek contribution from any other insurance available to the additional insured.

**2.** The following paragraph is added to Paragraph **4.b.** of the Other Insurance Condition of Section **IV – Commercial General Liability Conditions**:

This insurance is excess over:

Any of the other insurance, whether primary, excess, contingent or on any other basis, available to an additional insured, in which the additional insured on our policy is also covered as an additional insured on another policy providing coverage for the same "occurrence", offense, claim or "suit".  This provision does not apply to any policy in which the additional insured is a Named Insured on such other policy and where our policy is required by written contract or written agreement to provide coverage to the additional insured on a primary and non-contributory basis.

**E.** With respect to the insurance afforded to the additional insureds under this endorsement, the following is added to Section **III – Limits Of Insurance**:

The most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement referenced in Paragraph **A.** of this endorsement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations,

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

All other terms and conditions of this policy remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

AMAZON_00338

COMMERCIAL GENERAL LIABILITY
CG 00 01 04 13

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

© Insurance Services Office, Inc., 2012
AMAZON_00338

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1), (2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

 © Insurance Services Office, Inc., 2012

AMAZON_00340

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

AMAZON_00340

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

AMAZON_00342

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

AMAZON_00342

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement**

   **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

   **b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions**

   This insurance does not apply to:

   **a. Knowing Violation Of Rights Of Another**

   "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

   **b. Material Published With Knowledge Of Falsity**

   "Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

   **c. Material Published Prior To Policy Period**

   "Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

   **d. Criminal Acts**

   "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

   **e. Contractual Liability**

   "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

   **f. Breach Of Contract**

   "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

   **g. Quality Or Performance Of Goods – Failure To Conform To Statements**

   "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

   **h. Wrong Description Of Prices**

   "Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

AMAZON_00344

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

AMAZON_00344

**COVERAGE C — MEDICAL PAYMENTS**

1. **Insuring Agreement**

   a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations;

      provided that:

         (a) The accident takes place in the "coverage territory" and during the policy period;

         (b) The expenses are incurred and reported to us within one year of the date of the accident; and

         (c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

   b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

      (1) First aid administered at the time of an accident;

      (2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

      (3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

   We will not pay expenses for "bodily injury":

   a. **Any Insured**

      To any insured, except "volunteer workers".

   b. **Hired Person**

      To a person hired to do work for or on behalf of any insured or a tenant of any insured.

   c. **Injury On Normally Occupied Premises**

      To a person injured on that part of premises you own or rent that the person normally occupies.

   d. **Workers' Compensation And Similar Laws**

      To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

   e. **Athletics Activities**

      To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

   f. **Products-Completed Operations Hazard**

      Included within the "products-completed operations hazard".

   g. **Coverage A Exclusions**

      Excluded under Coverage **A.**

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

© Insurance Services Office, Inc., 2012

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III — LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   **a.** Damages under Coverage **A;** and

   **b.** Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   **(1)** How, when and where the "occurrence" or offense took place;

   **(2)** The names and addresses of any injured persons and witnesses; and

   **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

   **b.** If a claim is made or "suit" is brought against any insured, you must:

   **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

   **(2)** Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   **c.** You and any other involved insured must:

   **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   **(2)** Authorize us to obtain records and other information;

   **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

   **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

## 7. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

## 8. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

## 9. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

AMAZON_00352

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

  **(a)** Snow removal;

  **(b)** Road maintenance, but not construction or resurfacing; or

  **(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

  **a.** False arrest, detention or imprisonment;

  **b.** Malicious prosecution;

  **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

  **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

  **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

  **f.** The use of another's advertising idea in your "advertisement"; or

  **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

  **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    **(1)** Products that are still in your physical possession; or

    **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

      **(a)** When all of the work called for in your contract has been completed.

      **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

      **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  **b.** Does not include "bodily injury" or "property damage" arising out of:

    **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

    **(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

  **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

AMAZON_00352

AMAZON_00353

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

　a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

　b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

　a. Means:

　　(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

　　　(a) You;

　　　(b) Others trading under your name; or

　　　(c) A person or organization whose business or assets you have acquired; and

　　(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

　b. Includes:

　　(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

　　(2) The providing of or failure to provide warnings or instructions.

　c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

　a. Means:

　　(1) Work or operations performed by you or on your behalf; and

　　(2) Materials, parts or equipment furnished in connection with such work or operations.

　b. Includes:

　　(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

　　(2) The providing of or failure to provide warnings or instructions.

AMAZON_00353

AMAZON_00354

# Bodily Injury Redefined

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| GLO 7367714-01 | 04/01/2020 | 04/01/2021 | | 73797000 | $ ▮▮▮ | $ |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the:

**Commercial General Liability Coverage Form**

The definition of "bodily injury" in SECTION V – DEFINITIONS is replaced by the following:

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person.  This includes mental anguish, mental injury, shock, fright or death resulting from bodily injury, sickness or disease.

AMAZON_00355

# Broad Form Additional Insured Coverage – Owners, Lessees Or Contractors – Scheduled Person or Organization



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer No. | Add'l. Prem | Return Prem. |
|---|---|---|---|---|---|---|
| GLO 7367714-01 | 04/01/2020 | 04/01/2021 | | 73797000 | ■ | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the:

**Commercial General Liability Coverage Part**

| Name Of Additional Insured Person(s) Or Organization(s): | Location And Description Of Covered Operations |
|---|---|
| ONLY THOSE WEHRE REQUIRED BY WRITTEN CONTRACT | ONLY THOSE WHERE REQUIRED BY WRITTEN CONTRACT |

**A.** Section **II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule of this endorsement.

**B.** The insurance provided to the additional insured shown in the Schedule of this endorsement applies only to "bodily injury", "property damage" or "personal and advertising injury" covered under Section **I – Coverage A – Bodily Injury And Property Damage Liability** and Section **I – Coverage B – Personal And Advertising Injury Liability**, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused:

**1.** In whole or in part by your acts or omissions or the acts omissions of those acting on your behalf; or

**2.** Unless prohibited by law, solely by acts or omissions of such additional insured, if coverage for sole acts or omissions of the additional insured is required by written contract or written agreement,

and resulting from:

**a.** Your ongoing operations; or

**b.** "Your work" completed as included in the "products-completed operations hazard",

performed for the additional insured at the location designated and described in the Schedule of this endorsement.

However,

1. The Insurance afforded to such additional insured:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
AMAZON_00355

AMAZON_00356

Only applies to the extent permitted by law; and

    **a.**    Will not apply to any insurance coverage that is not provided to you in this policy; and

**2.**  If coverage provided to the additional insured is required by a written contract or written agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the written contract or written agreement to provide for such additional insured.

**C.**  With respect to the insurance afforded to the additional insured shown in the Schedule of this endorsement the following additional exclusion applies:

This insurance does not apply to:

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering or failure to render any professional architectural, engineering or surveying services including:

    **a.**    The preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

    **b.**    Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or the failure to render any professional architectural, engineering or surveying services.

**D.**  The additional insured shown in the Schedule of this endorsement must see to it that:

**1.**  We are notified as soon as practicable of an "occurrence" or offense that may result in a claim;

**2.**  We receive written notice of a claim or "suit" as soon as practicable; and

**3.**  A request for defense and indemnity of the claim or "suit" will promptly be brought against any policy issued by another insurer under which such additional insured may be an insured in any capacity.  This provision does not apply to insurance on which the additional insured is a Named Insured, if the written contract or written agreement requires that this insurance be primary and non-contributory.

**E.**  For purposes of the coverage provided by this endorsement:

**1.**  The following is added to the **Other Insurance** Condition under Section **IV – Commercial General Liability Conditions**:

**Primary and Noncontributory insurance**

This Insurance is primary to and will not seek contribution from any other insurance available to an additional insured under this endorsement provided that:

    **a.**    The additional insured is a Named Insured under such other insurance; and

    **b.**    You are required by a written contract or written agreement that this insurance be primary and not seek contribution from any other insurance available to the additional insured.

**2.**  The following paragraph is added to Paragraph **4.b.** of the **Other Insurance** Condition under Section **IV – Commercial General Liability Conditions**:

This insurance is excess over:

Any of the other insurance, whether primary, excess, contingent or on any other basis, available to an additional insured, in which the additional insured on our policy is also covered as an additional insured on another policy providing coverage for the same "occurrence", offense, claim or "suit".  This provision does not apply to any policy in which the additional insured is a Named Insured on such other policy and where our policy is required by a written contract or written agreement to provide coverage to the additional insured on a primary and non-contributory basis.

**F.**  With respect to the insurance afforded to the additional insured(s) under this endorsement, the following is added to Section **III – Limits Of Insurance**:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
AMAZON_00356

AMAZON_00357

If coverage provided to the additional insured is required by a written contract or written agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the written contract or written agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations,

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

All other terms and conditions of this policy remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

AMAZON_00357

AMAZON_00358

POLICY NUMBER: GLO 7367714-01

**COMMERCIAL GENERAL LIABILITY**
**CG 20 11 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Designation Of Premises (Part Leased To You):**<br>ALL LEASED PREMISES |
| **Name of Person(s) Or Organization(s) (Additional Insured):**<br>ANY PERSON OR ORGANIZATION TO WHOM OR TO WHICH YOU ARE REQUIRED TO PROVIDE ADDITIONAL INSURED STATUS IN A WRITTEN CONTRACT OR WRITTEN AGREEMENT EXECUTED PRIOR TO LOSS, EXCEPT WHERE SUCH CONTRACT OR AGREEMENT IS PROHIBITED BY LAW. |
| **Additional Premium:**          **INCL.** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

AMAZON_00358

AMAZON_00359

**A.** **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

**1.** Any "occurrence" which takes place after you cease to be a tenant in that premises.

**2.** Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

     © Insurance Services Office, Inc., 2012     CG 20 11 04 13

AMAZON_00359



# Self Insured Retention – With Qualifying Deductible Amount

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. | |
|---|---|
| Policy No. GLO 7367714-01 | **Effective Date:** 04/01/2020 |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the:

**Commercial General Liability Coverage Part**
**Employee Benefits Liability Coverage Part**
**Liquor Liability Coverage Part**
**Stop Gap Employers Liability Coverage Part**

**Under the provisions of this endorsement, you are responsible for payment of all or part of "defense costs" and "self insured retention".**

## SCHEDULE – SELF INSURED RETENTION AMOUNTS

| You may select only one choice of **Option 1**, **2**, **3** or **4** below.  In addition, **Option 5** may or may not be selected. | | |
|---|---|---|
| ☐ **Option 1** | $ | **Per Incident – You Pay Defense Costs Within SIR** |
| ☒ **Option 2** | $ 2,000,000 | **Per Incident – You Pay All Defense Costs** |
| ☐ **Option 3** | $ | **Per Incident – All Incidents Other Than Products-Completed Operations – You Pay Defense Costs Within SIR** |
| | $ | **Per Incident – Products-Completed Operations Incidents Only – You Pay Defense Costs Within SIR** |
| | If only one amount is shown, that same amount also applies as respects the **Option 3** Self Insured Retention Amount not shown. | |
| ☐ **Option 4** | $ | **Per Incident – All Incidents Other Than Products-Completed Operations – You Pay All Defense Costs** |
| | $ | **Per Incident – Products-Completed Operations Incidents Only – You Pay All Defense Costs** |
| | If only one amount is shown, that same amount also applies as respects the **Option 4** Self Insured Retention Amount not shown. | |
| If no Self Insured Retention Amount(s) is shown above for **Option 1**, **2**, **3** or **4**, **Option 1 – Per Incident – You Pay Defense Costs Within SIR** for an amount of $1,000,000 is deemed to be selected. | | |

Includes copyrighted material of Insurance Services Office, Inc., with its permission. AMAZON_00360

AMAZON_00361

| | | |
|---|---|---|
| ☐ **Option 5** | $ | **Aggregate – Adjustable**<br>Based on a rate of $          per          (units) of          (exposure)<br>*Example:  based on a rate of $3.00 per $100 of  WC Payroll* |
| | $ | **Minimum Aggregate** |
| | | OR |
| ☐ **Option 5** | $ | **Aggregate – Flat** |
| | **Periodic Reporting Requirement**<br>(If no information is provided at left, the reporting requirement is quarterly.) |
| 50 % | **Level of Notification of Potential Penetration as a % of the Self Insured Retention** (If no percentage information is provided at left, 25% applies.) |
| SEDGWICK CSM & GALLAGHER BASSETT | **Authorized Claim Service Provider** |

The insurance provided by this policy is subject to the following additional provisions, which in the event of conflict with any other provisions elsewhere in the policy, shall control the application of the insurance to which this endorsement applies:

**I.   Your Obligations – Self Insured Retention**

    **A.**   The Self Insured Retention (SIR) Amount(s) shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement apply as follows:

        **1.   Option 1 Per Incident – You Pay Defense Costs Within SIR**

        If **Option 1** is selected, it is a condition precedent to our liability that you make actual payment of "self insured retention" and "defense costs" for each "incident", until you have paid "self insured retention" and "defense costs" equal to the **Per Incident – You Pay Defense Costs Within SIR** amount, subject to the provisions of Paragraph **A.5.** below.

        The **Per Incident – You Pay Defense Costs Within SIR** amount is the most you will pay for "self insured retention" and "defense costs" arising out of each "incident", regardless of:

        **a.**   The number of persons or organizations making claims or bringing "suits" because of the "incident"; or

        **b.**   The number of coverages applicable to the "incident" under this policy,

        except for any "defense costs" we may elect to pay.

        If any final judgment or settlement and "defense costs" are less than such Self Insured Retention Amount(s), we shall have no obligation to pay "self insured retention" or "defense costs" under this policy.

        **2.   Option 2 Per Incident – You Pay All Defense Costs**

        If **Option 2** is selected, it is a condition precedent to our liability that you make actual payment of "self insured retention" for each "incident", until you have paid "self insured retention" equal to the **Per Incident – You Pay All Defense Costs** amount, subject to the provisions of Paragraph **A.5.** below.

        The **Per Incident – You Pay All Defense Costs** amount is the most you will pay for "self insured retention" arising out of each "incident", regardless of:

        **a.**   The number of persons or organizations making claims or bringing "suits" because of the "incident"; or

        **b.**   The number of coverages applicable to the "incident".

        Under this **Option 2**, you are also obligated to pay all "defense costs", both within and excess of the Self Insured Retention Amount, except for any "defense costs" we may elect to pay.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

AMAZON_00361

3. **Option 3 Per Incident – You Pay Defense Costs Within SIR**

   If **Option 3** is selected, it is a condition precedent to our liability that you make actual payment of "self insured retention" and "defense costs" for each "incident", until you have paid "self insured retention" and "defense costs" equal to the:

   a. **Per Incident – All Incidents Other Than Products-Completed Operations – You Pay Defense Costs Within SIR** amount; or

   b. **Per Incident – Products-Completed Operations Incidents Only – You Pay Defense Costs Within SIR** amount,

   subject to the provisions of Paragraph **A.5.** below.

   The **Per Incident – All Incidents Other Than Products-Completed Operations – You Pay Defense Costs Within SIR** amount is the most you will pay for "self insured retention" and "defense costs" arising out of each "incident", regardless of the number of persons or organizations making claims or bringing "suits" because of the "incident" or the number of coverages, other than "products-completed operations hazard" coverage, applicable to the "incident", except for any "defense costs" we may elect to pay.

   The **Per Incident – Products-Completed Operations Incidents Only – You Pay Defense Costs Within SIR** amount is the most you will pay for "self insured retention" and "defense costs" arising out of each "products-completed operations hazard" "incident", regardless of the number of persons or organizations making claims or bringing "suits" because of the "incident", except for any "defense costs" we may elect to pay.

   If any final judgment or settlement and "defense costs" are less than such Self Insured Retention Amount(s), we shall have no obligation to pay "self insured retention" or "defense costs" under this policy.

4. **Option 4 Per Incident – You Pay All Defense Costs**

   If **Option 4** is selected, it is a condition precedent to our liability that you make actual payment of "self insured retention" for each "incident", until you have paid "self insured retention" equal to the:

   a. **Per Incident – All Incidents Other Than Products-Completed Operations – You Pay All Defense Costs** amount; or

   b. **Per Incident – Products-Completed Operations Incidents Only– You Pay All Defense Costs** amount,

   subject to the provisions of Paragraph **A.5.** below.

   The **Per Incident – All Incidents Other Than Products-Completed Operations – You Pay All Defense Costs** amount is the most you will pay for "self insured retention" arising out of each "incident", regardless of the number of persons or organizations making claims or bringing "suits" because of the "incident" or the number of coverages, other than "products-completed operations hazard" coverage, applicable to the "incident".

   The **Per Incident – Products-Completed Operations Incidents Only– You Pay All Defense Costs** amount is the most you will pay for "self insured retention" arising out of each "products-completed operations hazard" "incident", regardless of the number of persons or organizations making claims or bringing "suits" because of the "incident".

   Under this **Option 4**, you are also obligated to pay all "defense costs", both within and excess of the Self Insured Retention Amount, except for any "defense costs" we may elect to pay.

5. **Aggregate Amount**

   a. If **Option 5** is selected as respects Paragraphs **A.1.** or **A.3.** above, it is a condition precedent to our liability that you make actual payment of "self insured retention" and "defense costs" equal to the aggregate amount. When you have paid "self insured retention" and "defense costs" equal to the aggregate amount, we will pay any further "self insured retention" and "defense costs" incurred during the remainder of the policy period. Such aggregate amount is the most you will pay for all "self insured retention" and "defense costs" incurred under this policy, subject to Paragraphs **c.(1)** or **(2)** below, whichever is applicable.

   b. If **Option 5** is selected as respects Paragraphs **A.2.** or **A.4.** above, it is a condition precedent to our liability that you make actual payment of "self insured retention" equal to the aggregate amount. When you have paid "self insured retention" equal to the aggregate amount, we will pay any further "self insured retention"

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

AMAZON_00363

incurred during the remainder of the policy period.  This aggregate amount, however, applies only to your total incurred "self insured retention" during the policy period and does not apply to your continued obligation for payment of "defense costs".  Such aggregate amount is the most you will pay for all "self insured retention" incurred under this policy, subject to Paragraphs **c.(1)** or **(2)** below, whichever is applicable.

**c.** **(1)** If an **Aggregate – Adjustable** amount is shown, the final aggregate amount will be determined at the end of the policy period by an audit of your records.  Such audit will be based on the rate shown under the **Aggregate – Adjustable** amount multiplied by the final audited exposure.  The amount shown as the **Aggregate – Adjustable** amount is an estimated amount that will be finalized based on what the audit of your records will develop.

In no event will the final audited aggregate amount be less than the **Aggregate – Adjustable** amount, shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS**, unless a **Minimum Aggregate** amount is shown.  If a **Minimum Aggregate** amount is shown, the final audited **Aggregate – Adjustable** amount will not be less than the **Minimum Aggregate** amount.

**(2)** If an **Aggregate – Flat** amount is shown, such amount is the final applicable aggregate amount, which will not be adjusted.

If no entry appears in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement as an aggregate amount, then your obligation for payment of "self insured retention" and "defense costs" applies only in accordance with the selected Paragraph **A.1.**, **A.2.**, **A.3.** or **A.4.** above.

**B. Payments By Others**

Payments by others, including but not limited to additional insureds or insurers, do not serve to satisfy your "self insured retention" obligations or your obligations for payment of "defense costs". However, the foregoing does not apply to any "qualifying deductible amount."

**C. Deductible Provisions**

Deductible provisions apply in addition to, but do not serve to satisfy the "self insured retention" requirements of this endorsement.  You must satisfy the "self insured retention" requirements of this endorsement prior to the application of any separate deductible provisions provided under this policy.

**D. Other Self Insured Retention Provisions**

**1.** The Self Insured Retention Amount(s) shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months.  In that case, the additional period will be deemed part of the last preceding period for purposes of determining the applicable Self Insured Retention Amount(s).

**2.** Your obligation to pay the Self Insured Retention Amount(s) is not fulfilled by:

**a.** The payment of "self insured retention" under any other policy; or

**b.** Any payment made by us or another insurance company,

even if the payments described under Paragraph **2.a.** or **2.b.** apply to the same "incident" associated with the "self insured retention" amount due under this policy. However, this Paragraph **2.** does not apply to any "qualifying deductible amount."

**3.** If more than one policy issued by us provides sums payable because of covered damages sustained from a single continuous covered "incident", it is a condition precedent to our liability for payment of these covered damages that you first shall pay all applicable "self insured retention" of each policy for which coverage applies to the continuous "incident".

**E. Your Insolvency or Bankruptcy**

To the fullest extent allowable by law, your satisfaction of the "self insured retention" and any applicable "defense costs", as a condition precedent to our liability, applies regardless of your insolvency or bankruptcy.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
AMAZON_00363

**F.   Settlement of Claim**

You may not settle any claim or "suit" which exceeds the Self Insured Retention Amount(s) shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement without our written permission to do so.  If you fail to obtain such written permission, we shall have no obligation to provide coverage for that claim or "suit" under this policy.

**G.   Authorized Claim Service Provider**

   **1.**   You shall employ a claim service provider acceptable to us, as shown in the **Authorized Claim Service Provider** of the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement for the purpose of providing claim services for settlement of losses.  You shall pay all fees, charges and costs of the claim service provider in addition to "self insured retention" and applicable "defense costs", without any reimbursement from us.

   **2.**   In the event of cancellation, expiration or revision of the claims service contract between you and the claim service provider, you shall notify us within 10 days of such change and shall replace the claim service provider with another claim service provider that is acceptable to us.

   **3.**   You shall allow us to audit the claim service provider and provide supervisory claim service, at our expense.

**H.   Notification of Potential Penetration**

   **1.**   You shall see to it that we are notified promptly of an "incident" which may result in a claim under this policy.  Notice must include:

      **a.**   How, when and where the "incident" took place;

      **b.**   The names and addresses of any injured persons and witnesses; and

      **c.**   The nature and location of any injury or damage arising out of the "incident".

   **2.**   You shall notify us promptly, per Paragraph **H.1.** above, in the event of any "incident", without regard to liability, which results in any of the following injuries or damages:

      **a.**   **(1)**  Death;

         **(2)**  Brain damage;

         **(3)**  Paraplegic or quadriplegic impairment;

         **(4)**  Amputation or serious functional impairment of any major limb;

         **(5)**  Severe burns involving more than 25% of the body or causing serious disfigurement;

         **(6)**  Sensory impairment (sight, hearing, taste or smell);

         **(7)**  Severe internal body organ damage or loss;

         **(8)**  Multiple fractures involving more than one body part;

         **(9)**  Permanent and total disability;

         **(10)** Sexual abuse or molestation;

         **(11)** Significant psychological / neurological involvement;

         **(12)** Occupational disease; or

      **b.**   Any construction defect damages arising from attached housing such as condominiums, townhomes or from multiple structures.

   **3.**   You must notify us promptly of any:

      **a.**   **(1)**  Potential exposure;

         **(2)**  Loss reserve established; or

         **(3)**  Potential judgment, without regard to liability,

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

AMAZON_00365

which equals or exceeds the **Level of Notification of Potential Penetration as a % of the Self Insured Retention** percentage amount shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement; or

**b.** "Suit", in the event a "suit" is filed, even if the amount claimed in the "suit" is unspecified or less than the Self Insured Retention Amount(s).

**I.  Reporting - Self Insured Retention**

**1.** You must report claims or "suits" per the following:

You must monitor the cumulative "self insured retention" and "defense costs" sustained and report those total amounts to us in accordance with the frequency of report indicated in the **Periodic Reporting Requirement** of the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement.  However, if the total of all "self insured retention" and "defense costs" under **Options 1** or **3** or the total of all "self insured retention" under **Options 2** or **4** should at any time during the policy period attain an amount equal to 75% of the **Aggregate – Adjustable** amount or **Aggregate – Flat** amount, if applicable, you are required in that event to make an immediate report to us as to total "self insured retention" and "defense costs" sustained at that time.

The periodic report that you send to us must be in a format that is acceptable to us, and include an accounting of all individual losses and "defense costs" incurred as of the date of the report.

**2.** Within 45 days after the end of the policy term, you must give us a listing of all existing claims or "suits" within the Self Insured Retention Amounts.  At a minimum, such listing will include the following for each claim or "suit":

**a.** A description of each claim or "suit";

**b.** The date of the "incident";

**c.** The amounts paid and reserved for future payments for loss and "defense costs"; and

**d.** The current status of the claim or "suit".

**3.** Quarterly thereafter, you are required to give us an updated listing of the status of all new and existing claims or "suits", both paid and reserved, until all claims and "suits" for the policy period are closed or settled.

**4.** Compliance with the reporting requirements set forth in this endorsement is a condition precedent to coverage.

**J.  Representations**

By acceptance of this policy you agree that you will not procure insurance for all or any part of the Self Insured Retention Amounts shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement.  If such insurance is procured, there will be no coverage under this policy as respects those Self Insured Retention Amounts.

**II.  Our Rights and Obligations Excess of the Self Insured Retention**

**A.  Self Insured Retention – Your Failure to Respond**

In the event of your refusal to respond to your obligations for the payment of "self insured retention" or "defense costs" for any reason, we shall not make payments for you, nor in any event shall we be required to substitute for you as respects your responsibility for payment of these "self insured retention" or "defense costs".

**B.  Damages/Defense Costs Excess of the Self Insured Retention – Per Incident**

We shall be liable only for the amount of covered damages and if applicable, "defense costs" in excess of the Self Insured Retention Amount(s) shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement, subject to the Limits of Insurance and other applicable provisions of our policy.  We shall have no obligations under this policy unless you have satisfied your "self insured retention" obligations.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

AMAZON_00365

AMAZON_00366

**C. Damages/Defense Costs Excess of the Self Insured Retention - Aggregate**

If an **Aggregate – Adjustable** amount or **Aggregate – Flat** amount is shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement, we shall be liable for the amount of covered damages and if applicable, "defense costs" excess of such aggregate amount, subject to the Limits of Insurance and other applicable provisions of our policy.  We shall have no obligations under this policy unless you have satisfied your "self insured retention" obligations.

**D. Settlement of Claims**

**1.** When your liability is reasonably anticipated to exceed the remaining Self Insured Retention Amount(s), we shall have, at our option, the right to ask you to tender the remaining Self Insured Retention Amount(s) and have the right to negotiate the settlement of any claim.  We shall obtain your consent prior to entering into any settlement of any claim which is equal to or less than the Self Insured Retention Amount(s).

If, however, you refuse to consent to any settlement recommended by us within the "self insured retention" and elect to contest the claim or continue with any legal proceedings in connection with such claim, our liability for that claim shall not exceed the amount determined by subtracting the "self insured retention" from the amount for which the claim could have been settled on the date you refused to consent.  We shall have no liability with respect to such claim if this difference is zero or a negative number.

For Paragraphs **A.1.** and **A.3.** under **I. Your Obligations – Self Insured Retention**, we shall have no responsibility for "defense costs" incurred after the date you refused to consent.

**2.** With respect to any claim under this insurance which has been tendered to us and which may exceed the Self Insured Retention Amount(s), we may pay any or all of the Self Insured Retention Amount(s) on your behalf to defend or to effect settlement of such claim.  Such amount paid by us shall be reimbursed promptly by you.

**3.** At our expense, we shall have the right, but not the duty to associate counsel and you have the duty to cooperate with any counsel we associate on a case, regardless of whether the covered damages or "defense costs" for which coverage is provided under this policy appear likely to exceed the Self Insured Retention Amount(s) shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement.

**E. Application of Recovered Amounts**

We have your rights and the rights of persons entitled to the benefits of this insurance to recover sums that are reimbursable under this endorsement and any "self insured retention" and "defense costs" from anyone liable for the injury or covered damages.  You will do everything necessary to protect those rights for us and to help us enforce them.

If we recover any payment made under this policy from anyone liable for injury or covered damages, the recovered amount will first be applied to any payments made by us in excess of the Self Insured Retention Amount(s) shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement.  The remainder of the recovery, if any, will then be applied to reduce the "self insured retention" and "defense costs" reimbursed or reimbursable by you as respects that injury or covered damages.

**III. Midterm Cancellation**

In the event of a midterm cancellation of this policy, **Option 5 – Aggregate – Adjustable** amount or **Aggregate – Flat** amount shown in the **SCHEDULE – SELF INSURED RETENTION AMOUNTS** of this endorsement is not subject to any pro rata reduction.  Such aggregate amount will apply as if the policy term had not been shortened.

**IV. Definitions**

The following words and phrases that appear in quotation marks have special meaning and are additional definitions that apply solely to this endorsement:

**A.** "Defense Costs" means:

Expenses directly allocable to specific claims and shall include but not be limited to all Supplementary Payments as defined under the policy; all court costs, fees and expenses; costs for all attorneys, witnesses, experts, depositions, reported or recorded statements, summonses, service of process, legal transcripts or testimony, copies of any public records; alternative dispute resolution; interest; investigative services, medical examinations, autopsies, medical costs containment, declaratory judgment, subrogation and any other fees, costs or expenses

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
AMAZON_00366

AMAZON_00367

reasonably chargeable to the investigation, negotiation, settlement or defense of a claim or a loss under the policy. However, the fees, charges and costs of a claim service provider are not considered "defense costs".

**B.** "Incident" means:

As defined or used in our policy, an "occurrence", offense, claim, accident, act, error or omission, common cause, disease or any other such event that is or is alleged to be the cause or result of a loss involving the:

**1.** Liability coverages; or

**2.** Medical expenses,

of our policy and to which a "self insured retention" applies.

**C.** "Qualifying deductible amount" means the Deductible Amount for all sums payable sustained by one or more persons or organizations, for which coverage is provided under policy no. **GLO 6951376** issued to **Amazon Logistics, Inc.,** so long as such Deductible Amount or Deductible Amounts relate to any "occurrence", offense, claim, accident, act, error or omission, common cause, disease or any other event, as defined or used in such policy.

**D.** "Self insured retention" means:

**1.** The amount or amounts which:

    **a.** You must pay for all covered damages which you or any insured shall become legally obligated to pay; and

    **b.** You pay for medical expenses,

for which coverage is provided under this policy, sustained by one or more persons or organizations; or

**2.** Any "qualifying deductible amount".

All other terms and conditions of this policy remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
AMAZON_00367

Exhibit "B"

AMAZON_00006
CONFIDENTIAL
DPL4

**LEASE AGREEMENT ("Lease")**
(1 Geoffrey Drive, Falls Township, Bucks County, Pennsylvania)

<u>CERTAIN TERMS AND DEFINITIONS</u>

| | |
|---|---|
| **"Landlord":** | AG-EIP 1 Geoffrey Drive, L.L.C., a Delaware limited liability company. |
| **"Tenant":** | Amazon.com Services LLC, a Delaware limited liability company. |
| **"Effective Date":** | Defined on the signature page. |
| **"Building":** | The building consisting of approximately 415,000 square feet and commonly known as 1 Geoffrey Drive, Falls Township, Pennsylvania as depicted on **Exhibit A**. Any mezzanine or floors added to the Building will not be included in the square footage of the Premises. |
| **"Land":** | The land described on **Exhibit A-1**. |
| **"Premises":** | The Land and the Building, as depicted on **Exhibit A**. |
| **"Tenant's Proportionate Share":** | 100% of the Premises. |
| **"Lease Term":** | From the Commencement Date (defined below) through February 28, 2022, subject to the extension and termination rights set forth in this Lease. |
| **"Base Rent":** | See **Base Rent and Operating Expense Exclusions, Addendum 1**. |
| **"Initial Annual Estimated Operating Expense Payments":** | $1.15 per square foot of the Building. |
| **"Brokers":** | Jones Lang LaSalle for Landlord and Avison Young and KBC Advisors for Tenant. |
| **"Work"; "Initial Improvements":** | Defined in **Work Letter, Addendum 5**. |
| **"Lender":** | Bank of America, N.A. |
| **"Tenant Guarantor":** | Amazon.com, Inc. |
| **"Permitted Exceptions":** | The encumbrances affecting the Land identified on **Exhibit B**, and any additional matters permitted under Section 1(a). |

| | | |
|---|---|---|
| **Addenda (incorporated into this Lease by this reference):** | 1 | Base Rent and Operating Expense Exclusions |
| | 2 | Extension Options |
| | 3 | Additional Terms and Conditions |
| | 4 | Notice Addresses |
| | 5 | Work Letter |

| | | |
|---|---|---|
| **Exhibits (incorporated into this Lease by this reference):** | A | Site Plan for Premises |
| | A-1 | Legal Description of Land |
| | B | Permitted Exceptions |
| | C | Form of Notice of Lease Term Dates |
| | D | Maintenance Obligations |
| | E | Form of Estoppel Certificate |
| | F | Intentionally Deleted |
| | G | Intentionally Deleted |
| | H | Form of Limited Parent Guaranty |
| | I | Form of Visitor NDA |

1. **Grant; Permitted Exceptions; Commencement Date; Notice of Lease Term Dates; Cooperation**.

(a) Grant; Permitted Exceptions. Landlord leases to Tenant, for the Lease Term, the Premises. Landlord will promptly provide copies of all notices it receives of potential or actual default under the Permitted Exceptions, except for notices from Landlord's lenders. Landlord will not voluntarily encumber or permit the Premises to be encumbered, or modify



AMAZON_00007
CONFIDENTIAL
DPL4

any Permitted Exceptions, in a manner that would materially affect Tenant's use or operations or increase Tenant's costs, without Tenant's prior consent (provided no Tenant consent is required with respect to Landlord's financing, subject to Section 27). If Tenant does not respond to such request within twenty (20) days, then Landlord may send **Tenant an additional copy of the notice stating "FAILURE TO RESPOND WITHIN 5 BUSINESS DAYS WILL CONSTITUTE DEEMED APPROVAL**," and, if Tenant does not respond within five (5) Business Days, the request will be deemed approved.  Upon request of Landlord, Tenant shall enter into a written agreement confirming that this Lease is subordinate to any encumbrance entered into by Landlord after the Effective Date pursuant to this Section 1(a), provided, however, that Tenant's obligation to enter into a subordination agreement relating to any mortgage shall be governed by Section 27).

(b)      Commencement Date; Notice of Lease Term Dates. The "Commencement Date" is the earlier of (i) the date Tenant occupies any portion of the Premises for the purpose of conducting business or (ii) the later of (1) October 1, 2020 (the "Anticipated Commencement Date"), and (2) the actual date of Substantial Completion of the Work (defined in **Work Letter, Addendum 5**) or the date Substantial Completion would have occurred but for a Tenant Delay (defined in **Work Letter, Addendum 5**).  Following the Commencement Date, Landlord and Tenant will execute a Notice of Lease Term Dates in the form attached as **Exhibit C**. The term of this Lease for purposes of 11 U.S.C. § 365(h)(1)(A)(ii) or any similar federal or state bankruptcy laws will commence on the Effective Date, but measurement of its duration and the time for performance of obligations hereunder will be governed by the other provisions of this Lease. For the avoidance of doubt, the following actions by Tenant shall not be construed as "conducting business": i) testing equipment, ii) conducting product delivery tests, iii) onsite employee training, or iv) receipt of merchandise related to any of the foregoing Tenant activities.

(c)      Cooperation. At Tenant's request, Landlord will reasonably cooperate with Tenant as may be required for Tenant to obtain, maintain, or modify any approvals or Incentives (including cooperation in Tenant's filing of applications and reports, as well as entering into agreements with Authorities for Incentives), or to perform its obligations under this Lease ("Cooperation Efforts"). Cooperation Efforts may include execution of documents, making appearances, and taking other actions as Tenant may reasonably request, provided that Landlord shall not be obligated to incur any cost which is not reimbursed by Tenant or any liability in connection with Cooperation Efforts.  In any case when Landlord is obligated to perform Cooperation Efforts, all reasonable third-party costs incurred by Landlord in connection with its Cooperation Efforts will be reimbursed by Tenant within thirty (30) days of receipt of invoice, provided that Landlord will notify Tenant if Landlord anticipates that its third party costs will exceed $█████.

2.      **Condition of Premises**. Without limiting any of Landlord's obligations, representations, or warranties under this Lease, Tenant will accept the Premises in its condition as of the Commencement Date, provided that Landlord shall cause the Premises to conform to the delivery obligations in **Work Letter, Addendum 5**, and to be in good order and operating condition and in compliance with Legal Requirements as of the Commencement Date. Landlord represents and warrants to Tenant that (a) Landlord has the full right and power to execute and perform under this Lease; (b) Landlord is the sole fee simple owner of the Building and the Land, subject only to the Permitted Exceptions; (c) as of the Commencement Date, Landlord has no actual knowledge of any newly-enacted, pending, proposed, or threatened land use actions, condemnation proceedings, or litigation that would in any way prevent or inhibit Tenant's use of the Premises as contemplated by this Lease; (d) the Land constitutes a single tax lot; (e) the mortgage in favor of Lender dated December 14, 2018, and recorded December 24, 2018, in the public records of Bucks County, Pennsylvania, is the only mortgage encumbering the Building and the Land; and (f) Landlord is not in default under such mortgage or any loan document related thereto and there is no event or condition that, with the giving of notice or the passage of time, or both, would constitute a default by Landlord thereunder.  The term "mortgage" as used in this Lease will be deemed to include deeds of trust, security assignments, and any other similar encumbrances, and any reference to the "lienholder" of a mortgage will be deemed to include the beneficiary under a deed of trust.

3.      **Use**.

(a)      Permitted Uses. Tenant may use the Premises for the purpose of receiving, storing, assembling, shipping, distributing, preparing, selling, and serving as pick-up/drop-off location for products, materials, food, grocery, and liquor items; parking, storage, and use (including driving into and through the Building for loading, unloading and parking inside of the Building) of automobiles, trucks, machinery, and trailers, including outdoor loading and unloading; outdoor storage of Tenant's Property; printing; making products on demand; warehouse and office use; ancillary and related uses for any of the foregoing; and, so long as the named Tenant as of the Effective Date or any Tenant Affiliate is the tenant hereunder, any other use in compliance with Legal Requirements (provided that if the tenant hereunder is an unaffiliated Transferee, then any other use in compliance with Legal Requirements will be allowed, subject to Landlord's prior consent) (all of the above being "Permitted Uses"). Subject to compliance with the terms of this Lease, Tenant may use the Premises twenty-four (24) hours per day, every day. Landlord shall use reasonable efforts to enforce its rights, and shall perform its obligations, under agreements affecting the Premises to which Landlord is a party or under the Permitted Exceptions.  As Tenant or its affiliate is licensed to

AMAZON_00008
CONFIDENTIAL
DPL4

sell alcohol, certain restrictions apply to contracts with an entity that imports, manufactures, or distributes alcoholic beverages. During the Lease Term, if Landlord has a direct interest in any business that imports, manufactures, or distributes alcoholic beverages, Landlord will provide Cooperation Efforts with respect to applicable licensing requirements, specifically tied-house regulations.

(b)     Compliance with Legal Requirements. Subject to Landlord's obligations under this Lease, Tenant's use of the Premises will, at Tenant's sole cost, comply with all applicable then-current federal, state, county, and municipal statutes, ordinances, codes, rules, regulations, and requirements ("Legal Requirements"). Tenant shall be responsible for structural changes required by Legal Requirements that are applicable only by reason of Tenant's particular use of and operations at the Premises, or the construction of Initial Improvements or Tenant-Made Alterations, and Landlord shall remain responsible for compliance with Legal Requirements applicable generally to projects in the area, including structural changes to the Premises (such costs may be included as Operating Expenses to the extent permitted under Section 6). For example, Tenant would be responsible for structural changes to the Premises required only because of Tenant's food preparation activities, or for a Tenant-Made Alteration that includes the addition of an office, whereas Landlord would be required to perform structural changes to the Premises at its cost in order to comply with seismic modifications required under Legal Requirements for buildings located in a certain area. Compliance with Legal Requirements does not obligate Tenant to perform Landlord's maintenance obligations as set forth in Section 10.

4.      Base Rent. Tenant shall pay Base Rent on or before the first (1st) Business Day of each calendar month. The first (1st) payment of Base Rent is due within thirty (30) days after the later of (a) receipt of an invoice from Landlord; or (b) the Commencement Date.  Payments of Base Rent for any fractional calendar month will be prorated. Tenant shall have no right to abate, reduce, or set-off any Rent due hereunder except as may be expressly provided in this Lease. "Rent" means Base Rent and all other amounts payable by Tenant under this Lease.

5.      **Intentionally deleted.**

6.      **Operating Expenses.**

(a)     Payment of Operating Expenses. Together with Base Rent, Tenant will pay an amount equal to 1/12 of the annual estimated cost of Tenant's Proportionate Share of Operating Expenses (which estimate Landlord may revise not more than two (2) times per calendar year for Operating Expenses other than Taxes, and by providing at least thirty (30) days' notice before such revision becomes effective). Payments for any fractional year or month will be prorated. Subject to Section 6(b), "Operating Expenses" means all reasonable costs and expenses incurred by Landlord during the Lease Term with respect to operating, maintaining, and managing the Building and the Land (including those items listed on **Exhibit D** as "Landlord Maintenance Obligations – Recoverable"); Taxes and fees payable to tax professionals that do not exceed $2,500 in any calendar year; insurance; association charges (if applicable); water and sewer charges; costs and expenses payable by Landlord or assessed against the Land or Building pursuant to any restrictive covenants, declaration of easements or similar operating agreement (including, without limitation, costs and expenses relating to the maintenance and repair of common roadways and drainage facilities servicing the Premises); and annual fees payable to a property manager that do not exceed two percent (2%) of annual Base Rent (the "PM Fee Cap"), which is Landlord's sole compensation for management and administrative fees.

(b)     Operating Expense Exclusions; Controllable Operating Expense Cap. The items on **Base Rent and Operating Expense Exclusions, Addendum 1** are excluded from Operating Expenses. To the extent an Operating Expense will be incurred that relates solely to the Premises, is not covered under an existing contract, and is estimated to exceed $▓▓▓▓▓, Landlord shall obtain at least two (2) bids, and provide copies upon Tenant's request (except in an emergency, when no bidding is required). Landlord will not collect more from Tenant than Tenant's Proportionate Share of Operating Expense, except that Landlord may collect Excess Operating Expenses as set forth below. Tenant will not pay (i) Operating Expenses in the calendar year in which the Commencement Date occurs (and the immediately following calendar year if the first calendar year of the Lease Term is less than ninety (90) days) to the extent Tenant's Proportionate Share of Operating Expenses for such year(s) exceed(s) (on an annualized basis) one hundred five percent (105%) of the estimated amounts set forth in Initial Annual Estimated Operating Expense Payments, or (ii) Controllable Operating Expenses in any subsequent year to the extent Tenant's Proportionate Share of Controllable Operating Expenses for such year exceeds ▓▓▓▓▓▓▓ (▓▓▓%) of the Controllable Operating Expenses payable by Tenant for the immediately preceding year (the "Cap"). If Controllable Operating Expenses in any calendar year exceed the Cap (the "Excess Operating Expenses"), then Landlord may bill such Excess Operating Expenses to Tenant in each of the subsequent calendar years in the Lease Term; provided, however, the carry forwards shall only be applied in any subsequent calendar year to the extent that the Excess Controllable Operating Expenses plus the actual increase in the Controllable Operating Expenses for such year does not exceed the Cap for such year. In order to bill any Excess Operating Expenses to Tenant, Landlord will (x) show a calculation of the Excess Operating Expenses in the statement of Operating Expenses for the year in which the expenses are incurred (and Tenant may inspect and audit Landlord's

AMAZON_00008

DocuSign Envelope ID: 02B90083-11E3-4876-8539-87959ADA4991

AMAZON_00009
CONFIDENTIAL
DPL4

books and records relating to such amounts); and (y) show any Excess Operating Expenses on the statement of Operating Expenses for the calendar year being charged and any remaining accrued but unbilled Excess Operating Expenses available to be billed in subsequent calendar years. "Controllable Operating Expenses" means all Operating Expenses, except for Taxes, utility costs, snow removal costs, insurance premiums, insurance deductibles, costs of capital repairs and replacements, the property management fee and any Operating Expenses resulting from Tenant-Made Alterations (including the Initial Improvements). Controllable Operating Expenses for any given year will be determined on an aggregate, non-cumulative, and non-compounded basis.

(c)    Reconciliation of Operating Expenses. On or before one hundred twenty (120) days following the end of each calendar year (the "Reconciliation Deadline"), Landlord shall deliver to Tenant a detailed reconciliation statement (the "Reconciliation") showing the calculation of Operating Expenses actually paid for the prior calendar year (including any portion of the calendar year that Landlord did not own the Premises if the then-current Landlord purchased the Premises during such calendar year), along with reasonable supporting documentation, including a detailed general ledger. If Landlord does not deliver the Reconciliation within one (1) year from the Reconciliation Deadline, then Tenant will not be responsible for any increases in Operating Expenses over the estimates paid by Tenant for such calendar year. Landlord may correct any Reconciliation within one hundred eighty (180) days after it is initially issued, but may not further correct it thereafter, except if the correction would result in a credit to Tenant; provided that the Reconciliation of Taxes may occur at any time within three hundred sixty-five (365) days following the final determination of the Taxes. If Tenant's total payments of Operating Expenses for any year are less than Tenant's Proportionate Share of Operating Expenses actually paid for such year, then Tenant shall pay the difference within sixty (60) days after demand, and, if more, then Landlord will retain such excess and credit it against Tenant's next payments or, if Tenant so requests, refund it to Tenant within sixty (60) days after demand.

(d)    Right to Audit. Tenant may audit the Reconciliation by providing notice to Landlord within one hundred eighty (180) days following Tenant's receipt of the Reconciliation or any correction thereof. Landlord shall electronically provide invoices and other standard Landlord reports for the Reconciliation (as well as for applicable prior years for purposes of evaluating compliance with the limitations on increases in Controllable Operating Expenses). Tenant will not use an auditor on a contingency fee basis unless such auditor provides services to Tenant on at least a regional basis. Landlord's books and records will be kept in accordance with generally accepted accounting principles, consistently applied ("GAAP"). In the event an audit discloses overpayment by Tenant, Landlord shall make a correcting payment within sixty (60) days after Tenant provides the audit results to Landlord. In the event of any errors on the part of Landlord costing Tenant in excess of ███ percent (█%) of Tenant's liability for Operating Expenses actually paid for any calendar year, Landlord shall also reimburse Tenant for audit costs reasonably incurred by Tenant up to $████ per audit within the above sixty (60)-day period.

(e)    Annual Estimates. On or before each December 1, Landlord shall use commercially reasonable efforts to deliver a detailed statement showing the estimated Operating Expenses for the subsequent calendar year and an explanation of any increases. At a minimum, such statement will contain a separate line item estimate of each general ledger account expected to contain Operating Expenses. Tenant shall continue to pay the then-current estimate of Operating Expenses until thirty (30) days after such estimate is provided to Tenant, and any Reconciliation will occur pursuant to Section 6(c).

7.    **Utilities**. Tenant pays for all utilities used on the Premises by Tenant directly to the provider of such utility service. Any utility incentives or rebates related to Tenant's occupancy of the Premises will be payable to Tenant, and, if received by Landlord, promptly remitted to Tenant.

8.    **Taxes**. Landlord pays all real estate taxes, assessments, and governmental charges for the Building and the Land (collectively, "Taxes"), and Taxes will be included in the Operating Expenses. Landlord will pay Taxes in the maximum number of installments permitted by Legal Requirements (unless otherwise directed by Tenant), and Tenant's obligation to pay such Taxes as part of Operating Expenses will be limited to each installment or prorated share thereof. Landlord will forward copies of all notices, invoices, and statements relating to taxes. Upon notice to Landlord, which must be provided at least thirty (30) days prior to the applicable deadline (but in no event less than ten (10) days after receiving notice of the deadline or of the valuation of the Premises, whichever is later), Tenant (acting on behalf of Landlord) may contest the amount, validity, or application of any Taxes or liens, at Tenant's sole cost in accordance with applicable Legal Requirements. If Tenant does not exercise this right, Landlord may contest such Taxes and shall promptly notify Tenant of any such contest. If Tenant exercises this right, Tenant will have exclusive control over the prosecution and conclusion of such contest and Landlord shall provide Cooperation Efforts with Tenant's prosecution. Tenant's Proportionate Share of all reductions, refunds, or rebates of Taxes paid or payable by Tenant as an Operating Expense, whether as a consequence of a Tenant proceeding or otherwise, will be refunded by Landlord to Tenant (less reasonable costs or expenses incurred by Landlord). For avoidance of doubt, nothing in this Section is intended to cause Tenant to be treated as an agent of Landlord. In no event will Tenant be liable for any estate, inheritance, gift, franchise, gross receipts, federal, state or local income taxes of Landlord (or tax in lieu thereof) or any other

4

AMAZON_00010
CONFIDENTIAL
DPL4

tax that is or may be imposed against the rents payable under this Lease or upon Landlord's income or profits, "roll-back" or similar taxes attributable to periods before the Lease Term, penalties or interest other than those attributable to Tenant's failure to comply timely with its obligations under this Lease, or special assessments incurred as a result of the initial construction or subsequent enlargement of the Building or the Land. If any tax for which Tenant is liable hereunder is levied or assessed, Tenant will be responsible for such taxes and will pay the same either directly or as part of Operating Expenses. Landlord pays (and such amounts will not be included in Operating Expenses) any transfer taxes or recording fees imposed by any governmental agency or municipality with respect to (a) this Lease, any memorandum of this Lease, any amendment, modification, or extension of this Lease, any transfer occurring with regard to this Lease, any financing of Landlord's interest in the Building or the Land, or the exercise of any options granted under this Lease; or (b) any transfer of any interest in the Building or the Land or direct or indirect interests in Landlord.

9.      **Insurance**.

        (a)     <u>Landlord's Insurance</u>. Landlord will maintain all risk (or "special form") property insurance covering the full replacement cost of the Building and all other structures and improvements on the Land (excluding any Initial Improvements and any Tenant-Made Alterations) with laws and ordinance endorsement and commercial general liability insurance including Tenant and Tenant Guarantor as additional insureds. All such insurance will be included as part of Operating Expenses to the extent permitted by Section 6. The Building and all other structures and improvements on the Land may be included in a blanket policy (in which case the cost of such insurance allocable to the Building and all other structures and improvements on the Land will be reasonably determined by Landlord based upon the insurer's cost calculations). Tenant will reimburse Landlord for any increased premiums or additional insurance that Landlord reasonably deems necessary as a result of Tenant's use of the Premises for other than the Permitted Uses.

        (b)     <u>Tenant's Insurance</u>. From and after the Commencement Date or any earlier date upon which Tenant enters or occupies the Premises or any portion thereof, Tenant will maintain, at its expense, all risk (or "special form") property insurance covering the full replacement cost of all Initial Improvements, Tenant-Made Alterations and Tenant's Property installed or placed in the Premises by Tenant at Tenant's expense; workers' compensation insurance with no less than the minimum limits required by law; employer's liability insurance with limits of $1,000,000 each accident; and commercial general liability insurance covering the Premises and Tenant's use thereof against claims for bodily injury or death and property damage, which commercial general liability insurance will include Landlord and mortgage lienholder as an additional insured. Landlord may from time to time require reasonable increases in any such limits consistent with the insurance being required by institutional owners of similar projects in the area.

        (c)     <u>Insurance Generally</u>. The commercial general liability policies shall provide coverage with a per occurrence limit of not less than $5,000,000, which limit may be satisfied by any combination of primary and excess or umbrella policies, insure on an occurrence and not a claims-made basis and provide contractual liability coverage. Tenant may meet all insurance requirements in this Lease through any combination of primary, excess or self-insurance coverage (subject to and in accordance with subsection (e) below). All insurance policies will be issued by insurers authorized to do business in the jurisdiction in which the Premises are located and have a Best's rating not less than A-. Each party will endeavor to give the other party thirty (30) days' prior notice before any cancellation or lapse of such coverage. Landlord will deliver a certificate evidencing such policies to Tenant upon Tenant's request, at the commencement of the Lease Term or at each renewal of said insurance. For evidence of Tenant's policies and the required inclusions, if applicable, of Landlord and mortgage lienholder as loss payee and/or additional insured, Tenant's memorandum of insurance can be located at www.amazon.com/moi.

        (d)     <u>Waiver of Subrogation</u>. Notwithstanding any other provision of this Lease, Landlord and Tenant each waives its right against the other party (the "<u>Benefited Party</u>") for any loss of, or damage to, any of the waiving party's property located at the Premises to the extent the loss or damage is or would be covered by the ISO special causes of loss form (CP 10 30) with the property in question insured for the full replacement cost, whether or not the waiving party actually carries such insurance, recovers under such insurance, or self-insures the loss or damage, and whether or not the loss is due to the negligent acts or omissions of the Benefited Party, or Landlord Party or Tenant Party, as applicable, except the waiver in this sentence shall not apply to the extent the loss or damage arises from the gross negligence or willful misconduct of the Benefited Party or Landlord Party or Tenant Party, as applicable. Each party's waiver in this Section includes a waiver of the right to recover any deductibles and self-insured retentions incurred by such waiving party in connection with a loss to which the waiver in this Section applies. The mutual waivers in this Section shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of, or damage to, property of the parties hereto. Each party shall ensure that its insurance policies required under this Lease permits the waiver in this Section, so that such party's waiver shall not invalidate or impair any of its coverage and shall upon request provide the other party with evidence of such arrangements.



AMAZON_00010

AMAZON_00011
CONFIDENTIAL
DPL4

(e)   <u>Self-Insurance</u>. Notwithstanding anything in this Section 9 or otherwise in this Lease to the contrary, so long as the originally named Tenant or a permitted Transferee (as defined below) is the tenant-in-possession, the guaranty of this Lease by Amazon.com, Inc. remains in effect with no defaults (beyond applicable notice and cure periods) thereunder, and Amazon.com, Inc. has a tangible net worth of at least Three Hundred Million Dollars ($300,000,000), Tenant may elect to self-insure some or all of the risks covered by the insurance that it is otherwise obligated to maintain under the terms of this Lease, and upon such election Tenant will be excused from its obligation to obtain third-party insurance for the self-insured risks.  If Tenant elects to self-insure, Tenant shall pay all amounts due in lieu of insurance proceeds as if Tenant was a third-party insurer providing the insurance coverage required by this Lease and all such amounts paid by Tenant shall be deemed to be insurance proceeds pursuant to this Lease.  All amounts that are paid or are required to be paid and all loss or damages resulting from risks for which Tenant has elected to self-insure shall be subject to the waiver of subrogation provisions of this Section 9 as to property insurance and shall not limit Tenant's indemnification obligations set forth in Section 18.  At any time when Tenant elects to self-insure any required coverage, Tenant shall provide Landlord and Landlord's lender, if any, with memoranda of self-insurance specifying the extent of self-insurance coverage hereunder.

(f)   <u>Insurance during Tenant Alterations</u>. During Tenant's performance of the Initial Improvements and any Tenant-Made Alterations, Tenant shall cause its contractors and subcontractors to secure and keep in effect the coverages listed below.   All such insurance shall be maintained with insurance companies permitted to do business in Pennsylvania with an AM Best rating of not less than A-/VII. Said policies shall contain a provision that coverage may not be canceled, non-renewed or materially changed without at least 30 days prior written notice to Landlord.  Such contractors shall not begin work until they have (1) furnished Certificates of Insurance to Landlord on Accord Form 25 evidencing all terms required; and (2) executed an indemnity agreement in favor of Tenant and Landlord.  Notwithstanding the foregoing, as long as the tenant under this Lease is Amazon.com Services LLC (or a Tenant Affiliate of Amazon.com Services LLC which assumes this Lease pursuant to Section 17(a)), the Guaranty remains in place without default and Tenant Guarantor has a net worth greater than $300,000,000.00, then the terms of this Section 9(f) shall not apply to Tenant.

(i)   Property insurance upon tools, material, equipment and supplies, whether owned, leased or borrowed by the contractor or its employees to the full replacement cost for all causes of loss included within "all risk" perils. Policy shall allow for a waiver of subrogation against Landlord.

(ii)   Workers Compensation insurance affording coverage under the laws of the Commonwealth of Pennsylvania and Employers Liability coverage subject to a limit of no less than $1,000,000 each employee, $1,000,000 each accident and $1,000,000 policy limit.

(iii)   Commercial General Liability insurance, including contractual liability, written on an occurrence form with combined bodily injury and property damage limits of not less than $5,000,000 per occurrence, $5,000,000 general aggregate and $5,000,000 products liability and completed operations.  Products and completed operations coverage shall extend for three years beyond completion of the work.  Policy shall not contain exclusions relating to (1) independent contractors, (2) gravity related injuries, (3) height limitations, or (4) injuries sustained by an employee of an insured or any insured.  Such insurance shall be primary and non-contributory, notwithstanding any insurance carried by Landlord or Tenant.  Policy shall name Landlord as additional insured utilizing both forms CG2010 and CG2037 or their equivalents.

10.   **Landlord's Maintenance and Repairs**.

(a)   <u>Landlord Obligations Generally</u>. Subject to <u>Section 15</u>, Landlord shall maintain, repair, and replace, as necessary, all portions of the Building and the Land not required to be maintained by Tenant, including those items listed on **Exhibit D** as "Landlord Maintenance Obligations – Non-Recoverable" (at Landlord's sole cost) and "Landlord Maintenance Obligations – Recoverable" (which may be included as Operating Expenses to the extent permitted under <u>Section 6</u>). Landlord's maintenance, repair, and replacement activities will be at a level substantially similar to other similar class buildings in the area. Landlord warrants the operation of the Premises, including all Building systems, including any HVAC existing as of the Effective Date (the "HVAC Systems"), the Base F/LS System (defined in **Exhibit D**), electrical, plumbing, and lighting (but excluding Tenant's Property) until the end of the twelfth (12th) full calendar month of the Lease Term. Any maintenance, repairs, and/or replacements (other than routine maintenance within the scope of Tenant's responsibilities in Section 11) during such period will be performed by Landlord at its sole cost; provided that such warranty will not apply to any damage caused by Tenant Parties. For any Landlord maintenance, repair, or replacement work, Landlord shall use commercially reasonable efforts to avoid interfering with Tenant's operations or access to the Premises, perform the work in a good and workmanlike



CONFIDENTIAL
DPL4

manner, in compliance with Legal Requirements and applicable industry-standard safety practices, and diligently prosecute the work to completion (including restoring any portion of the Premises, as well as any Tenant-Made Alterations and Tenant's Property that were disturbed by Landlord's work). Landlord will not locate any new ducts, pipes, mains, wires, or conduits in any part of the Premises without Tenant's prior consent. Additionally, Landlord shall, at its sole cost, correct design and structural defects during the first three (3) years of the Lease Term (thereafter, such costs may be included in Operating Expenses).

(b)      Landlord Coordination of Work. If Landlord desires to do any work (for maintenance or repairs or otherwise) that would require an interruption of any utility to the Premises (including interruption of any fire/life safety systems or Energy and Communications Related Improvements) or interrupt Tenant's operations or access to the Premises, the following requirements apply (except in an emergency that precludes compliance with one or more of the following requirements, in which case Landlord shall comply to the extent reasonably possible): (i) no such work may occur during the period from November 1 to January 15, or June 15 through July 31 (the "Holiday Season"), without Tenant's prior consent; (ii) Landlord will give at least ten (10) days' notice; (iii) such work may only occur during times reasonably approved by Tenant (and it will be reasonable for Tenant to require that such work occur outside of normal business hours if Tenant agrees to pay the incremental increase in the cost of such work resulting from such after-hours performance); (iv) any such interruption may not exceed four (4) hours in length; (v) in the case of a power interruption, if requested by Tenant, Landlord will provide a source of back-up power to allow Tenant to continue its normal business operations (and the fuel costs and other related charges may be included in Operating Expenses); and (vi) if such work involves access to the roof, Landlord's notice will identify the portions of any Energy and Communications Related Improvements that will be disturbed or removed, and Landlord and Tenant will reasonably cooperate on a temporary relocation plan (which Tenant will perform at its sole cost). It will not be a Landlord Default if Landlord is unable to perform its obligations under this Section 10 due to the Holiday Season.

(c)      Tenant's Right to Maintain. Notwithstanding anything to the contrary, for any item listed on **Exhibit D** as "Landlord's Maintenance Obligations – Recoverable", upon at least thirty (30) days' notice to Landlord, Tenant may enter into any service contract relating to such maintenance obligation of Landlord, at Tenant's sole cost and, (i) Landlord will not have any obligation to maintain any matters covered by such service contract after the date set forth in Tenant's notice; (ii) Tenant will be responsible for any breakage costs associated with Landlord's service contract(s) for such maintenance; (iii) any costs incurred by Landlord in connection with any matters covered by such service contract after the date set forth in Tenant's notice will be excluded from Operating Expenses; and (iv) Tenant shall perform such maintenance obligations in a good and workmanlike manner, free and clear of liens, in a manner consistent with the maintenance of other similar buildings in the vicinity of the Building and otherwise in accordance with the terms of this Lease. Landlord may, from time to time, request a written list of the scope of services and vendors providing services under such maintenance contracts and if Landlord provides Tenant with written notice that it reasonably objects to Tenant's use of any such vendors (along with a reasonable description of the reasons that Landlord so objects), the parties will discuss the continued use of such vendor. If, after such discussion, Landlord continues to object to such vendor, then Tenant shall terminate and/or replace such vendor within a reasonable period of time. Additionally, upon ninety (90) days' notice, Tenant may self-manage the Premises, in which case the property management fee will be reduced by fifty percent (50%); further, Tenant will be responsible for any breakage costs associated with Landlord's current management contract (provided such contract has a term no longer than one (1) year).

11.      **Tenant's Maintenance and Repairs.** Subject to Sections 9, 10, and 15, Tenant will, at its sole cost, maintain, repair, and/or replace, as necessary, those items listed on **Exhibit D** as "Tenant Maintenance Obligations" and Tenant will be responsible for the cost of any repair or replacement to the Premises that results from non-casualty damage caused by Tenant Parties. Landlord acknowledges that items within and components of the Building and the Land that Tenant must maintain will be subject to reasonable wear and tear and, subject to Section 9, non-casualty damage caused by Landlord Parties, and Tenant is not required to maintain the Premises in a "like new" condition. If Tenant fails to perform any repair or replacement for which it is responsible, and does not cure such failure within any applicable cure period, Landlord may, upon ten (10) days' notice, perform such work and shall be reimbursed by Tenant for the reasonable cost of such work within thirty (30) days after demand therefor (which demand will be accompanied by reasonable supporting documentation). Landlord will assign or otherwise make available to Tenant the benefit of any warranties from contractors, equipment manufacturers, or others that benefit any portion of the Premises that Tenant is required to maintain.

12.      **Tenant-Made Alterations.** Except for the Work or as otherwise provided in this Lease, any alterations or improvements made by or on behalf of Tenant to the Building or the Land ("Tenant-Made Alterations"), including any HVAC installed by Tenant and any equipment, systems, and facilities (such as refrigeration equipment) required to obtain or comply with any specialized licenses or permits for Tenant's operation or business at the Premises, will be subject to Landlord's prior consent in accordance with the following (the "Plan Approval Process"): (a) Landlord will approve or disapprove of all requests for consent to Tenant-Made Alterations within seven (7) days of receipt of a request containing plans and



AMAZON_00013
CONFIDENTIAL
DPL4

specifications for the proposed Tenant-Made Alteration (pursuant to the email notice procedures in Section 5 of **Additional Terms and Conditions, Addendum 3**); (b) if Landlord does not approve or disapprove of such request within seven (7) days, then Tenant may send Landlord an additional copy of the notice stating "**FAILURE TO APPROVE OR DISAPPROVE WITHIN 5 DAYS WILL CONSTITUTE DEEMED APPROVAL**," and, if Landlord does not approve or disapprove within five (5) days, the request will be deemed approved; (c) Tenant will reimburse Landlord for actual third party costs incurred for Landlord's review of each request; (d) Landlord will not unreasonably withhold, condition, or **delay its consent if Tenant** provides reasonable safety and engineering measures; and (e) Tenant will notify Landlord of its **proposed general contractor,** and Landlord will notify Tenant of any reasonable objection within the time period for Landlord's approval or disapproval of the Tenant-Made Alteration. Notwithstanding Section 5 of **Additional Terms and Conditions, Addendum 3**, all notices pursuant to this Section may be sent to Landlord via email only to the address set forth in **Notice Addresses, Addendum 4.** Notwithstanding the foregoing, the Plan Approval Process will not apply (and Landlord's consent will not be required) for Tenant-Made Alterations that do not adversely affect the Building's structure or the electrical, mechanical, plumbing, heat, air conditioning or ventilation systems of the Building or the roof of the Building and are not visible from outside the Building (collectively, "Minor Alterations"), including covering or blocking windows in the Premises, and drilling between floors and walls to add ducting or conduit in connection with the HVAC Systems, telecommunications lines, and electricity requirements. To the extent any Tenant-Made Alteration voids any warranties, Tenant will replace the voided warranty at Tenant's cost. With respect to any single Minor Alteration in excess of $100,000, Tenant will provide Landlord with notice prior to commencing construction of such Minor Alteration. Tenant may, without Landlord's consent, erect or install Tenant's Property unless consent is otherwise required under Section 26 or 37. In the event that Tenant performs a Tenant-Made Alteration without Landlord's consent and it is determined that Landlord's prior consent was required under the terms of this Section, Landlord will evaluate the completed Tenant-Made Alteration and give or withhold its consent. If Landlord withholds its consent, Landlord, as its sole remedy, may require that Tenant commence removal of the Tenant-Made Alteration within ninety (90) days after receipt of Landlord's disapproval and pursue such removal until complete. All Tenant-Made Alterations will be constructed diligently, in a good and workmanlike manner, in accordance with all applicable Legal Requirements, free and clear of liens and in a manner that does not unreasonably interfere with any other tenant's use of, or access to, the Building. Landlord will provide Cooperation Efforts to (i) obtain or comply with any licenses, permits, or other governmental permissions required in connection with a Tenant-Made Alteration; and (ii) obtain approvals of Tenant-Made Alterations required under Permitted Exceptions. Landlord may, at its sole cost, monitor construction of Tenant-Made Alterations that require Landlord's approval. At the completion of any Tenant-Made Alterations and upon request from Landlord, Tenant will deliver to Landlord final lien waivers from all contractors and subcontractors that provided services or materials that cost in excess of $25,000. At the time Landlord approves a Tenant-Made Alteration (or, for a Minor Alteration, those identified as part of the walk-through as described in Section 21(b)), Landlord will confirm whether Tenant must remove such Tenant-Made Alteration at the end of the Lease Term and restore the Premises to the condition required under Section 21. For Tenant-Made Alterations requiring Landlord consent, if Landlord fails to notify Tenant that such Tenant-Made Alteration must be removed, Tenant will remove such Tenant-Made Alteration and repair any damage caused by such removal pursuant to Section 21.

13.     **Signs**. Tenant may (a) place its standard graphics and signage at the entrance to the Premises or the Land, and in a prominent location on the exterior of the Building subject to the Plan Approval Process; and (b) install temporary and/or directional signage, at Tenant's sole cost, all subject to Legal Requirements and Permitted Exceptions. Upon surrender of the Premises, Tenant will remove all such signs and spot-repair, paint, and/or replace the affected Building fascia surface or other surface areas. Tenant will obtain all applicable governmental permits and approvals for sign and exterior treatments. Landlord will not install signs identifying Tenant anywhere on the Building or the Land without Tenant's prior consent, which Tenant may withhold in its sole and absolute discretion. Landlord will not place its graphics or signage on the Building or on any monument on the Land without Tenant's prior consent, which will not be unreasonably withheld, conditioned, or delayed.

14.     **Parking**. From and after the Commencement Date, Tenant will be entitled to the exclusive use of the parking areas, truck courts, and driveways located on the Land. Landlord will not alter or modify the parking areas, truck courts, and driveways which Tenant has the exclusive right to use without Tenant's prior consent.

15.     **Casualty**.

        (a)     Termination. If any portion of the Premises is damaged by a fire or other casualty or there is an interruption of utility service to the Premises resulting from any fire or other casualty, Landlord shall notify Tenant within thirty (30) days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises or utility service, as the case may be (the "Initial Reconstruction Notice"). If the restoration time is estimated to exceed three hundred sixty-five (365) days following the casualty, then Landlord and Tenant each may elect to terminate this Lease, in each case upon notice to the other party given no later than thirty (30) days after the Initial Reconstruction Notice. Notwithstanding anything to the contrary in this Section 15, Landlord may terminate this Lease upon written notice to Tenant, given within forty-five (45) days

DocuSign Envelope ID: 02B90083-14E3-4876-8539-87058ADA4991

AMAZON_00014
CONFIDENTIAL
DPL4

of the date of the casualty, if the casualty is uninsured and the uninsured cost to repair the damage to the portions of the Premises Landlord is required to restore exceeds $250,000.00 (and the reason therefor is not Landlord's failure to carry the insurance required to be carried by Landlord under this Lease), provided that Tenant may nullify Landlord's termination notice by agreeing to pay the uninsured cost within thirty (30) days after receipt of Landlord's termination notice.  Notwithstanding the foregoing, Tenant may terminate this Lease if the Premises are damaged during the last year of the Lease Term and Landlord reasonably estimates that it will take more than sixty (60) days to repair such damage.

(b)      Restoration in General. If this Lease is not terminated under Section 15(a), then Landlord will promptly restore the Premises, excluding the Initial Improvements and any Tenant-Made Alterations. All construction and repairs made by Landlord will be made in accordance with Legal Requirements and in a good and workmanlike manner, with architecture, facilities and amenities of no less quality than existing prior to the casualty.

(c)      Rent Abatement. Base Rent and Operating Expenses will be abated in proportion to the square footage of the Premises affected by the casualty and related restoration work from the date of such casualty to completion of restoration (and for up to an additional sixty (60) days for Tenant's restoration of any improvements or equipment installed by Tenant). If restoration is not completed within one hundred twenty (120) days after the date specified in the Initial Reconstruction Notice, subject to extension due to Force Majeure for up to ninety (90) days, Tenant will have the right to terminate this Lease upon notice to Landlord. Alternatively, Tenant may elect to complete the restoration of the Premises by delivering notice to Landlord, in which event Landlord will assign any unused insurance proceeds to Tenant.

16.      **Condemnation**. If all of the Premises are taken for any public or quasi-public use under any Legal Requirement or by eminent domain, or by purchase or easement in lieu thereof (a "Taking"), or if a partial Taking would materially reduce or impair the size, access to, or use of the Premises by Tenant, then upon notice by Tenant this Lease will terminate on the effective date of such Taking, and Base Rent and Operating Expenses will be apportioned as of said date. For partial Takings without termination, Landlord will promptly, at its sole cost, restore and reconstruct the Premises, and the Base Rent and Operating Expenses will be reduced to such extent as may be fair and reasonable under the circumstances. If allowed under Legal Requirements, Tenant may separately pursue a claim against the condemnor for (a) the value of Initial Improvements, Tenant's Property or Tenant-Made Alterations; (b) Tenant's moving costs; (c) Tenant's loss of business; and/or (d) Tenant's leasehold interest, provided such award does not reduce Landlord's award.  Landlord will promptly notify Tenant of any threatened Taking known to Landlord and allow Tenant to participate in such negotiations if it is customary in such jurisdiction.

17.      **Assignment and Subletting**.

(a)      Transfers. Except as set forth below, without Landlord's prior consent, Tenant will not assign this Lease, sublease any portion of the Premises, or grant any license or right to use any portion of the Premises (each, a "Transfer") to any person or entity (a "Transferee"). Landlord will approve or disapprove of any Transfer request within ten (10) days following receipt of the request and will provide reasons for any disapproval. If Landlord does not respond within ten (10) days, then Tenant may send Landlord an additional copy of the notice. If Landlord does not respond to such additional notice within five (5) Business Days, then Tenant may send a third (3rd) copy of the notice, stating "**FAILURE TO RESPOND WITHIN 3 BUSINESS DAYS WILL CONSTITUTE DEEMED APPROVAL,**" and, if Landlord does not approve or disapprove within five (5) Business Days, the request will be deemed approved. Notwithstanding anything to the contrary, Tenant may effect a Transfer, without Landlord's consent, to (i) any entity controlling, controlled by, or under common control with Tenant (an "Affiliated Entity"); (ii) any entity resulting from the merger or consolidation of or with Tenant or an Affiliated Entity; (iii) any person or entity that acquires all (or substantially all) of the assets of Tenant or an Affiliated Entity; (iv) any successor of Tenant or an Affiliated Entity by reason of public offering, reorganization, dissolution, or sale of stock, membership, or partnership interests or assets (each of the scenarios described in clauses (i)–(iv) above, a "Tenant Affiliate"); or (v) any third party doing business with Tenant or any Tenant Affiliate at the Premises (provided, however, that Tenant must obtain Landlord consent in the event it wishes to sublease 50% or more of the Premises (in the aggregate) to one or more third parties doing business with Tenant or any Tenant Affiliate at the Premises) (collectively, "Permitted Transferees"). Section 17(b) does not apply to Permitted Transferees.  Section 17(c) does not apply to an assignment to a Permitted Transferee. Upon a Transfer (other than a sublease), and provided that the Guaranty remains in place without default and Tenant Guarantor has a net worth greater than $300,000,000.00, Tenant will be automatically released from all obligations under this Lease occurring after the date of such Transfer.

(b)      Transfer Premium. In the event that the rent payable by a Transferee exceeds the Base Rent and Operating Expenses payable under this Lease plus all actual and reasonable out-of-pocket costs incurred by Tenant for brokerage commissions, improvement allowances, and legal fees in connection with such Transfer, plus Unamortized Capital Costs applicable to the term of the sublease or assignment, then Tenant will pay Landlord as additional rent hereunder fifty percent (50%) of such excess rent within thirty (30) days following receipt thereof by Tenant. If such Transfer is for less than all of the



Premises, such excess rent will be calculated on a rentable square foot basis. "<u>Unamortized Capital Costs</u>" means the unamortized portion of the Tenant Capital Costs remaining after amortization of the Tenant Capital Costs on a straight-line basis over the Lease Term. "<u>Tenant Capital Costs</u>" means the total costs incurred by Tenant to (i) design and construct any improvements, including any Tenant-Made Alterations and any work performed by Landlord at Tenant's cost; and (ii) purchase and install furniture, fixtures, and equipment (other than any of such items paid for by Landlord pursuant to Paragraph 3 of Addendum 2).

(c)     <u>Right to Pursue Transferee</u>. If Tenant effects a Transfer, or if the Premises are occupied in whole or in part by anyone other than Tenant, then during a Tenant Default, Landlord may collect any rent due under the terms of the relevant Transfer from any Transferee or other occupant and apply it to the Rent payable hereunder. No such collection or application of rent will be deemed a release of Tenant from Tenant's further performance of its obligations hereunder.

(d)     <u>Landlord Transfers</u>. "<u>Landlord</u>" means only the owner, for the time being, of the Building and the Land, and if such owner transfers its interest in the Building and the Land to a bona fide third party purchaser that assumes all obligations of Landlord under this Lease arising after such transfer, such owner will be released and discharged from all obligations of Landlord thereafter accruing, but such obligations will be binding during the Lease Term upon each new owner for the duration of such owner's ownership.

18.     **Indemnification**.

(a)     <u>Tenant Indemnification Obligation</u>. To the extent permitted by Legal Requirements, but subject to Sections 9(d) and 33, and except to the extent resulting from the negligence or willful misconduct of a Landlord Party or a breach of this Lease by Landlord, Tenant agrees to indemnify, defend, and hold harmless Landlord and its affiliates, as well as their respective agents, servants, directors, officers, and employees (collectively, the "<u>Landlord Indemnitees</u>"), from and against any and all losses, liabilities, damages, costs, and expenses (including reasonable attorneys' fees) resulting from claims by third parties occasioned by (i) death, injuries to any person or damage to, or theft or loss of, property occurring in or about the Premises to the extent caused or alleged to be caused by the violation of Legal Requirements, fraud, negligence, or willful misconduct of Tenant or of any member, partner, manager, affiliate, contractor, or subcontractor of Tenant or its or their officers, directors, employees, or agents, or any of Tenant's Vendors (defined below) or of any other invitee or licensee of Tenant (including Tenant, each, a "<u>Tenant Party</u>," and collectively, the "<u>Tenant Parties</u>"); or (ii) any actual or alleged breach of this Lease by Tenant. If any proceeding is brought against any Landlord Indemnitee involving a claim from which Tenant is obligated to indemnify the Landlord Indemnitees pursuant to this Section, Tenant, upon notice from Landlord, will resist and defend such proceeding with respect to that claim (by counsel reasonably satisfactory to Landlord, except Landlord's consent is not required if such defense is provided by Tenant's insurer) at Tenant's sole cost. The furnishing of insurance required hereunder shall not be deemed to limit Tenant's obligations under this Section 18(a).

(b)     <u>Landlord Indemnification Obligation</u>. To the extent permitted by Legal Requirements, but subject to Sections 9(d) and 33, and except to the extent resulting from the negligence or willful misconduct of a Tenant Party or a breach of this Lease by Tenant, Landlord agrees to indemnify, defend, and hold harmless Tenant and its affiliates, as well as their respective agents, servants, directors, officers, and employees (collectively, the "<u>Tenant Indemnitees</u>"), from and against any and all losses, liabilities, damages, costs, and expenses (including reasonable attorneys' fees) resulting from claims by third parties occasioned by (i) death, injuries to any person, or damage to, or theft or loss of, property occurring in or about the Premises to the extent caused or alleged to be caused by the violation of Legal Requirements (which is the obligation of Landlord to comply pursuant to this Lease), fraud, negligence, or willful misconduct of Landlord or of any member, partner, manager, affiliate, contractor, or subcontractor of Landlord or its or their officers, directors, employees, or agents, or of any invitee or licensee of Landlord (including Landlord, each, a "<u>Landlord Party</u>," and collectively, the "<u>Landlord Parties</u>"); or (ii) any actual or alleged breach of this Lease by Landlord. If any proceeding is brought against any Tenant Indemnitee involving a claim from which Landlord is obligated to indemnify the Tenant Indemnitees pursuant to this Section, Landlord, upon notice from Tenant, will resist and defend such proceeding with respect to that claim (by counsel reasonably satisfactory to Tenant, except Tenant's consent is not required if such defense is provided by Landlord's insurer) at Landlord's sole cost. The furnishing of insurance required hereunder shall not be deemed to limit Landlord's obligations under this Section 18(b).

19.     **Inspection and Access**. A Landlord Party may only enter the Premises during normal business hours on at least one (1) Business Day's notice (except in an emergency, when no such notice is required) (a) to inspect the Premises and to perform its obligations under this Lease; and (b) to show the Premises to prospective purchasers and, during the last three hundred sixty-five (365) days of the Lease Term (but not before all extension rights under this Lease have expired), to prospective tenants. In connection with any such entry, (i) Landlord agrees to collect a duly-executed non-disclosure agreement on the form attached as **Exhibit I** (as may be reasonably updated by Tenant from time to time) prior to permitting any other Landlord Party or any third party to enter; (ii) Tenant may deny access to third parties if Tenant determines, in its reasonable discretion, that

CONFIDENTIAL



allowing such third party potential exposure to Tenant's Confidential Information within the Premises would be detrimental to Tenant's business interests; (iii) except in an emergency where necessary to prevent imminent damage to persons or property, Landlord and any other party will enter the Premises only when accompanied by a Tenant representative and in compliance with Tenant's security programs, confidentiality requirements, and other reasonable rules and regulations; and (iv) Landlord will minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations and will diligently prosecute to completion any activities that involve the Premises. Landlord may not erect signs on the Premises stating the Premises are available for lease until the last one hundred eighty (180) days of the Lease Term (but not before all extension rights under this Lease have expired). In addition, if Landlord desires for any of its employees, who need access to the Premises on a routine basis, to be able to enter the Premises unescorted by a Tenant representative, then Landlord will perform a background check on such person with a vendor selected by Tenant, at Tenant's cost.

20.    **Tenant's Property; Waiver of Landlord's Lien**. Tenant's property, racking, shelves, wall display systems, bins, machinery, fixtures, security devices (including security gates and security cameras), Energy and Communications Related Improvements, Generators, furnishings, equipment, accounts receivable, inventory, and other personal property (collectively, "Tenant's Property"), however installed or located on or about the Premises, will be and remain the property of Tenant or its lender, service providers, contractors, or vendors (and their respective lenders or contractors) (collectively, "Vendors") and may be installed, modified, and removed at any time and from time to time during the Lease Term without Landlord's consent except as provided in Sections 26 and 37, provided that Tenant shall at all times repair any damage to the Premises caused by the removal of Tenant's Property. In no event (including a Tenant Default) will Landlord have any lien or other security interest in any of Tenant's Property located in the Premises or elsewhere, and Landlord hereby expressly waives and releases any lien or other security interest however created or arising. At Tenant's request and cost, Landlord will execute a reasonable lien waiver and access agreement requested by Vendors so long as such party agrees (a) to provide Landlord with at least five (5) days' notice before exercising any remedy to remove Tenant's Property; (b) to allow a representative of Landlord to be present during the exercise of any such remedy; (c) to repair and restore any damage caused by the removal of Tenant's Property; (d) to carry at least the same level of insurance as required of Tenant during any time that such third party is on the Premises; (e) to indemnify, defend, and hold harmless Landlord from any claims arising out of or relating to such party's exercise of its rights; (f) there will be no private or public auctions conducted at the Premises; and (f) to pay Rent during any period that such third party is occupying or accessing the Premises (it being understood that such third party shall be entitled to a credit against such Rent in the amount of any Rent actually paid by Tenant with respect to such period).

21.    **Surrender**.

(a)    <u>Surrender Obligations Generally</u>. Upon expiration or earlier termination of this Lease, Tenant will surrender the Premises to Landlord in good condition, broom clean, except for reasonable wear and tear, casualty loss and condemnation covered by Sections 15 and 16, claims covered by the waiver of subrogation in Section 9(d), damage caused by any Landlord Parties, and replacement, repairs or maintenance for which Tenant is not responsible under this Lease. Landlord specifically acknowledges that reasonable wear and tear may leave the Premises in need of painting, re-carpeting, and the like. Any Tenant's Property not removed within thirty (30) days after expiration from Landlord will be deemed abandoned and Tenant waives all claims resulting from Landlord's retention and disposition of such property (provided, however, Tenant shall remain liable for removing Tenant's Property and reimbursing Landlord for any reasonable cost of removal, disposal or storage of Tenant's Property that Landlord might incur (it being understood that Landlord is not obligated to incur any such cost)). Tenant will not be obligated to remove the Work, any replacement thereof, or any substantially similar improvements. Tenant's surrender obligations with respect to Tenant-Made Alterations will be governed by Section 12. Tenant will decommission and remove, pursuant to Section 21(b), any inoperable portion of the HVAC Systems that were installed after the Effective Date (the "Inoperable HVAC") that Landlord does not elect to repair and retain. Tenant will repair and restore any portions of the Premises damaged or otherwise adversely affected by Tenant's removal of improvements.

(b)    <u>Walk-Through</u>. Within thirty (30) days following (i) the Extension Notice Deadline (defined in **Extension Options, Addendum 2**) without Tenant exercising its right to extend the Lease Term; or (ii) Landlord's receipt of Tenant's exercise of the Operational Extension Option (as defined in Section 22), Landlord and Tenant will conduct a walk-through of the Premises to determine the scope of improvements to be removed by Tenant from the Premises, which may include (x) any Tenant-Made Alterations required to be removed pursuant to Section 12; (y) all or any part of any mezzanine and related improvements within the Premises, provided, however, that Tenant will not be required to remove any mezzanine level that provides structural support to the Building; and (z) any Inoperable HVAC (collectively, the "Removal Scope"). If Landlord fails to conduct such walk-through with Tenant in the time period provided in this Section 21(b), then Tenant may send Landlord its proposed Removal Scope. Landlord will approve of the Removal Scope or schedule a walk-through with Tenant within seven (7) days of receipt of the Removal Scope. If Landlord does not approve of the Removal Scope or schedule a walk-through with Tenant within seven (7) days, then Tenant may send Landlord an additional copy of the notice stating



CONFIDENTIAL
DPL4

"**FAILURE TO APPROVE THE REMOVAL SCOPE OR SCHEDULE A WALK-THROUGH WITHIN 5 DAYS WILL CONSTITUTE DEEMED APPROVAL**," and, if Landlord does not approve of the Removal Scope or schedule a walk-through within five (5) days, the Removal Scope will be deemed approved.  Tenant may either remove the improvements included in the Removal Scope at Tenant's sole cost, or may elect, within thirty (30) days of agreement (or deemed approval) of the Removal Scope, for Landlord to remove such improvements. If Tenant elects for Landlord to remove such improvements, then within thirty (30) days of Tenant's notice to Landlord of such election, Landlord will obtain at least three (3) bids for the removal of the Removal Scope and submit such bids to Tenant. Upon approval by Landlord and Tenant of a bid for removal of the Removal Scope, Landlord will perform such work (provided any removal of mezzanine or Inoperable HVAC will be performed after expiration of the Lease Term), and Tenant will reimburse Landlord for costs incurred within thirty (30) days of receipt of an invoice, together with reasonable supporting documentation, up to the agreed-upon bid amount. If Landlord and Tenant are not able to agree upon a bid for the Removal Scope (or if Landlord fails to provide such bids to Tenant) by the date that is at least ninety (90) days prior to the expiration of the Lease Term, then Tenant will remove the improvements included in the Removal Scope.

(c)     Removal Period. If Tenant elects to perform the removal of the Removal Scope itself, and the Removal Scope includes mezzanine and/or Inoperable HVAC, then, provided that (i) a Tenant Default is not continuing; and (ii) Tenant delivers a notice to Landlord within thirty (30) days of agreement on the Removal Scope, Tenant will have the right of non-exclusive access to the Premises for a period of ninety (90) days following expiration or earlier termination of this Lease (the "Removal Period") to remove the portion of the Removal Scope constituting the mezzanine or Inoperable HVAC and restore the Premises. During the Removal Period, Tenant's access will be subject to the terms and conditions of this Lease and Tenant will continue to pay Base Rent at the rate of ▮▮% of the amount in effect prior to the expiration of the Lease and to be responsible for Tenant's Proportionate Share of Operating Expenses and for the utilities applicable to the Premises.  If Tenant has exercised the Operational Extension Option, this Removal Period will commence immediately following the Operational Extension Option. The Removal Period will not be considered a holdover for purposes of this Lease.

22.     **Holding Over**. Tenant may remain in the Premises for a specified time period (up to one hundred eighty (180) days) following the Lease Term expiration (the "Operational Extension") by notifying Landlord of its intention prior to the Extension Notice Deadline (the "Operational Extension Option"). The Operational Extension will be under the same terms and conditions in effect during the immediately previous Lease Term, except that Base Rent shall be increased by ▮%. In the event a holdover possession exceeds the Operational Extension, or in the event of any other holdover (including following an early termination by Tenant), such possession will be month-to-month at a rate of ▮▮▮▮▮▮▮▮▮ (▮▮%) of Base Rent at the time of the holdover, provided that any annual increases in Base Rent will continue to occur as contemplated by **Base Rent and Operating Expense Exclusions, Addendum 1**, and subject to termination by Landlord or Tenant upon thirty (30) days' notice to the other party at any time. During any holdover possession, all of the other terms of this Lease (excluding any expansion or similar option or right) will be applicable and all other payments will continue. Subject to Section 33, if (a) Tenant has not vacated the Premises following the expiration of the Lease Term or the Operational Extension, as applicable; and (b) Landlord provides at least thirty (30) days' notice of the amount of any of the following damages that Landlord will incur as a result of Tenant's failure to vacate the Premises at the end of such thirty (30)-day period, then if Tenant fails to vacate before the latest of (i) the expiration of the Lease Term; (ii) the expiration of any Operational Extension; or (iii) thirty (30) days after receipt of such notice, Tenant will be liable to Landlord for the rental revenue actually lost by Landlord solely as a result of the holdover from an executed lease, and any amounts Landlord is required to pay to any new tenant solely as a result of the holdover, but Tenant will not be liable for any other indirect or consequential damages. No holding over by Tenant, whether with or without consent of Landlord, will operate to extend this Lease except as otherwise expressly provided herein.

23.     **Tenant Default**. Each of the following events will be an event of default by Tenant ("Tenant Default") under this Lease:

(a)     Failure to Pay Rent. Tenant fails to pay any installment of Rent when due, and such failure continues for a period of five (5) Business Days after notice that such payment was not made when due.

(b)     Bankruptcy. Tenant or any guarantor or surety of Tenant's obligations hereunder (i) makes a general assignment for the benefit of creditors; (ii) commences any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively, a "proceeding for relief"); (iii) becomes the subject of any proceeding for relief that is not dismissed within sixty (60) days of its filing or entry; or (iv) is dissolved. If a guarantor or surety files a proceeding for relief, Tenant may replace such guarantor or surety within ninety (90) days of such filing with a guarantor or surety reasonably satisfactory to Landlord.



AMAZON_00018
CONFIDENTIAL
DPL4

(c)      Other Defaults. Tenant fails to comply with any provision of this Lease other than those specifically referred to above in this Section 23, and, except as otherwise expressly provided herein, such default continues for more than thirty (30) days after Landlord has given Tenant notice of such default, provided that where any such failure cannot reasonably be cured within a thirty (30)-day period, Tenant will not be in default if Tenant commences to cure the failure within the thirty (30)-day period, and thereafter diligently pursues all reasonable efforts to complete the cure. Notwithstanding the foregoing, if the thirty (30)-day period occurs during any part of the Holiday Season, Tenant will be deemed to have commenced a cure for purposes of this Section 23(c) if, (i) during such thirty (30)-day period, Tenant schedules commencement of the cure as soon as reasonably practical after the end of that portion of the Holiday Season; and (ii) such delay does not pose an imminent risk of bodily injury or death or of material damage to the Premises and is not a violation of Legal Requirements.

24.      **Landlord Remedies**.

(a)      Remedy Options. During the existence of a Tenant Default, Landlord may terminate this Lease or Tenant's right of possession (but Tenant will remain liable as hereinafter provided); provided that Landlord may not terminate this Lease or Tenant's right of possession unless, after a Tenant Default, Landlord delivers notice of Landlord's intent to so terminate (which notice will be in addition to any notice required under Section 23) and Tenant fails to cure such Tenant Default within ten (10) Business Days after receipt of the notice (or, in the case of a Tenant Default described in Section 23(c), if Tenant fails to commence to cure within ten (10) Business Days after receipt of the notice).

(b)      Termination of Lease. If Landlord terminates this Lease, Landlord may recover from Tenant the sum of the following: all Base Rent and all other amounts accrued hereunder to the date of such termination; the cost of reletting the whole or any part of the Premises, including leasing commissions incurred by Landlord (provided that Tenant will not be liable for any portion applicable to the period after the scheduled termination of this Lease); costs of removing and storing Tenant's or any other occupant's property; costs of putting the Premises into the condition that Tenant was required to leave it on termination of this Lease; all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs; and the excess of the then-present value of the Base Rent and Operating Expenses would have been required to pay to Landlord during the period following the termination measured from the date of such termination to the expiration date stated in this Lease (excluding any extension periods), over the present value of any net amounts Tenant establishes Landlord can reasonably expect to recover by reletting the Premises for such period, taking into consideration the availability of acceptable tenants and other market conditions affecting leasing. Such present values will be calculated at a discount rate of ███t percent (█%) per annum.

(c)      Termination of Possession. If Landlord terminates Tenant's right to possession without terminating this Lease, Landlord will use commercially reasonable efforts to mitigate its damages and relet the Premises; provided that (i) any reletting will be on such terms and conditions as Landlord in its reasonable discretion may determine; (ii) Landlord may lease any other space controlled by Landlord first; and (iii) any proposed tenant must meet Landlord's then applicable leasing criteria. For the purpose of such reletting, Landlord is authorized to make any repairs and alterations to the Premises as Landlord deems reasonably necessary or desirable. If the Premises are not relet, then Tenant will pay to Landlord as damages a sum equal to the amount of the Base Rent and Operating Expenses payable under this Lease for such period, plus the cost of recovering possession of the Premises (including reasonable attorneys' fees and court costs). If the Premises are relet and the sum realized from such reletting will not satisfy the Base Rent and Operating Expenses payable under this Lease, then Tenant will pay any such deficiency within thirty (30) days of demand from Landlord. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous Tenant Default.

25.      **Landlord Default; Tenant Remedies; Interruption of Tenant's Business.**

(a)      Landlord Default and Tenant Remedies Generally. Landlord will be in default ("Landlord Default") if Landlord fails to perform any of its obligations hereunder within thirty (30) days after notice from Tenant specifying such failure; provided that where any such failure cannot reasonably be cured within a thirty (30)-day period, Landlord will not be in default if Landlord commences to cure the failure within the thirty (30)-day period and thereafter diligently pursues all reasonable efforts to complete the cure. Notwithstanding the above, Landlord acknowledges that continuous operation is critical to Tenant's business and agrees that if Landlord's failure causes material interference to Tenant's operations, Landlord will commence its cure within such shorter period as is commercially reasonable given the nature of the failure and the interference and will diligently prosecute the cure to completion. If Tenant gives notice that Landlord's act or omission, or a condition is discovered or develops that, would or is causing a material interference with Tenant's operations, or would place Tenant out of compliance with, or prevent Tenant from obtaining, any license or permit related to the Permitted Uses, or may adversely affect human health or safety (any event, a "Material Interference"), then Landlord will respond within twenty-four (24) hours with a statement of Landlord's plan to address the Material Interference and the estimated time for cure, commence the cure as soon as possible (but in any event within forty-eight (48) hours after Tenant's notice), and diligently pursue and keep



AMAZON_00019
CONFIDENTIAL
DPL4

Tenant informed of the progress of the cure and Landlord's failure to comply with this sentence will constitute a Landlord Default. Notices under the preceding sentence may be given by email to the email addresses set forth in **Notice Addresses, Addendum 4** (promptly followed by notice under Section 5 of **Additional Terms and Conditions, Addendum 3**). If Landlord is in default (including failure to address a default in the shorter time periods provided for in this subsection), Tenant, in addition to pursuing any or all other remedies at law or in equity, may take commercially reasonable actions to cure the Landlord Default (or to cure a Material Interference, which Tenant may do without prior notice if such prior notice is not reasonably possible due to an emergency) and, if Landlord fails to reimburse Tenant for the reasonable costs and reasonable attorneys' fees for such curative actions, or if Landlord fails to pay any other amount owed to Tenant under this Lease (including any tenant improvement or construction allowance or any other reimbursement), within thirty (30) days after demand therefor, accompanied by supporting evidence of the expenses incurred by Tenant where applicable, Tenant may (i) offset such amount from up to ■■ percent (■■%) of Base Rent each month (provided that such amounts may be accelerated in order for Tenant to recover the full amount prior to expiration of the Lease Term); or (ii) bring an action for damages against Landlord to recover such costs and reasonable attorneys' fees, together with interest thereon at the rate provided in Section 12 of **Additional Terms and Conditions, Addendum 3**, and reasonable attorneys' fees incurred by Tenant in bringing such action for damages. Tenant will deliver a notice ("Tenant's Offset Notice") to Landlord prior to exercising its offset right. If Landlord delivers a notice to Tenant within twenty (20) days after receipt of Tenant's Offset Notice contesting either Tenant's right to offset and/or the amounts specified in Tenant's Offset Notice (with an explanation of Landlord's objections), and if Landlord and Tenant are unable to agree as to Tenant's right of offset and/or the amounts specified within ten (10) days of Landlord's objection notice, then either party may submit the matter to the Expedited Arbitration Process. Each of Landlord and Tenant will submit to the arbitrator its respective argument regarding Tenant's right to offset, and if Tenant is found to have had the right to offset, the specific amount of the offset. The arbitrator, in good faith, will decide whether Tenant had the right to offset and if so, will select either Landlord's or Tenant's proposal for the amount of the offset. Tenant will not offset any Base Rent payment until the dispute is resolved.

(b)     Interruption of Tenant's Business. If a Material Interference results from (x) an interruption of utilities, services or access to the Building or the Land; (y) Landlord's breach of this Lease (regardless of whether any cure period has elapsed); or (z) the activities of any Landlord Parties on or in the Building or the Land, then the following remedies will apply:

(i)     if the Material Interference is an event described in (y) or (z), or is an event described in (x) and due to the actions, omissions, or negligence of any Landlord Party, then beginning on the sixth (6th) Business Day after any such event and provided Tenant does not use the affected portion of the Premises, Base Rent and Operating Expenses will abate in proportion to the square footage of the Premises affected until the problem is corrected, provided that, if any such Material Interference continues for more than one hundred eighty (180) days (which may be extended for Force Majeure up to thirty (30) days), then Tenant may terminate this Lease on thirty (30) days' notice, provided that such termination will be null and void if the Material Interference is cured within such thirty (30) day period; or

(ii)     if the Material Interference is not due to the actions, omissions, or negligence of any Landlord Party, then Base Rent and Operating Expenses will not abate; provided that if any such Material Interference continues for more than two hundred seventy (270) days (which may be extended for Force Majeure up to thirty (30) days), then Tenant may terminate this Lease on thirty (30) days' notice, provided that such termination will be null and void if the Material Interference is cured within such thirty (30)-day period.

26.     **Generator**. At Tenant's sole cost and subject to the Plan Approval Process, Tenant may install, operate, test, and maintain one or more battery storage systems, generators, and fuel tanks (collectively, the "Generator") in or adjacent to the Building in a location acceptable to Landlord. The Generator and Generator pads will be constructed in accordance with plans and specifications approved in advance by Landlord, which plans will include fencing and curbing as is necessary to contain any fuel spill. At Tenant's sole cost and either prior to the expiration of the Lease Term or during the Removal Period (if applicable), Tenant will remove the Generator but not the Generator pads.

27.     **Subordination**. If there is a mortgage encumbering the Premises, concurrently with or following the execution of this Lease, Landlord will deliver an SNDA executed by Landlord and mortgage lienholder in a form as described below and otherwise acceptable to Tenant. Neither Landlord nor such mortgage lienholder will record any SNDA without Tenant's prior consent, in its sole and absolute discretion. This Lease and Tenant's interest and rights hereunder are and will be subject and subordinate at all times to the lien of any mortgage, hereafter created on or against the Premises, and to the lien of all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments, and extensions thereof, provided that the mortgage lienholder has executed, acknowledged, and delivered to Tenant a subordination, non-disturbance, and attornment agreement ("SNDA") reasonably acceptable to it and Tenant. In the event that Tenant fails to execute and deliver an SNDA within fifteen (15) days following receipt of Landlord's request therefor, Tenant shall pay to Landlord a fee in the

14
(legal)

AMAZON_00000
CONFIDENTIAL
DPL4

amount of $▮▮ per day for each day following such 15-day period, but only to the extent that Tenant is not negotiating the terms of the SNDA in good faith. Notwithstanding the foregoing, any such lienholder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice to Tenant, and thereupon this Lease will be deemed prior to such mortgage without regard to their respective dates of execution, delivery, or recording and in that event such lienholder will have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery, and recording of such mortgage and had been assigned to such mortgage lienholder.

28.     **Mechanics' Liens**. Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work by Tenant on the Premises and will hold Landlord harmless from all losses, costs, or expenses based on or arising out of asserted claims or liens with respect to such work against the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant will give Landlord immediate notice of any lien or encumbrance against the Premises as a result of work by Tenant and cause such lien or encumbrance to be discharged within thirty (30) days of the filing or recording thereof; provided Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such thirty (30)-day period.

29.     **Estoppel Certificates**. Tenant and Landlord agree, from time to time, but not more often than two (2) times in any calendar year (except in connection with a sale or financing, in which case there is no limit), within twenty (20) days after request of the other that is delivered pursuant to Section 5 of **Additional Terms and Conditions, Addendum 3**, to execute and deliver to each other, any prospective purchaser, or any lender for the Premises, an estoppel certificate in the form attached hereto as **Exhibit E**, with appropriate exceptions to the statements therein. In the event that Tenant fails to execute and deliver an estoppel certificate within such twenty (20) day period, Tenant shall pay to Landlord a fee in the amount of $▮▮ per day for each day following such 20-day period, but only to the extent that Tenant is not negotiating any additional statements within such estoppel certificate in good faith. Tenant acknowledges that a purchaser or lender may rely upon the truth of the matters set forth in any such estoppel certificate. The parties acknowledge that an estoppel certificate does not constitute an independent contractual undertaking or constitute representations, warranties or covenants or otherwise have legal effect (except as an estoppel from asserting any contrary fact or claim as that set forth in such certificate), or modify in any way, Tenant's relationship, obligations, or rights vis-à-vis Landlord.

30.     **Environmental Requirements**.

(a)     Hazardous Materials Generally and Tenant Obligations. Except for Hazardous Materials used in connection with Tenant's normal business operations as permitted under this Lease, including any packaged merchandise to be sold, handled, and/or held for shipment, maintenance of Tenant's trucks and machinery, fuel (including liquid hydrogen or other alternative fuels) or batteries for any trucks, generators, other machinery, or Energy and Communications Related Improvements (all of which will be handled by Tenant in compliance with all Environmental Requirements), Tenant will not permit any Hazardous Material upon the Building or Land, or transport, store, use, generate, manufacture, or release any Hazardous Material in or about the Building or Land without Landlord's prior consent. Tenant, at its sole cost, to the extent required by Environmental Requirements, will investigate, remove, monitor, mitigate, and remediate Hazardous Materials released into or on the Building or Land by any Tenant Parties. Landlord will provide Cooperation Efforts to obtain or comply with any licenses, permits, or other governmental permissions required in connection with Tenant's use of Hazardous Material in compliance with this Section. "Environmental Requirements" means all Legal Requirements relating to the protection of human health and the environment or exposure to hazardous substances or hazardous materials, including the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; the Occupational Safety and Health Act; all state and local counterparts thereto; and any regulations, policies, permits, or approvals promulgated or issued thereunder. "Hazardous Materials" means any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic under any Environmental Requirements.

(b)     Landlord Representations. Landlord represents and warrants that except for information contained in that certain Phase I Environmental Site Assessment dated October 23, 2018 and prepared by EBI Consulting (the "Environmental Report"), to Landlord's actual knowledge, (i) the Building and the Land are free from Hazardous Materials and mold and there are no environmental conditions affecting the Building or the Land in violation of Environmental Requirements; (ii) there is no asbestos, asbestos-containing materials, presumed asbestos-containing materials, PCBs, or PCB-containing materials or equipment in, at, on or under the Building or the Land; (iii) reserved; (iv) there are no past, present, or threatened releases, disposals, discharges, dispersals, or emissions of Hazardous Materials at, in, on, under or emanating to or from the Building or



AMAZON_00021
CONFIDENTIAL
DPL4

the Land in violation of Environmental Requirements; (v) there are no, and have never been, any underground storage tanks or wells in, at, on or under the Building or the Land; and (vi) Landlord has provided Tenant with copies of all notices within its possession or control (x) from governmental entities in connection with actual or potential environmental conditions in, at, or on the Building or the Land; (y) from governmental entities relating to compliance with environmental permits or Environmental Requirements; and (z) related to actual or threatened administrative or judicial proceedings in connection with environmental conditions in, at, or on the Building or the Land. Landlord represents and warrants that to its actual knowledge it conducted "all appropriate inquiries" as required to qualify as a "bona fide prospective purchaser" as those terms are used in 42 U.S.C. § 9601(40).

(c)     Tenant Indemnification Obligation. Tenant will indemnify, defend, and hold Landlord harmless from and against any and all losses, liabilities, damages, costs, and expenses (including remediation, removal, repair, corrective action, or cleanup expenses, reasonable attorneys' and consultants' fees, and punitive and/or natural resource damages) (collectively, "Environmental Claims") that are brought or recoverable against, or incurred by, Landlord as a result of any release of Hazardous Materials that Tenant is obligated to remediate as provided above or any other breach of the requirements under this Section 30 by any Tenant Party, regardless of whether Tenant had knowledge of such noncompliance, except to the extent caused by the negligence or willful misconduct of Landlord or any Landlord Party.

(d)     Landlord Obligations. Landlord shall, at its sole cost, comply with, and cause the Building and the Land to comply with, all Environmental Requirements during the Lease Term except to the extent Tenant is required to do so under this Section 30. Without limiting the foregoing, Landlord shall, at its sole cost, promptly and diligently (i) investigate, remove, monitor, mitigate, and/or remediate (or, at Tenant's election, reimburse Tenant for the costs to investigate, remove, monitor, mitigate, and/or remediate) any and all Hazardous Materials located in, on, and under the Building or the Land (other than those for which Tenant is responsible under this Section 30) to the extent required by Environmental Requirements, or as may be required for the health or safety of Tenant's employees; (ii) obtain, maintain, and comply with any and all permits required with respect to the Building and the Land under applicable Environmental Requirements, except for such permits specifically required and held by Tenant in connection with Tenant's operations; and (iii) cause an authorized representative of Landlord to sign hazardous waste manifests, if any, that may be required by applicable Environmental Requirements, as the "generator" for soil, groundwater or existing building materials generated at the Premises during renovation activities as contemplated under this Lease (provided, however, that Tenant (and not Landlord) shall sign hazardous waste manifests as the "generator" with respect to any soil, groundwater, building materials or other hazardous materials which are contaminated by Tenant).   Landlord shall indemnify, defend, and hold Tenant harmless from and against any and all Environmental Claims that are brought or recoverable against, or incurred by, Tenant arising from (x) any environmental condition existing prior to Tenant's occupancy of the Premises in violation of Environmental Requirements; (y) the release of Hazardous Materials by Landlord or any Landlord Parties affecting the Premises and in violation of Environmental Requirements; or (z) any other breach of the requirements under this Section 30 by any Landlord Party, regardless of whether Landlord had knowledge of such noncompliance, except to the extent caused by the negligence or willful misconduct of Tenant or any Tenant Party.

(e)     Remediation Obligations. If, during the Lease Term, Landlord or Tenant (each, a "Notifying Party") reasonably believes that any Hazardous Materials are located in, under, on, or about the Building or the Land in violation of any Environmental Requirements (other than those that the Notifying Party is responsible for under this Section 30), then the Notifying Party shall promptly give the other party (the "Responding Party") notice thereof (the "Hazardous Materials Notice"). Within thirty (30) days after receipt of the Hazardous Materials Notice, the Responding Party, at its sole cost, shall diligently conduct its own investigation, and shall commence to remove, monitor, mitigate, and/or remediate such Hazardous Materials to the extent required by Environmental Requirements, or as may be required for the health or safety of Tenant's employees, within sixty (60) days after the Hazardous Materials Notice and thereafter diligently prosecute such activities to completion. If the Responding Party fails to perform its obligations under this Section 30(e), the Notifying Party may elect to perform such obligations on behalf of the Responding Party and the Responding Party shall reimburse the Notifying Party. Notwithstanding the foregoing, Tenant shall have no responsibility for the removal, monitoring, mitigation, and/or remediation of any Hazardous Materials present in the soil or groundwater underneath the Premises if such Hazardous Materials were initially released from a source off the Premises and migrated to the soil and groundwater underneath the Premises, and neither the initial release, nor the subsequent migration or expansion were caused by Tenant.

31.     **Security Service**. Landlord is not providing any security services with respect to the Premises and will not be liable to Tenant for any loss by theft or any other damage incurred by Tenant in connection with any unauthorized entry into the Premises by any third party or any other breach of security, except to the extent such entry or breach of security is caused by the gross negligence or willful misconduct of any Landlord Party or a breach of this Lease by Landlord.

CONFIDENTIAL

16



AMAZON_00022
CONFIDENTIAL
DPL4

32.    **Anti-Corruption**. Landlord acknowledges that Tenant Guarantor's Code of Business Conduct and Ethics posted at http://phx.corporate-ir.net/phoenix.zhtml?c=97664&p=irol-govconduct (the "Code") prohibits the paying of bribes to anyone for any reason, whether in dealings with governments or the private sector. Landlord will not violate or knowingly permit anyone to violate the Code's prohibition on bribery or any applicable anti-corruption laws in performing under this Lease. Landlord will maintain true, accurate and complete books and records concerning any payments made to another party by Landlord under this Lease, including on behalf of Tenant. Tenant and its designated representative may inspect Landlord's books and records to verify such payments and for compliance with this Section.

33.    **Waiver of Consequential Damages**. Notwithstanding anything to the contrary, neither Landlord nor Tenant will be liable to the other for consequential damages, such as lost profits or interruption of either party's business, except that this sentence will not apply to (a) damages resulting from Tenant's holdover, but only to the extent described in Section 22; or (b) Landlord's breach of its confidentiality obligations under this Lease up to an amount equal to six (6) months of Base Rent for a non-willful breach (and no such cap will apply to Landlord's willful breach). Any liability of Landlord under this Lease will be limited solely to its interest in the Building and the Land and to the rents and proceeds therefrom (including insurance proceeds), and in no event will any recourse be had to any other property or assets of Landlord.

34.    **Option to Extend**. Tenant has options to extend the Lease Term as provided in **Extension Options, Addendum 2**.

35.    **Intentionally deleted.**

36.    **Public Announcements; Confidentiality**.

(a)    Public Announcements. No Landlord Party will make public announcements regarding Tenant's proposed or actual occupancy of the Premises without Tenant's prior consent, which Tenant may withhold in its sole and absolute discretion, and Landlord will instruct its brokers, developers, contractors, subcontractors, agents, and consultants not to make or issue any public announcement regarding Tenant's proposed or actual occupancy of the Premises; provided that Landlord may issue a press release regarding Tenant's occupancy of the Premises only if such press release (i) is issued following (or simultaneously with, if required by Legal Requirements) the issuance of a press release by Tenant; (ii) does not contain information relative to Tenant or the Premises other than information contained in any press release(s) issued by Tenant or as otherwise approved by Tenant, in its sole and absolute discretion, and (iii) is approved in its final form by Tenant prior to release, such approval not to be unreasonably withheld. After the commencement of Tenant's operations at the Premises, Landlord may list Tenant or Tenant's ultimate parent's name (but not its logo) and/or use a picture of the exterior of the Premises in lists of representative tenants or other marketing materials.

(b)    Confidential Information. All information specifically labeled as "confidential" or that would reasonably be presumed to be confidential, including the terms and conditions of this Lease and all nonpublic information relating to Tenant's technology, operations, customers, business plans, promotional and marketing activities, finances, and other business affairs (collectively, "Confidential Information"), that is learned by or disclosed to any Landlord Parties with respect to Tenant's business in connection with this leasing transaction will be kept strictly confidential by such Landlord Parties and will not be used or disclosed to others without the express prior consent of Tenant, which Tenant may withhold in its sole and absolute discretion; provided that Landlord may (i) use Confidential Information for its confidential internal business purposes; (ii) disclose Confidential Information as required by Legal Requirements; and (iii) disclose the terms and conditions of this Lease to the Landlord Indemnitees, or potential purchasers or lenders, provided that Landlord ensures that parties receiving Confidential Information understand the terms of this confidentiality provision. Notwithstanding Section 17(d), the provisions of this Section 36 will continue to bind Landlord after Landlord's conveyance of the Premises or any portion thereof.

37.    **Energy and Communications Related Improvements**.

(a)    Energy and Communications Related Improvements. Tenant has exclusive use of the roof, provided that Landlord may use any portion of the roof to operate, maintain, repair and replace any Building equipment or systems which are located on the roof. Subject to Legal Requirements and the Plan Approval Process, Landlord will permit Tenant or Vendors to install, operate, test, inspect, and maintain in the Building, on the roof or exterior of the Building, or on the Land, in locations mutually acceptable to Landlord and Tenant, satellite dishes, cellular antennae, fiber optic lines, overhead or underground conduits, cabling, power lines, distribution systems, and related equipment (the "Energy and Communications Related Improvements"). Energy and Communications Related Improvements may include (i) renewable energy systems, including, solar energy systems ("Solar Energy Systems"), electric systems, hydrogen or other fuel cells, tanks, and related equipment, including ducts, risers, closets, pipes, lines, conduits, and distribution systems connecting the Energy and Communications Related Improvements to the utilities serving the Premises and/or directly to Tenant's equipment in the Premises; and (ii) improvements appurtenant to the Energy and Communications Related Improvements, including parking lot canopies, concrete pads, and concrete or asphalt driveways. For purposes of the Plan Approval Process, Landlord will not withhold,



DocuSign Envelope ID: 02B90083-14E3-4876-8539-87956ADA4991

AMAZON_00023
CONFIDENTIAL
DPL4

condition, or delay its approval of plans and specifications for any Solar Energy System (collectively, the "Solar Plans") unless (x) the Solar Energy System as described on the Solar Plans will undermine the integrity of the Building or roof; or (y) the Solar Plans have not sufficiently screened the rooftop portions of the Solar Energy System from view at ground level on all sides of the Building in a commercially reasonable manner. Tenant or Vendors may erect and maintain the Energy and Communications Related Improvements for a term that will expire or otherwise terminate prior to or concurrently with the termination, expiration or extension of the Lease Term. Notwithstanding anything to the contrary set forth in this Lease, Tenant shall remove all Energy and Communications Related Improvements from the Premises and repair any damage to the Premises caused by the installation or removal thereof prior to the expiration or earlier termination of this Lease.

(b)     Ownership; Use; Permits. Tenant or Vendors will own the Energy and Communications Related Improvements. The Solar Energy Systems and any renewable energy that is produced (including environmental credits and related attributes) are personal property, and will not be considered the property (personal or otherwise) of Landlord. Tenant pays all electrical costs resulting from the Energy and Communications Related Improvements. Landlord makes no representations or warranties to Tenant as to the permissibility of any Energy and Communications Related Improvements on, in, or under the Premises under Legal Requirements. Landlord will provide Cooperation Efforts to obtain or comply with any licenses, permits, or other governmental permissions required in connection with the Energy and Communications Related Improvements. For any Tenant Default related to the Energy and Communications Related Improvements, Landlord will give Tenant an additional ten (10)-day notice and cure period beyond the period in Section 23(c) to allow Tenant to give notice to Vendor and coordinate the cure of such default.

(c)     Installation. If any Energy and Communications Related Improvements installation requires roof penetrations, Tenant or Vendors will use a contractor approved by Landlord and will cause such work to be done in a manner that preserves any roof warranty held by Landlord. If required by Landlord's roofing manufacturer, Landlord (as the owner of the Premises and the holder of the roof warranty) will execute a roof manufacturer overburden waiver (or similar document) and Tenant or Vendors will comply with its terms and pay any costs associated therewith.

(d)     Access; Cooperation. Landlord will grant Tenant and Vendors access to the Premises for purposes of installing, testing, monitoring, repairing, maintaining, and removing any of the Energy and Communications Related Improvements, including allowing Tenant and Vendors to (i) bring fiber optic lines to the Premises (including establishing one or more additional pathways to the Building) and install fiber distribution panels within the Building to provide connectivity to the Premises; (ii) install, monitor, and maintain other equipment within the Building to provide, receive, and monitor telephone and network connectivity to the Premises, and power from the Energy and Communications Related Improvements to the Premises or to Tenant's Property; (iii) bring overhead or underground conduit, cabling, and other power lines and distribution systems on the Land (including establishing one or more additional pathways to the Building from the Energy and Communications Related Improvements); (iv) access the Premises to refill tank(s) with liquid hydrogen; and (v) access and use existing easement areas (subject to the terms of such easement agreements) and telecommunications ducts, risers, closets, and conduits serving the Building and the Premises, penetrate the slab or roof, and remove and replace portions of the curbing, pavement, and sidewalks in each case as reasonably necessary for any of the foregoing. All such work by Tenant or Vendors will be subject to Section 12 and the Plan Approval Process. Without imposing additional costs or restrictions, Landlord will execute any license, right of entry agreement, or similar agreement reasonably requested in connection with the provision of services to the Premises by any Vendors. Notwithstanding anything to the contrary, Landlord will have no liability to Tenant for any damage or interruption of utility or other service to the Premises resulting from any activities of Vendors. Subject to Sections 9 and 15, Tenant will repair all damage to the Building caused by Vendors, their work or installations or the removal of such work or installations, to the extent such work is done by or on Tenant's behalf.

38.     **Credits and Incentives**.

(a)     At Tenant's sole cost, Tenant may seek from the federal, state, and local agencies and authorities (the "Authorities") economic development incentives including the creation of an enterprise zone, tax abatements, tax increment financing, job training grants, utility-related incentives, and/or industrial revenue bonds in connection with Tenant's decision to conduct business on the Premises (the "Incentives"); provided that any such activity by Tenant does not interfere with any economic development incentives including the creation of an enterprise zone, tax abatements, tax increment financing, job training grants, utility-related incentives, and/or industrial revenue bonds which are in effect from time to time or which Landlord might pursue during the Lease Term.

(b)     Upon Tenant's request, Landlord will provide Cooperation Efforts and information regarding Landlord's costs incurred in connection with the construction or operation of the Building and the Land, if known, in such manner and detail as may be reasonably requested by Tenant and the Authorities in order to obtain and maintain the Incentives. Such documentation will only be for the purpose of obtaining and maintaining the Incentives and will not be binding upon any other



AMAZON_00024
CONFIDENTIAL
DPL4

parties, including any lender of Landlord. Tenant will be solely responsible for all reporting obligations required in connection with the Incentives.

       (c)      All Incentives are for the benefit of Tenant and will be passed through to Tenant by **Landlord in a manner** reasonably acceptable to Tenant, Landlord, and the Authorities so that, to the maximum extent possible, **Tenant is placed in the** same financial position as if it received such Incentives directly.

       (d)      Landlord will not modify or terminate the Incentives without Tenant's prior consent and will follow Tenant's reasonable written instructions as to the implementation and use of the Incentives.

39.      **Additional Terms and Conditions**. **Additional Terms and Conditions, Addendum 3** contains additional standard terms and conditions of this Lease.

40.      **Tenant Guaranty**. Tenant Guarantor has provided a limited guaranty for Tenant's payment obligations in this Lease in the form attached as **Exhibit H** (the "Guaranty").

41.      **Landlord Representation—Potential Conflicts of Interest**.  Landlord represents and warrants that, to Landlord's actual knowledge, Landlord has disclosed to Tenant if any of its principals or their immediate family members are employed by (a) governmental agencies with jurisdiction over the Work or Initial Improvements, or (b) Tenant or a Tenant Affiliate.

42.      **Amazon Lockers**. Subject to Landlord's reasonable approval of the plans and specifications pursuant to the Plan Approval Process and to Legal Requirements, Tenant may install kiosks/lockers for deliveries and returns (the "Amazon Lockers") in any common areas and the parking areas, in all cases adjacent to the Premises, for no additional Base Rent. Upon expiration or earlier termination of this Lease, Tenant will remove the Amazon Lockers and all associated equipment, and will restore the area and repair any damage caused by such removal except for reasonable wear and tear and damage caused by any other tenants or a Landlord Party.

[SIGNATURES ON NEXT PAGES]



AMAZON_00025
CONFIDENTIAL
DPL4

Landlord and Tenant have executed this Lease on the dates set forth below, to be effective as of the later of the dates shown below (the "Effective Date").

**LANDLORD:**

AG-EIP 1 Geoffrey Drive, L.LC.,
a Delaware limited liability company

By:  AG-EIP Industrial 6, L.L.C., its sole member

By:  AG Real Estate Manager, Inc., its manager

By _____

Name _Bruce Levine_____

Title _manager_____

Date signed _September 24, 2020_____

AMAZON_00025

AMAZON_00026
CONFIDENTIAL
DPL4

**TENANT:**

Amazon.com Services LLC,
a Delaware limited liability company

By _Joshua Abells_
4E8B394352C04EB...

Name _Joshua Abells_

Title _Authorized Signatory_

Date signed _September 22, 2020_

AMAZON_00026

AMAZON_00027
CONFIDENTIAL
DPL4

ADDENDUM 1

<u>BASE RENT AND OPERATING EXPENSE EXCLUSIONS</u>

**Base Rent**.

| Time Period | Annual Base Rent Per Square Foot | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| Commencement Date – February 28, 2022 | $ | $ | $ |

**Operating Expense Exclusions**. The following costs shall be excluded from Operating Expenses: (1) costs incurred in connection with the original construction, or subsequent reconfiguration or upgrade, of the Building or the Land; (2) costs of correcting design and structural defects during the first three (3) years of the Lease Term; (3) real estate brokers' commissions, renovations, tenant improvements, or other costs incurred for attracting tenants or with respect to other rentable area; (4) costs resulting from the negligence or willful misconduct of any Landlord Party or the default of Landlord under this Lease or any other agreement affecting Landlord, the Building, or the Land; (5) legal, accounting, or professional fees and costs incurred in connection with lease negotiations, lease enforcement, administration or disputes, the audit of any Landlord financial materials and requests related to any assignment or sublease; (6) interest and principal payments or other amortization or depreciation charges on the Building or the Land (including the Building systems and equipment) or the indebtedness of Landlord; (7) overhead and profit paid to subsidiaries or affiliates of Landlord for management or other services, or for supplies or other materials, to the extent the amounts incurred exceed those that would have been reasonably incurred if such supplies, materials, or services were obtained from unrelated third parties; (8) contributions to any political or charitable persons or entities; (9) costs for the acquisition or maintenance of art; (10) advertising, marketing, and promotion costs; (11) costs associated with the operation of the entity that constitutes Landlord, as distinguished from costs of operation of the Building and the Land; (12) costs for which Landlord receives reimbursement under warranties or by insurers, others tenants (other than reimbursement as operating expenses pursuant to lease obligations), or third parties; (13) reserves; (14) costs incurred to comply with Environmental Requirements or to investigate, remove, remediate, or respond to any claim related to Hazardous Materials (but Tenant's responsibility for Hazardous Materials brought onto the Premises by any Tenant Party will be governed by Section 30); (15) costs of capital repairs or replacements unless amortized in equal monthly installments over their useful lives in accordance with GAAP; (16) costs and expenses incurred in leasing equipment or systems that would ordinarily constitute a capital expenditure if such equipment or systems were purchased, to the extent such rental charges exceed the amortization charge, if any, that would have been permitted had the item been purchased; (17) costs of repairs or other work necessitated by fire, windstorm, or other casualty and costs of repair or other work necessitated by the exercise of the right of eminent domain; (18) cost of insurance coverages not generally carried by landlords of similar buildings in the area; (19) insurance deductibles and co-insurance payments; provided that no more than $             of insurance deductibles in the aggregate may be included in Operating Expenses for any one insured event; (20) interest or penalties due to the late payment of taxes, utility bills, or other costs; (21) costs, including fines, penalties, and legal fees incurred, due to violations by any Landlord Party, or any other tenant or occupant of the Building or the Land, of Legal Requirements, contracts, or leases pertaining to the Building or the Land, or title matters; (22) any amount paid to an owners' association of which the Building and the Land are a part or paid in connection with any covenants, conditions, and restrictions or other title matters affecting the Building and the Land if such costs would be excluded from Operating Expenses pursuant to other provisions of Section 6 of this Lease and this Addendum 1; (23) rent under any ground lease or master lease; (24) costs incurred in connection with the financing or transfer of the Building or the Land (including the cost of any lender's policy of title insurance) or any interest therein; (25) the cost of any action that is specifically Landlord's expense under this Lease or any costs for which Landlord is required to pay or reimburse Tenant (including the cost of any repairs or replacements covered by Landlord's express warranties set forth in this Lease); (26) expenses that are separately metered or calculated and that are billed separately to Tenant or one or more other tenants, as applicable; (27) wages, salaries, and other compensation paid to personnel above the grade of property manager; (28) Landlord's general overhead and any other expense not directly related to the Building and the Land; (29) property management fees in excess of the PM Fee Cap; and (30) to the extent not already covered above, any maintenance obligations of Landlord listed as "Landlord Maintenance Obligations – Non-Recoverable" on **Exhibit D**.

AMAZON_00027

AMAZON_00028
CONFIDENTIAL
DPL4

## ADDENDUM 2

### EXTENSION OPTION

1.      Tenant (or any Permitted Transferee) has the right to extend the Lease Term for either one (1) period of three (3) years (the "Three Year Option") or one (1) period of two (2) years (the "Two Year Option") commencing on the day following the expiration of the Lease Term (the "Commencement Date of the Extension Term"). Tenant will give notice (the "Extension Notice") of its election to extend the Lease Term at least three hundred sixty-five (365) days prior to the scheduled expiration of the Lease Term (the "Extension Notice Deadline").  The Extension Notice shall specify whether Tenant elects to exercise the Three Year Option or the Two Year Option (the option which Tenant elects to exercise shall be referred to herein as the "Extension Term").

2.      If Tenant exercises the Three Year Option, then the Base Rent during the Three Year Option period shall be as set forth below, and Landlord shall provide an allowance in the amount of $███████ in connection with Refurbishment Costs (as defined in Paragraph 3 below) incurred by Tenant.

| Time Period | Annual Base Rent Per Square Foot | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| March 1, 2022 – February 28, 2023 | $██ | $██████ | $██████ |
| March 1, 2023 – February 28, 2024 | $██ | $██████ | $██████ |
| March 1, 2024 – February 28, 2025 | $██ | $██████ | $██████ |

If Tenant exercises the Two Year Option, then the Base Rent during the Two Year Option period shall be as set forth below, and Tenant shall not be entitled to any improvement allowance.

| Time Period | Annual Base Rent Per Square Foot | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| March 1, 2022 – February 28, 2023 | $██ | $██████ | $██████ |
| March 1, 2023 – February 28, 2024 | $██ | $██████ | $██████ |

3.      (a)     Subject to the terms of this Paragraph 3, if Tenant exercises the Three Year Option in accordance with Paragraph 1 above, Landlord agrees to reimburse Tenant, in an amount not to exceed $███████ in the aggregate (the "Refurbishment Allowance"), for the Refurbishment Costs (as defined below).  Any refurbishment work performed for, or on behalf of, Tenant shall be performed in accordance with all of the terms and conditions of the Lease.

        (b)     To receive the Refurbishment Allowance, Tenant shall submit to Landlord a standard AIA requisition form for the portion of the Refurbishment Costs for which Tenant is requesting reimbursement.  Tenant shall not submit a request for reimbursement more than once in any thirty (30) day period.  Attached to the AIA requisition form shall be (1) a certification from Tenant's architect certifying that the work relating to the Refurbishment Costs for which Tenant is requesting reimbursement has been completed in accordance with the plans approved by Landlord, (2) lien waivers from all contractors, subcontractors, suppliers and materialmen who performed work, furnished services or provided materials in connection with the portion of the Refurbishment Costs for which Tenant is requesting reimbursement, (3) a copy of any permit or approval required pursuant to Legal Requirements in connection with the completion of such refurbishment work, (4) invoices for the Refurbishment Costs for which Tenant is requesting reimbursement, and (5) any other documents or information which Landlord reasonably requests.  Landlord shall pay the requested portion of the Refurbishment Allowance to Tenant within thirty (30) days after Landlord's receipt of the AIA requisition form and the other documentation required by this Paragraph 3, provided Tenant is not in default under the Lease.

        (c)     If Tenant has not exhausted the entire Refurbishment Allowance on or before the first (1st) anniversary of the Commencement Date of the Extension Term with respect to the Three Year Option, any unexhausted portion thereof shall be deemed forfeited, it being understood that the unexhausted amount shall not be credited against the Base Rent, Additional Rent or any other amounts due to Landlord under the Lease and shall not be paid to Tenant.

(d)     As used herein, the term "Refurbishment Costs" means all reasonable out-of-pockets costs actually paid by Tenant after the Commencement Date of the Extension Term and which have been approved in advance by Landlord for (i) renovating, painting, carpeting or decorating the Premises; (ii) new equipment and trade fixtures to be installed at and/or used exclusively at the Premises; and/or (iii) new furniture or fixtures purchased by Tenant to be installed and maintained in the Premises. Refurbishment Costs shall mean only the cost of labor and materials, general conditions costs, permit and inspection fees and architectural and engineering fees.

3.      Except for the Base Rent as determined above, Tenant's occupancy of the Premises during the applicable Extension Term will be on the same terms and conditions as are in effect immediately prior to the expiration of the Lease Term; provided that Tenant will have no further options to extend this Lease once the option set forth in this **Extension Options, Addendum 2** has been exercised.

4.      If this Lease is extended for the Extension Term, then Landlord will prepare an amendment to this Lease confirming the extension of the Lease Term and the other provisions applicable thereto and **Landlord** and **Tenant** will execute the amendment within thirty (30) days after agreement on the final form of such amendment, **provided that** any such extension will be effective irrespective of the execution of any such amendment.

5.      If Tenant exercises its right to extend the Lease Term for the Extension Term pursuant to this Addendum, the term "Lease Term" as used in this Lease will be construed to include the applicable Extension Term.



DocuSign Envelope ID: 02B90083-14E3-4876-8539-87956ADA4991

AMAZON_00030
CONFIDENTIAL
DPL4

ADDENDUM 3

ADDITIONAL TERMS AND CONDITIONS

1.      **Conflict; Amendment**. This Lease and any non-disclosure agreement between Landlord and Tenant (or any of their affiliates) (the "NDA") constitute the complete agreement of Landlord and Tenant with respect to the subject matter hereof. In the event of any conflict between the NDA and this Lease regarding information about the Premises or this Lease, this Lease will control. In the event of any conflict between any exhibits or addenda attached to this Lease and this Lease, such exhibits or addenda will control. Any capitalized terms used but not defined in any exhibit or addendum will have the same meaning ascribed to them in this Lease. No representations, inducements, promises, or agreements are effective unless contained in this Lease or the NDA, and any prior agreements, promises, negotiations, or representations are superseded by this Lease and the NDA. This Lease may not be amended except in a written agreement signed by both parties.

2.      **Brokers**. Each party represents and warrants that it has dealt with no broker, agent, or other person in connection with this transaction and that no broker, agent, or other person brought about this transaction, other than the Brokers, whom Landlord agrees to compensate per separate agreement (a copy of which will be provided by Landlord to Tenant upon request by Tenant), and each party agrees to indemnify and hold the other harmless from and against any claims by any other broker, agent, or other person claiming a commission or other form of compensation by virtue of having dealt with the indemnifying party with regard to this transaction. This Paragraph 2 shall survive the expiration or earlier termination of this Lease.

3.      **Severability**. If any provision of this Lease is determined to be illegal or unenforceable under Legal Requirements, the parties intend that the remainder of this Lease will not be affected thereby. In lieu of each provision of this Lease that is illegal, invalid, or unenforceable, there will be added, as a part of this Lease, a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

4.      **Joint and Several Liability**. If and when included within the term "Tenant," there is more than one person, firm, or corporation, each will be jointly and severally liable for the obligations of Tenant. If and when included within the term "Landlord," there is more than one person, firm, or corporation, each will be jointly and severally liable for the obligations of Landlord.

5.      **Notice**. All notices, approvals, consents, requests, or demands required or permitted to be given by either party will be in writing and will be delivered (except as otherwise provided in this Lease) (a) personally; (b) by depositing with

the United States Postal Service, postage prepaid, by registered or certified mail, return receipt requested; (c) by a nationally-recognized delivery service providing proof of delivery; or (d) by email, provided that, for delivery pursuant to this clause (d), a copy is also sent pursuant to either clause (a), (b), or (c) above, and in all such events, properly addressed to the addresses set forth on **Notice Addresses, Addendum 4**. Except where otherwise expressly provided to the contrary, notice is deemed given upon delivery (or, in the case of delivery via the method described in (b), the earlier of delivery or three (3) days following the date of depositing), or when delivery is refused. Either party may change its notice address by giving notice in the manner set forth above. Landlord agrees that notices sent to the address(es) shown on **Notice Addresses, Addendum 4** are all of the parties who comprise Landlord who are entitled to notice under this Lease. Notice given by an attorney for a party shall be effective for all purposes.

6.      **Consent**. Except as otherwise expressly provided in this Lease, neither party will unreasonably withhold, condition, or delay any consent or approval to be given pursuant to this Lease.

7.      **No Waiver**. Notwithstanding any law, usage, or custom to the contrary, each party may enforce this Lease in strict accordance with its terms; and the failure to do so will not create a custom contrary to the specific terms, provisions, and covenants of this Lease or modify the same, and a failure by either party to enforce its rights pursuant to this Lease or at law or in equity will not be a waiver of such party's rights in connection with any subsequent default. The receipt of rent or other payment by either party with knowledge of the breach of any term, provision or covenant of this Lease will not be a waiver of such breach. No waiver by either party will be deemed to have been made unless expressed in writing and signed by such party.

8.      **Reserved**.

9.      **Not a Binding Offer**. The submission by Landlord or Tenant of this Lease will have no binding force or effect, will not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party, until execution and delivery of this Lease by both parties.

10.     **Word Usage**. Words of gender used in this Lease will be held and construed to include any other gender, and words in the singular will be held to include the plural, unless the context otherwise requires. The captions inserted in this Lease are for convenience only and in no way define, limit, or otherwise describe the scope or intent of any provision of this Lease, or in any way affect the interpretation of this

AMAZON_00031
CONFIDENTIAL
DPL4

Lease. The words "includes" or "including" are used in this Lease to provide information that is illustrative or exemplary, and not exclusive or exhaustive.

11.     **Legal Counsel**. Landlord and Tenant each acknowledge that it has had the opportunity to review this Lease with legal counsel of its choice, and ambiguities will not be construed or interpreted against the drafter.

12.     **Interest**. Any amount owing by either party pursuant to this Lease that is not paid within five (5) Business Days after receipt of notice that such amount is past due will bear interest from the due date until paid in full at the lesser of the highest rate permitted by Legal Requirements or ███ percent (██%) per year, provided that no interest will be due until the second (2nd) such event in any three hundred sixty-five (365)-day period.   If any Legal Requirement is judicially interpreted so as to render usurious any interest called for under this Lease, then it is the parties' express intent that all excess amounts theretofore collected be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to the applicable party), and, without needing to execute any new document, this Lease will be deemed immediately reformed and the amounts thereafter collectible reduced so as to comply with Legal Requirements while permitting the recovery of the fullest amount otherwise called for under this Lease.

13.     **Choice of Law; Venue**. Construction and interpretation of this Lease will be governed by Legal Requirements of the state in which the Premises are located, excluding any principles of conflicts of laws. Except for any disputes resolved under the Expedited Arbitration Process, any other dispute arising under, in connection with, or incident to this Lease or the Guaranty or about their interpretation will be resolved exclusively in the state or federal courts located in the county in which the Premises are located. Each of the parties irrevocably submits to those courts' venue and jurisdiction for such disputes.

14.     **Time is of the Essence**. Subject to Section 24 of this **Additional Terms and Conditions, Addendum 3**, time is of the essence as to the performance of each party's obligations under this Lease.

15.     **Business Day**. "Business Day" means any day that is not a Saturday, Sunday, or state or federal holiday.

16.     **Counterparts; Electronic Signatures**. Landlord or Tenant may deliver executed signature pages to this Lease by electronic means to the other party, and the electronic copy will be deemed to be effective as an original. This Lease may be executed in any number of counterparts, each of which will be deemed an original and all of which counterparts together will constitute one agreement with the same effect as if the parties had signed the same signature page.

17.     **Authority; Consent**. Each party represents to the other that it has the full right and authority to bind itself without the consent or approval of any other person or entity and that it has full power, capacity, authority, and legal right to execute and deliver this Lease and to perform all of its obligations hereunder. Landlord further represents and warrants that no consent of any lender or any other party is required for this Lease, or such consent has been obtained and evidence of same has been delivered to Tenant.

18.     **No Joint Venture or Partnership**. It is the express intention of both Landlord and Tenant that this Lease be considered a lease between Landlord and Tenant for all purposes, including federal and state tax purposes. Nothing in this Lease will be construed as creating a joint venture, partnership, tenancy-in-common, joint tenancy, financing, agency, or any relationship other than a landlord-tenant relationship between Landlord and Tenant, express or implied, including for federal and state tax purposes. The parties will treat this Lease as a lease in their separate books and records and in any reports to any third party.

19.     **Tax Treatment of Improvements.** For federal tax purposes, the parties intend that Tenant will not be treated as recognizing gross income as a result of receiving any allowance from Landlord, to the maximum extent permitted under Legal Requirements. Consistent therewith, the parties intend that any "qualified lessee construction allowance" (as defined in section 110 of the Internal Revenue Code of 1986, as amended, and the Treasury regulations thereunder (the "section 110 rules")) will qualify for the benefits accorded such allowances under the section 110 rules. The parties intend that any amount received in cash by Tenant from Landlord (or that is treated as a rent reduction) is, unless otherwise agreed to in writing by the parties, for the purpose of constructing or improving "qualified long-term real property" (as defined in the section 110 rules) for use in Tenant's trade or business at the "retail space" (as defined in the section 110 rules), which constitutes the Premises subject to this Lease. With respect to any "qualified lessee construction allowance" (as defined in the section 110 rules), Landlord and Tenant will comply with the section 110 rules, including the expenditure, consistent treatment, and information reporting rules under Treasury regulations section 1.110-1(b)(4), (5) and -1(c). In addition, the parties agree that Landlord will be treated for all purposes, including tax purposes, as the owner of any improvements that were paid for with, or reimbursed by, an allowance (the "Landlord Percentage") and Tenant will be treated for all purposes, including tax purposes, as the owner of any improvements to the extent that the cost for such improvements exceeds any allowance provided by Landlord or was otherwise paid for by Tenant (the "Tenant Percentage"). Unless required to adopt a contrary position as a result of an administrative or judicial proceeding, the parties agree to file all federal income tax returns in a manner consistent with, and to take no action inconsistent with, the intentions set forth in this paragraph.

AMAZON_00031

DocuSign Envelope ID: 02B90083-14E3-4876-8539-87056ADA4991

The parties will provide each other with such cooperation as is reasonably necessary to implement the intentions of this paragraph.

20.     **Survival**. All obligations of Landlord and Tenant hereunder not fully performed as of and intended to survive the termination of the Lease Term will survive the termination of the Lease Term for a period of two (2) years, including indemnity obligations, confidentiality obligations, obligations under Section 30 of this Lease, payment and reconciliation obligations and audit rights with respect to Operating Expenses, and obligations concerning the condition, repair, and/or surrender of the Premises.

21.     **Attorneys' Fees**. The prevailing party in any action to enforce this Lease will be entitled to receive from the other party all reasonable expenses, including legal fees and disbursements paid or incurred by the prevailing party in such action.

22.     **Quiet Enjoyment**. So long as there is no continuing Tenant Default, Tenant will, at all times during the Lease Term, have peaceful and quiet enjoyment of the Premises free from claims arising by or through Landlord.

23.     **Waiver of Jury Trial**. TO THE EXTENT PERMITTED BY LEGAL REQUIREMENTS, THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE PARTIES ARISING OUT OF THIS LEASE, THE GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.

24.     **Force Majeure**. Neither party will be held responsible for delays in the performance of its obligations hereunder when caused by abnormal inclement weather; acts of terrorists, war (whether declared or not) or national conflicts; strikes, lockouts, labor disputes, boycotts or work stoppages not caused by or limited to Landlord, or its contractors or subcontractors; natural disasters, such as earthquake, hurricane or flood; epidemic, pandemic or widespread disease (including, without limitation, COVID-19 and coronavirus); governmental restrictions, regulations or controls; or delay in obtaining or inability to obtain labor, materials or reasonable substitutes, or Approvals, beyond time periods typical for the area (despite using commercially reasonable efforts to obtain), in each case that (a) could not reasonably have been anticipated by such party, (b) is beyond the reasonable control of such party, and (c) could not be prevented or overcome, wholly or in part, by the exercise of due diligence by such party ("Force

Majeure"), provided that this will not apply (i) to excuse any failure of either party to comply with any monetary obligations hereunder; (ii) to delay the date on which Tenant is entitled to exercise self-help rights; or (iii) only to the extent provided in Section 15 of this Lease, to delay the date on which either party is permitted to terminate this Lease or exercise other rights following a casualty. The parties acknowledge that extension of some of the deadlines in Section 1 of this Lease and elsewhere in this Lease for Force Majeure is limited as set forth in such sections. If Force Majeure occurs, the party claiming Force Majeure (the "Claiming Party") will give written notice to the other party within five (5) days after first learning of the occurrence of the Force Majeure. If the Claiming Party fails to give such timely notice, the Claiming Party will have the extension in deadlines to which it would otherwise be entitled to (but for the late notice), reduced on a day-for-day basis for each day that the notice is late. In addition, Landlord will promptly notify Tenant by sending an email to opsrelegalnotice@amazon.com if Landlord or its agents, subcontractors, or consultants or any party acting on their behalf is directly or indirectly asked by any person to make or offer any payment to a government official or authority (or any other person at a government official's request or with such official's assent or acquiescence) where making or offering the payment would cause Landlord to violate, or be in violation of, any Legal Requirements or this Section. As used herein, "Approvals" means any permit, consent, approval, authorization, agreement, waiver, easement, right of way, license or similar item that must be obtained from any person (including both private persons and governmental authorities) in order for work to be performed or Tenant to operate its business at the Premises.

25.     **Expedited Arbitration Process**. "Expedited Arbitration Process" means arbitration according to the then-current Expedited Procedures under the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association ("AAA"), modified as follows: (a) there will be one arbitrator who is selected utilizing the then-current AAA process and who has at least ten (10) years of relevant experience; (b) the arbitration will be conducted through document submission without a hearing; and (c) the arbitrator will issue a final decision within sixty (60) days after confirmation of the appointment of the arbitrator. The arbitrator will have no decision-making authority other than to select either the determination or recommendation of Landlord or Tenant as final and conclusive after due consideration of the factors to be taken into account under the applicable provisions of this Lease. The arbitrator's determination will be binding upon the parties. The costs and fees of the arbitrator will be shared equally by Tenant and Landlord.

DocuSign Envelope ID: 02B90083-14E3-4876-8539-87959ADA4991

AMAZON_00033
CONFIDENTIAL
DPL4

ADDENDUM 4

NOTICE ADDRESSES

**LANDLORD'S NOTICE ADDRESS:**

Address:
AG-EIP 1 Geoffrey Drive, L.L.C.
c/o Equity Industrial Partners, Corp.
20 Pickering Street, Second Floor
Needham, MA 02492
Attention: Bruce A. Levine
Facsimile: (781) 719-0670

With copy to:

c/o Angelo, Gordon & Co., LP
245 Park Avenue, 24th Floor
New York, New York 10167
Attention: Matthew Jackson
Facsimile: (212) 867-5436

**FOR REQUESTS FOR CONSENT TO TENANT-MADE ALTERATIONS UNDER SECTION 12, EMAILS TO BE SENT TO LANDLORD AT:** Bruce A. Levine at blevine@eipcorp.net and Gary McMillan at gary.mcmillan@yahoo.com

**FOR NOTICE OF A MATERIAL INTERFERENCE UNDER SECTION 25(a), EMAILS TO BE SENT AS FOLLOWS:**

To Landlord:  Bruce A. Levine at blevine@eipcorp.net and Gary McMillan at gary.mcmillan@yahoo.com

To Tenant: email addresses set forth below.

**TENANT'S NOTICE ADDRESS:**

c/o Amazon.com, Inc.
Attention:  Real Estate Manager (NA Ops: DPL4)
Attention:  General Counsel (Real Estate (NA Ops): DPL4)
Attention:  NA Ops Asset Management (DPL4)

Each with an address of:
410 Terry Ave. N
Seattle, WA 98109-5210
Telephone: (206) 266-1000

With copies to:
naops-propmgmt@amazon.com; opsrelegalnotice@amazon.com;
na-realestate@amazon.com; naops-rent@amazon.com

using the subject line—Re: DPL4 and reason for the notice (e.g., default, cease & desist, bribery or anti-corruption)

AMAZON_00033

CONFIDENTIAL
AMAZON_00034
DPL4

ADDENDUM 5

**WORK LETTER**

1.        **Work and Initial Improvements**. The terms "Work" and "Initial Improvements" will have the meanings ascribed to them in this Addendum.

2.        **Commencement Date**.

(i)        If for any reason the Work has not been completed within five (5) days after the Anticipated Commencement Date, Tenant will not be obligated to pay Base Rent or Operating Expenses, and Landlord will pay to Tenant as liquidated damages (and not as a penalty) a late delivery fee in the amount of one (1) day's Base Rent for each day of delay (the "Late Delivery Fee") until the Work has been completed. The Anticipated Commencement Date will be subject to extension on a day-for-day basis due to Force Majeure (not to exceed sixty (60) days) and Tenant Delay. The parties agree that Tenant's actual damages as a result of Landlord's late delivery would be extremely difficult or impracticable to determine, and acknowledge that the Late Delivery Fee has been agreed upon, after negotiation, as the parties' best and reasonable estimate of Tenant's damages. If the Work has not been completed within ninety (90) days after the Anticipated Commencement Date, then Tenant may terminate this Lease upon written notice to Landlord at any time after such ninety (90) day period and prior to the date on which the Work is completed. Tenant's rights set forth in this Paragraph 2 shall be Tenant's sole and exclusive remedies in the event of a delay in Landlord's completion of the Work by the Anticipated Commencement Date.

(ii)        "Substantial Completion" (or any grammatical variation thereof) means completion of the Work in accordance (in all material respects) with Paragraph 3 below.

(iii)        "Tenant Delay" means any actual delay in completing the Work that is caused by: (i) any matters specifically identified as Tenant Delays in this Work Letter; (ii) Tenant's failure to approve, disapprove or otherwise act within the time periods described herein; (iii) material interference by Tenant or Tenant Parties with Landlord's performance and construction of the Work; (iv) the parties engaging in the Expedited Arbitration Process, but only if Landlord is the prevailing party in such Expedited Arbitration Process as determined by the arbitrator; and (v) Tenant's failure to respond to Landlord's request for material information or a material clarification within five (5) Business Days.  As a condition to any Tenant Delay, Landlord shall provide Tenant with email notice to the addresses at the end of this paragraph specifying the nature of the Tenant Delay and stating "**FAILURE TO RESPOND WITHIN 2 BUSINESS DAYS WILL CONSTITUTE TENANT DELAY**," and Tenant does not correct the alleged delay within two (2) Business Days of such notice.  Email addresses for notice pursuant to this Section: transportation-cms@amazon.com, with copies to: na-realestate@amazon.com and opsrelegalnotice@amazon.com using the subject line – Re: NA Ops – DPL4.

3.        **Landlord's Representative; Work**. Landlord's representative during the completion of the Work and the Initial Improvements is Gary McMillan (gary.mcmillan@yahoo.com). Landlord will ensure and/or perform the following (collectively, the "Work") at Landlord's sole cost and expense:

(a)        Deliver the Premises in broom-clean condition, free and clear of all prior occupants, claims and furniture, fixtures and equipment.

(b)        The utilities serving the Premises, including water, gas, electricity, telephone, sewer, and sprinkler services, will be stubbed to or delivered to the Premises and gas and electric are separately metered.

4.        **Initial Improvements**. Tenant will have the right to construct the improvements (the "Initial Improvements") as described in the Preliminary Scope and Final Plans. Tenant will not be required to pay any construction management or supervision fee, or equivalent, in connection with Tenant's performance of the Initial Improvements.  Tenant shall perform the Initial Improvements diligently, in a good and workmanlike manner, in compliance with all applicable Legal Requirements and free and clear of all liens.  The Initial Improvements shall not include any alterations, additions or improvements to any common areas of the Land or which would unreasonably interfere with the use of the Land or Building by any other tenant of the Building.

(a)        Early Access. Tenant (and its vendors and contractors) will be entitled to enter the Premises ("Tenant's Early Occupancy") following the Effective Date for purposes of planning and measurement, construction of the Initial Improvements, installation of furniture, fixtures and equipment and receipt of products and inventory for training purposes ("Tenant's Work"). Tenant's Work will not unreasonably interfere with the completion of any work required to be performed by Landlord for delivery of the Premises. All provisions of the Lease, except for Tenant's maintenance obligations and the payment of Base Rent, will be applicable during Tenant's Early Occupancy.

(b)        Preliminary Scope; Final Plans. Landlord hereby approves of the current scope of the Initial Improvements designated on **Exhibit A to Addendum 5** (the "Preliminary Scope"). Tenant will submit construction drawings of the Initial Improvements (the "Construction Drawings") to Landlord for approval, and Landlord will approve or disapprove, and provide detailed reasons for such disapproval, within 5 Business Days after receipt thereof. So long as the Construction Drawings are substantially consistent with the Preliminary Scope, Landlord will not disapprove such Construction Drawings. If Landlord fails to approve or request

Addendum 5 - 1

CONFIDENTIAL
DPL4
AMAZON_00035

changes to the Construction Drawings within 5 Business Days after receipt thereof, then Landlord will be deemed to have approved such Construction Drawings. The approved Construction Drawings will be referred to as "Final Plans."

(c)     Removal of Initial Improvements. Tenant will not be required to remove any of the Initial Improvements except to the extent required by Landlord at the time Landlord approves of the Construction Drawings.

(d)     Permits. Landlord will provide Cooperation Efforts to Tenant in connection with Tenant's obtaining permits and other necessary approvals to construct the Initial Improvements, including without limitation executing any plan or permit application as the owner of the Premises. Landlord is responsible for all permits and other necessary approvals for the Work (it being understood that Tenant is responsible for all permits and approvals relating to the Initial Improvements).

5.     **Prohibited Materials**. In the event any mold, asbestos or Hazardous Materials ("Prohibited Materials") are discovered during the construction or installation of the Work or the Initial Improvements, Landlord will perform any removal and/or remediation work at Landlord's sole cost and expense; provided that if such Prohibited Materials are brought to the Premises as a result of the acts or omissions of Tenant or any Tenant Parties, then Tenant shall perform any removal and/or remediation work at Tenant's sole cost and expense. Such removal and/or remediation work will include, but is not limited to, having an expert (e.g., an industrial hygienist) certify that the Premises is (a) in compliance with Legal Requirements pertaining to the Prohibited Materials, and (b) safe for Tenant's use. Removal and/or remediation of Prohibited Materials pursuant to this Section will not constitute part of the Initial Improvements.

AMAZON_00035

DocuSign Envelope ID: 02B90083-14E3-4876-8539-87959ADA4991

AMAZON_00036
CONFIDENTIAL
DPL4

## **Exhibit A to Addendum 5**

### **INITIAL IMPROVEMENTS**

SITE
- Limit site work; Leave existing gravel paving as is; restriping of pavement if it is in good condition. Patching where required
- Do not provide a standard AMZL canopy for exterior loading, but investigate clear span tensile structures (look at lease options); tensile structure must be snow rated; review for township permitting requirements; Consider lighting options at the tensile structures

ARCHITECTURE
- Reuse existing docks, pits, and levelers and replace dock door locks and mechanics.
- Reuse existing mezzanine office area. Remove partitions as required and provide program for breakroom, mothers room, multi-faith, HR, and typical offices. Patch/Repair existing finishes.
- Close off the part of the warehouse that will not be needed for MHE operation
- Provide cast-in-place concrete or Dockzilla (or equal) load out ramps. Note these will likely trigger site plan approval/zoning.
- Provide AMZL signage (directional, interior, and exterior wall sign); Confirm if this requires any special township reviews (Note: modify stock signs to meet township requirements and do not request variances)
- Reuse existing breakrooms in lieu of providing a new breakroom. This would save time on demo, new MEP, and fit out.
- Confirm if there are roof leaks as there are several stained ceiling panels throughout the office and break areas
- Highlight the Associates entrance with vinyl window film (perhaps bright Amazon blue)

MECHANICAL
- Reuse existing RTUs and service as required; Design a cooling option with fixed units and an option for rental units for air temperature cooling; Provide Big Ass Fans to supplement air conditioning; Stantec's early review projects that we could not provide additional RTUs without additional structural support; Consider where on the ground we might place the units; Consider the addition of cooling may be a Day 2 element to be added after Launch
- Our current plan is to reuse existing HVAC system controls to the greatest extent possible. Existing controls were mostly provided with the equipment they serve. For example, rooftop units have their own thermostats which do not appear to interface with a central control system. We will continue this approach. Anything new we provide will also have its own packaged controls. The alternative would be to provide either their standard control or a "lite" control system. Both of these approaches would be a significant cost increase over re-using existing
- Heating will reuse the existing units; MAU will be required and are not anticipated to be too much procurement lead time; Stantec is to provide specifications and quantities ahead of CD package release so Gilbane can start procurement

ELECTRICAL
- Zelus is capturing the interior and exterior light levels; we will re-lamp with LEDs and supplement interior lighting as needed (Note: this should be considered as tenant maintenance items and completed without permit); Consider lighting modifications will trigger energy code compliance.
- GC to modify existing lighting in field; we need to re-verify the lamp light levels after modifications are made.
- Current electrical service is 2000amps; this service is not sufficient to support additional warehouse AC even with the removal of the battery charging equipment; additional electrical service will be provided Day 2
- New panel boards are expected to take 4-6 weeks to procure; Stantec is to provide specifications and quantities ahead of CD package release so Gilbane can start procurement

PLUMBING
- We will reuse existing lines

FIRE PROTECTION/FIRE ALARM
- The sprinkler is not EFSR which is ok as this is not AMZL required; sprinklers may need to be modified at the office areas;

DocuSign Envelope ID: 02B90083-14E3-4876-8539-87956ADA4991

AMAZON_00037
CONFIDENTIAL
DPL4

## EXHIBIT A

### SITE PLAN FOR PREMISES



AMAZON_00037

DocuSign Envelope ID: 02B80083-14E3-4876-8539-87056ADA4991

AMAZON_00038
CONFIDENTIAL
DPL4

**EXHIBIT A-1**

**LEGAL DESCRIPTION OF LAND**

For APN/Parcel ID(s): 13-028-062-004

TRACT NO. 1

ALL THAT CERTAIN piece or parcel of ground, situate in Falls Township, Bucks County, Pennsylvania, bounded and described according to a Plan made by Benjamin C. Queen, Professional Land Surveyor, dated March 21, 1983, last revised August 30, 1983, as follows, to wit:

BEGINNING at a point of reverse curve on the Southwest sideline of Kresge Road (60.00 feet wide) marking the end of a radius of round corner at the Southwest corner of the intersection of Kresge Road and Geoffrey Road (60.00 feet wide); thence from said beginning point, along said sideline of Kresge Road and the Northeast sideline of a railroad easement, the two following courses and distances: (1) on a line curving to the left with a radius of 330.00 feet, the arc distance of 231.73 feet to a point of tangency; (2) South 04 degrees 26 minutes East 24.44 feet to a point; thence leaving said sideline crossing said railroad easement, partly along the Southeast sideline of a drainage easement, crossing a railroad easement serving Cartex Corporation, and 35.00 feet Southeast of and parallel to the Northwest sideline of a 50.00 feet wide railroad and drainage easement, South 85 degrees 34 minutes West 1844.77 feet to a point on a curve marking the Southeast sideline of said Geoffrey Road; thence along same crossing said railroad and drainage easement and partly along the Northeast sideline of a 10.00 feet wide utility easement, the seven following courses and distances: (1) on line curving to the right with a radius of 420.19 feet, the arc distance of 69.62 feet to a point of tangency; (2) North 40 degrees 05 minutes 42 seconds East 653.53 feet to a point of curve; (3) on a line curving to the right with a radius of 270.00 feet, the arc distance of 214.28 feet to a point of tangency; (4) North 85 degrees 34 minutes East 769.97 feet to a point of curve; (5) on a line curving to the right with a radius of 270.00 feet the arc distance of 189.60 feet to a point of tangency; (6) South 54 degrees 12 minutes East 364.03 feet to a point of curve of the radius round corner aforesaid; (7) on a line curving to the right with a radius of 45.00 feet, crossing the railroad easement aforesaid, the arc distance of 70.69 feet to the place of beginning.

TRACT NO. 2

ALL THAT CERTAIN tract of land with improvements, situate in the Township of Falls, County of Bucks and Commonwealth of Pennsylvania, bounded and described in accordance with the Subdivision Plan of said property dated November 5, 1985 as revised 10/22/1986 as prepared by Yerkes Associates, Inc., Bryn Mawr, Pa., more particularly described as follows:

BEGINNING at a point on the South sideline of Geoffrey Road (60.00 feet wide), said point being 1323.60 feet measured Westwardly along said sideline, from the end of a radius round corner marking the Southwest corner of the intersection of Geoffrey Road and Kresge Road (60.00 feet wide); thence extending from said beginning point, along the Southeast sideline of a portion of Geoffrey Road to be vacated and along property now or formerly of Toys "R" Us - Penn., Inc., the three following courses and distances: (1) along the arc of a circle curving to the left with a radius of 270 feet the arc distance of 214.28 feet to a point of tangency: (2) South 40 degrees 05 minutes 42 seconds West 653.53 feet to a point of curve; (3) along the arc of a circle curving to the left with a radius of 420.19 feet, the arc distance of 69.62 feet to a point on line of lands now or formerly of Commonwealth Wood Preservers, Inc.; thence crossing Geoffrey Road (to be vacated); along other lands now or formerly of WMI Properties, Inc., of which this is a part, the three following courses and distances: (1) South 85 degrees 34 minutes West 442.72 feet to a point; (2) South 26 degrees 34 minutes West 233.33 feet to a point; (3) South 85 degrees 34 minutes West 655.00 feet, crossing the area taken by the Pennsylvania Department of Transportation for a Channel Change of Rock Run Creek, to a point on the Southeast sideline of U.S. Route 13 (L.R. 778); thence along the same and the Northwest side of line of the Rock Run Channel Change, aforesaid, the two

AMAZON_00039
CONFIDENTIAL
DPL4

following courses and distances: (1) North 47 degrees 53 minutes East 888.66 feet to a point of curve; (2) along an arc of a circle curving to the left with a radius of 3129.55 feet, the arc distance of 473.70 feet to a point on line other lands now or formerly of WMI Properties, Inc., aforesaid; thence along the same, North 85 degrees 34 minutes East 806.93 feet to a point on the arc of a circle forming the Geoffrey Road cul-de-sac; thence along said arc of a circle curving to the left with a radius of 52.00 feet, the arc distance of 89.71 feet to the first mentioned point and place of beginning.

TOGETHER WITH THE EASEMENT AND RIGHTS OF WAY by and between WMI Properties, Inc. and Toys "R" Us-Penn., Inc. dated October 24, 1986 and recorded in Bucks County Recorder of Deeds Office in Deed Book 2710 page 938.

ALSO BEING DESCRIBED BY SURVEY AS FOLLOWS:

ALL THAT CERTAIN parcel or tract of ground, with improvements erected thereon, situate in Falls Township, County of Bucks and the Commonwealth of Pennsylvania as shown on a Plan by Pennoni Associates Inc., entitled "Toys R Us" ALTA/ACSM Land Title Survey", dated 1/719/99, and being more particularly described as follows:

BEGINNING at a point at the end of the terminus of a curve connecting the Southwesterly right-of-way of Kresge Road (60 feet wide) with the Southerly side of Geoffrey Road (60 feet wide); thence (1) along said Kresge Road on a curve to the left, an arc length of 231.73 feet with a radius of 330.00 feet to a point of tangency; thence (2) continuing along same, South 04 degrees 26 minutes 00 seconds East, a distance of 24.44 feet to a point; thence (3) South 85 degrees 34 minutes 00 seconds West, a distance of 2287.49 feet to a point; thence (4) South 26 degrees 34 minutes 00 seconds West, a distance of 233.33 feet to a point; thence (5) South 85 degrees 34 minutes 00 seconds West, a distance of 540.00 feet (more or less) to a point in the Southeasterly side of land taken by the Pennsylvania Department of Transportation for Channel Change of Rock Run Creek; thence (6) along the same on a curve to the right an arc length of 70.12 feet (more or less) with a radius of 198.48 feet (more or less) to a point; thence (7) North 47 degrees 53 minutes 00 seconds East, a distance of 728.66 feet (more or less) along the same to a point of curve; thence (8) along the same on a curve to the left an arc length of 539.53 feet (more or less) with a radius of 3189.55 feet (more or less) to a point; thence (9) North 85 degrees 34 minutes 00 seconds East, a distance of 724.71 feet (more or less) to a point in said Geoffrey Road; thence (10) along the same on a curve to the left having an arc length of 89.71 feet with a radius of 52.00 feet to a point of tangency; thence (11) North 85 degrees 34 minutes 00 seconds East, along said Geoffrey Road, a distance of 769.97 feet to a point; thence (12) continuing along same on a curve to the right having an arc length of 189.60 feet with a radius of 270.00 feet to a point of tangency; thence (13) South 54 degrees 12 minutes 00 seconds East, a distance of 364.03 feet along the same to a point of curve; thence (14) along a curve to the right having an arc length of 70.60 feet and a radius of 45.00 feet to the said point of beginning.

TOGETHER WITH THE EASEMENT AND RIGHTS OF WAY by and between WMI Properties, Inc. and Toys "R" Us-Penn., Inc. dated October 24, 1986 and recorded in Bucks County Recorder of Deeds Office in Deed Book 2710 page 938.

Being the same premises which EIP Industrial Toys LLC, a Delaware limited liability company by Deed dated 11/28/2018, effective 11/30/2018 and recorded 12/7/2018 in Bucks County in Instrument # 2018067259 conveyed unto AG-EIP 1 Geoffrey Drive, L.L.C., a Delaware limited liability company, in fee.

AMAZON_00039

AMAZON_00040
CONFIDENTIAL
DPL4

**EXHIBIT B**

**PERMITTED EXCEPTIONS**

Right of way granted to The Bell Telephone Company of Pennsylvania as set forth in <u>Deed Book 1951, page 603</u> and <u>Deed Book 2552, page 456</u>, as shown on the Survey as hereinafter defined.

Rights granted to Philadelphia Electric Company as set forth in <u>Deed Book 1817, page 850</u> and <u>Deed Book 2261, page 1180</u>, as shown on the Survey

Subject to 10-feet wide Utility Easement, part of, 50-foot wide Rail and Drainage Easement, Railroad Tracks Easement, as shown on Survey made by Pennoni Associates, dated January 7, 1999, as shown on the Survey.

Deed of Easement between Toys "R" Us – Penn, Inc. and Township of Falls Authority dated February 14, 1996 as in Land <u>Record Book 1346, page 1663</u> as assigned by that certain Assignment of Easements from Township of Falls to Township of Falls Authority, recorded 1/9/2007 in <u>Record Book 5245, page 1883</u>, as shown on the Survey

Deed of Dedication of Public Facilities from Toys "R" Us – Penn, Inc. to Township of Falls Authority dated February 14, 1996 as in Land <u>Record Book 1346, page 1669</u>, as shown on the Survey.

Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated November 27, 2018, effective December 14, 2018, executed by AG-EIP 1 Geoffrey Drive, L.L.C., a Delaware limited liability company, in favor of Bank of America, N.A. a national banking association, as administrative agent, in the principal amount of $74,266,304.00, and recorded December 24, 2018, at Instrument No. 2018070313.

Exhibit B - 1

AMAZON_00041
CONFIDENTIAL
DPL4

**EXHIBIT C**

**FORM OF NOTICE OF LEASE TERM DATES**

Date: _____

To:     Amazon.com Services LLC
        c/o Amazon.com, Inc.
        Attention:  Real Estate Manager (NA Ops: DPL4)
        Attention:  General Counsel (Real Estate (NA Ops): DPL4)
        Attention:  NA Ops Asset Management (DPL4)

        <u>Each with an address of</u>:
        410 Terry Ave. N
        Seattle, WA 98109-5210
        Telephone: (206) 266-1000

RE:     Lease Agreement dated _____, 20__, between _____ ("<u>Landlord</u>"), and _____ ("<u>Tenant</u>"), concerning the Premises located at _____, _____ County, _____ (the "<u>Lease</u>").

Capitalized terms used herein, but which are not defined herein, will have the meanings given to such terms in the Lease.

In accordance with the Lease, Landlord represents the following:

1.     That Tenant has possession of the Premises and acknowledges that under the provisions of the Lease the Lease Term will commence as of _____ for a term of ____ months ending on _____.

2.     That, in accordance with the Lease, Base Rent commences to accrue on _____.

3.     That the Base Rent Schedule is as follows:

[INSERT RENT SCHEDULE]

**<u>LANDLORD</u>**:

_____
a _____

By: _____
Name: _____
Title: _____
Date: _____

Acknowledged:

**<u>TENANT</u>**:

_____
a _____

By: _____
Name: _____
Title: _____
Date: _____

Exhibit C - 1

AMAZON_00041

DocuSign Envelope ID: 02B80083-11E3-4876-8539-87056ADA4991

AMAZON_00042
CONFIDENTIAL
DPL4

**EXHIBIT D**

**MAINTENANCE OBLIGATIONS (SINGLE-TENANT)**

| LANDLORD MAINTENANCE OBLIGATIONS – OPERATING EXPENSES (RECOVERABLE) | | |
|---|---|---|
| Item | Description of Service | Controllable[1] |
| **Catch basins (parking lot and drive aisles)** | Permits, regulatory compliance, maintenance, restoration | Yes |
| **Electrical system** | Maintenance, repair, and replacement of transformer, electrical switchgear, and other components of the electrical system located outside the Premises or subgrade | Yes |
| **Exterior paint** | Paint building exterior to mutually-agreeable color and design once every 10 years and touch up more frequently as needed to maintain a uniform aesthetic | Yes |
| **Exterior pumps** | General maintenance and repair | Yes |
| **Fire sprinkler and fire protection systems** | Any capital repair/replacement of fire/life safety system installed as part of the Base Building Specifications ("Base F/LS System"), including any maintenance and capital repair/replacement of any fire water tank. Landlord to provide copies of maintenance, repair and replacement logs upon Tenant's request. | Yes |
| **Ground irrigation** | Maintenance and replacement of system elements, as needed | Yes |
| **Gutters, scuppers, downspouts, and storm water systems** | Preventative maintenance and repair | Yes |
| **Parking lots and drive surfaces** | Preventative maintenance, restoration, sealing, striping | Yes |
| **Parking lot lighting** | Maintenance, repair and replacement | Yes |
| **Pest control** | Exterior only, as needed. Upon Tenant's request, Landlord to provide Tenant with a copy of Landlord's rodent and pest control plan (including chemicals used) and Tenant will have right to reasonably approve of same. | Yes |
| **Roof** | Annual inspections, leak repair, preventative maintenance, as needed to maintain warranty | Yes |
| **Snow removal—roof only** | Snow and ice removal from roof, awnings, and overhangs, including drain clearing | No |
| **Subgrade utility lines** | Maintenance, repair, and replacement of all subgrade utility lines, including sewer, plumbing, pumps, and lift stations, if any | Yes |
| **Swales and retention/detention ponds** | Permits, regulatory compliance, maintenance, restoration | Yes |

---

[1] Cost part of Controllable Operating Expenses unless capital repair or replacement (subject to amortization requirements as further described in Section 6 and **Base Rent and Operating Expense Exclusions, Addendum 1** of the Lease).

DocuSign Envelope ID: 02B90083-14F3-4876-8539-87056ADA4991

AMAZON_00043
CONFIDENTIAL
DPL4

| LANDLORD MAINTENANCE OBLIGATIONS – CAPITAL IMPROVEMENTS (NON-RECOVERABLE) | | |
|---|---|---|
| Item | Description of Service | Controllable |
| **Exterior signage—Landlord installed** | Repair, replace, upgrade Landlord signage as needed to maintain professional aesthetic | N/A |
| **Landscaping (non-recurring service)** | Items exceeding general maintenance such as tree removal or trimming, replacement (including annual color replacement), re-grading, overhauling, etc. | N/A |
| **Parking lot and drive surfaces** | Replace sections as needed based on useful life and performance requirements | N/A |
| **Structure of building, including structural mezzanines and platforms** | Maintain, repair, and replace, as needed | N/A |
| **Roof replacement and structural repair** | Repair and replacement of roof deck and structural components | N/A |
| **Roof membrane and above-deck roof components** | Replacement | N/A |
| **Slab and foundation** | Ensure integrity, conduct repair, including voids and cavities in soils and fill under slab and around foundation | N/A |
| **Exterior walls and load-bearing walls** | Ensure integrity, conduct repair, and replace wall sections, as needed | N/A |

CONFIDENTIAL

AMAZON_00043

DocuSign Envelope ID: 02B90083-14F3-4876-8539-87059ADA4991
AMAZON_00044
CONFIDENTIAL
DPL4

| TENANT MAINTENANCE OBLIGATIONS (after warranty period if applicable) | |
|---|---|
| Item | Description of Service |
| All interior non-structural portions of the Premises | Maintain, repair, and restore as needed |
| Backflow devices, if any | Necessary testing, inspecting, maintenance, and permit management |
| Below-deck ceiling insulation (if equipped) | Maintenance and replacement of insulation materials that are suspended just below the roof deck |
| Carpentry – Doors, cabinets, counters, etc. | Maintenance and repair of doors and millwork |
| Dock doors and dock levelers | General maintenance and repair |
| Electric service (after main feed, above slab) | General maintenance and repair |
| Elevator (if equipped) | General maintenance and repair |
| Energy and Communications Related Improvements | General maintenance and repair |
| Exterior building lighting | Maintenance and repair of exterior lighting affixed to building |
| Exterior curbs and bollards | Maintenance and repair |
| Exterior fencing | Maintain gates and fences around Premises |
| Exterior glazing | Repair broken and/or damaged glass and seals |
| Exterior signage—Tenant installed | Maintain and update Tenant-installed signage as needed |
| Fire sprinkler and fire protection systems | Inspections, testing, compliance, and maintenance of (1) those portions of the Base F/LS System that are on the Premises, and (2) any Tenant-installed supplemental fire/life safety systems, as well as any capital repairs and replacements of (2) |
| Fire protection system monitoring | Monitoring of all applicable portions of fire protection systems and fire water supply |
| Fixtures | General maintenance and repair |
| Generator | Maintenance, testing, inspections, permits |
| HVAC | Maintenance, repair and replacement of HVAC Systems exclusively serving Premises in accordance with manufacturer's recommended standards, but subject to warranty period in Section 10(a) of the Lease. May elect not to repair/replace inoperable HVAC units but subject to removal requirements under Section 21(a). |
| Interior lighting | Maintenance, repair, and replacement of bulbs and ballasts |
| Interior/exterior pest control | As needed |
| Interior sump pump or lift stations | General maintenance and repair |
| Interior walls and floor coverings | Maintenance, repair, and replacement of walls and flooring surfaces (non-structural) |
| Janitorial | Janitorial services, if desired |
| Kitchen appliances | General maintenance and repair |
| Landscaping (recurring services) | Recurring services for landscape maintenance, including mowing, fertilizing, leaf removal, pruning |
| Parking lot sweeping | Maintenance sweeping for debris removal |
| Plumbing – Above slab | General maintenance and repair |
| Snow removal – grounds and parking lots | Remove snow and/or treat ice |
| Suspended ceilings and hard lid ceilings | General maintenance, repair and replacement |
| Trash and recycling | As needed |
| Window washing | Washing of exterior and interior |

AMAZON_00044

DocuSign Envelope ID: 02B90083-14E3-4876-8539-87959ADA4991

AMAZON_00045
CONFIDENTIAL
DPL4

**EXHIBIT E**

**FORM OF ESTOPPEL CERTIFICATE**

ESTOPPEL CERTIFICATE

To: _____ ("Recipient")

Re: Lease Agreement dated _____ (as amended, if at all, as set forth on Exhibit A, the "Lease"), by and between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant"), for the premises described in the Lease (the "Premises"), located at _____. Capitalized terms used herein, but which are not defined herein, will have the meanings given to such terms in the Lease.

The undersigned, as [Tenant] [Landlord] under the Lease, hereby certifies to Recipient the following, as of the present date:

1. [Tenant] [Landlord] is a party to the Lease. The Lease has not been amended or modified (excluding approvals, consents, or waivers given by Landlord in connection with the Lease) by any written instrument between Tenant and Landlord except as set forth on Exhibit A.

2. Landlord has completed the Work except for _____.

3. Tenant is not owed any allowance except for _____.

4. Tenant has paid Base Rent and Tenant's Proportionate Share of Operating Expenses through _____.

5. To [Tenant's] [Landlord's] actual knowledge, there is no [Landlord] [Tenant] default existing under the Lease (after expiration of applicable notice and cure period), and [Tenant] [Landlord] has not sent any notice of default to [Landlord] [Tenant] under the Lease which has not been cured.

[Tenant's] [Landlord's] "actual knowledge" means the current, actual knowledge of the person executing this document on behalf of [Tenant] [Landlord], without any duty of investigation or inquiry.

[Tenant's certifications are made solely to estop Tenant from asserting to or against Recipient facts or claims contrary to those stated. This estoppel certificate does not constitute an independent contractual undertaking or constitute representations, warranties or covenants or otherwise have legal effect other than estopping Tenant from asserting to or against Recipient any contrary facts or claims. This estoppel certificate does not modify in any way the Lease.]

_____,
a _____

By: _____
Name: _____
Title: _____
Date signed: _____

AMAZON_00045

DocuSign Envelope ID: 02B90083-14E3-4876-8559-87956ADA4991

AMAZON_00046
CONFIDENTIAL
DPL4

EXHIBIT A TO ESTOPPEL CERTIFICATE
List of Lease Documents


[To be completed with delivery of Estoppel Certificate]



Exhibit D - 2

DocuSign Envelope ID: 02B90083-14E3-4876-8539-87D59ADA4991

AMAZON_00047
CONFIDENTIAL
DPL4

**EXHIBIT F**

**INTENTIONALLY DELETED**



AMAZON_00047

AMAZON_00048
CONFIDENTIAL
DPL4

**EXHIBIT G**

**INTENTIONALLY DELETED**



AMAZON_00048

AMAZON_00049
CONFIDENTIAL
DPL4

**EXHIBIT H**

**FORM OF LIMITED PARENT GUARANTY**

<u>LIMITED PARENT GUARANTY</u>

This Limited Parent Guaranty (this "<u>Guaranty</u>"), effective as of the date of the Contract (as defined below), is made by Amazon.com, Inc., a Delaware corporation ("<u>Amazon.com</u>"), to and for the benefit of **AG-EIP 1 GEOFFREY DRIVE, L.L.C.** (the "<u>Beneficiary</u>"). Capitalized terms not otherwise defined herein have the meanings specified in the Contract (defined below).

**Recitals**

A.       Amazon.com Services LLC, a directly or indirectly wholly owned subsidiary of Amazon.com ("<u>Subsidiary</u>"), and Beneficiary are parties to that certain Lease Agreement (the "<u>Contract</u>") for property located at 1 Geoffrey Drive, Falls Township, Pennsylvania.

B.       In order to be assured of payment under the Contract, Beneficiary desires that Amazon.com guaranty the performance of certain payment obligations as set forth herein.

**Guaranty**

In consideration of the foregoing and to induce Beneficiary to enter into the Contract, Amazon.com agrees as follows.

1.       Amazon.com unconditionally and absolutely guarantees to Beneficiary Subsidiary's performance when due and owing of all present and future payment obligations, which are not paid in accordance with the terms of the Contract by Subsidiary. Notwithstanding anything to the contrary set forth in this Guaranty, Amazon.com's maximum cumulative liability under this Guaranty will be 100% of remaining aggregate Base Rent (as defined in the Contract) owing under the Contract, but not less than the Base Rent due during the final twelve (12) months of the then current term of the Contract. Notwithstanding the foregoing, Amazon.com shall pay (or cause Subsidiary to pay), which obligation shall not be subject to the limitation on liability set forth in this Paragraph 1, (i) all amounts that are required to be paid by Subsidiary pursuant to Section 9 of the Contract if Subsidiary elects to self-insure in accordance with the terms of the Contract, and (ii) all amounts which are due and payable in connection with any indemnification obligations by Subsidiary in favor of Beneficiary pursuant to the Contract.

2.       Under this Guaranty, Amazon.com shall perform (or cause Subsidiary to perform) all payment obligations in accordance with the terms and conditions of the Contract.

3.       Amazon.com promises to pay all amounts guaranteed promptly upon receipt of a written notice from Beneficiary which evidences (a) Subsidiary's non-performance of its payment obligations under the Contract; and (b) Beneficiary's first having demanded payment from Subsidiary in writing, which Subsidiary has not honored. Beneficiary's demand upon Subsidiary does not need to include the initiation of legal proceedings and is deemed satisfied if demand upon Subsidiary would violate any stay of collection in effect in an insolvency proceeding. Except to the extent of the demand requirement set forth in this Section 3, Amazon.com waives protest and notice of dishonor or default. This is a guaranty of payment only, and not of collection.

4.       This Guaranty is governed as to its validity, construction and performance by the laws of the Commonwealth of Pennsylvania, without regard to its conflict of law provisions.

5.       Amazon.com agrees that this Guaranty is a continuing guaranty and will remain in full force and effect until all payment obligations under the Contract have been performed as set forth in the Contract, subject to Section 1 above.

6.       This Guaranty is binding upon and inures to the benefit of Amazon.com and Beneficiary and their respective successors and assigns.

7.       Amazon.com has all rights and defenses that Subsidiary may have to any payment obligation, except that the liability of Amazon.com is not affected by (a) any defense based upon an election of remedies by Beneficiary that destroys or otherwise impairs the subrogation rights of Amazon.com or the right of Amazon.com to proceed against any Subsidiary for reimbursement; (b) any duty on the part of Beneficiary to disclose to Amazon.com any facts Beneficiary may know about any Subsidiary, it being agreed that Amazon.com is fully responsible for being and keeping informed of the financial condition of Subsidiary and of all circumstances bearing on the risk of non-payment of the payment obligations; or (c) any

Exhibit H - 1

AMAZON_00049

AMAZON_00050
CONFIDENTIAL
DPL4

defense arising from the bankruptcy or insolvency of any Subsidiary.

8.      All notices hereunder will be given in writing, will refer to this Guaranty and will be personally **delivered** or sent by overnight courier, or registered or certified mail (return receipt requested). Notices to Amazon.com **will be delivered at** the following addresses:

| Mail | Courier |
|---|---|
| Amazon.com, Inc. | Amazon.com, Inc. |
| P.O. Box 81226 | 410 Terry Avenue North |
| Seattle, WA 98108-1226 | Seattle, WA 98109-5210 |
| Attn: Real Estate Manager (NA Ops: DPL4) | Attn: Real Estate Manager **(NA Ops: DPL4)** |
| | |
| With a copy to: | With a copy to: |
| | |
| Amazon.com, Inc. | Amazon.com, Inc. |
| P.O. Box 81226 | 410 Terry Avenue North |
| Seattle, WA 98108-1226 | Seattle, WA 98109-5210 |
| Attn: General Counsel (Real Estate (NA Ops): DPL4) | Attn: General Counsel (Real Estate (NA Ops): DPL4) |

Amazon.com may from time to time change such address by giving Beneficiary notice of such change in accordance with the notice provisions of the Contract.

**AMAZON.COM, INC.,**
a Delaware corporation

By:_____
Printed Name:_____
Its:_____
Date Signed:_____

AMAZON_00050

AMAZON_00051
CONFIDENTIAL
DPL4

DocuSign Envelope ID: 02B00083-1E53-4876-8530-078E6ADA1991    Case 2:22-cv-04629-TJS   Document 1   Filed 11/18/22   Page 100 of 137

**EXHIBIT I**

**FORM OF VISITOR NDA**

**VISITOR NONDISCLOSURE AGREEMENT**

During the course of your visit to this Amazon facility, you may receive information that is not known to the general public ("Confidential Information") relating to Amazon.com, Inc. and/or an entity that controls, is controlled by or is under common control with such company (collectively, "Amazon"). Confidential Information may concern, among other things, Amazon's technology, facilities, assets, systems, customers, vendors, business plans, finances and other information, which should be reasonably considered as confidential. Confidential Information may be contained in tangible materials such as drawings, data, specifications, reports and computer programs, or may be in the nature of unwritten knowledge.

In consideration of Amazon's willingness to allow you to visit its facilities, you agree (i) all Confidential Information will remain Amazon's exclusive property; (ii) you will not use Confidential Information for any purpose whatsoever; (iii) you will not disclose Confidential Information to any individual, company or other third party, except as may be required by law; (iv) you will restrict the possession, knowledge and use of Confidential Information to those employees and subcontractors who have a need to know the specific Confidential Information and you will ensure compliance on the part of these parties with this agreement; and (v) you will notify Amazon immediately upon discovery of any unauthorized use or disclosure of Confidential Information or any other breach of this agreement; and (vi) you will destroy all Amazon materials containing Confidential Information. You also agree that you will not disclose any information to Amazon that is confidential or proprietary to you or any other person or company. Your obligation to comply with this agreement will continue for five (5) years from the date of your visit; however, it will survive indefinitely as long as the information continues to constitute a trade secret.

If a provision of this agreement is held invalid under any applicable law, such invalidity will not affect any other provision of this agreement that can be given effect without the invalid provision. Further, all terms and conditions of this agreement will be deemed enforceable to the fullest extent permissible under applicable law, and, when necessary, the court is requested to reform any and all terms or conditions to give them such effect. This agreement is specifically enforceable by Amazon. This agreement will be construed in accordance with the internal laws of the State of Washington.

Any failure by Amazon to enforce your strict performance of any provision of this agreement will not constitute a waiver of Amazon's right to subsequently enforce such provision or any other provision of this agreement.

This Visitor Nondisclosure Agreement does not replace any other Nondisclosure Agreements with Amazon executed by you, your company or any other person/entity that you represent. Such other Nondisclosure Agreements will remain in full force and effect in accordance with their respective terms.

_____
Company Name: _____
Authorized Signatory: _____
Date: _____

Exhibit I - 1
Legal

AMAZON_00052
DocuSign Envelope ID: CDC04C58-C972-453F-96AD-063E633F81CB

DPL4

## NOTICE OF LEASE TERM DATES

Date:    November 21, 2020

To:    AMAZON.COM SERVICES LLC
c/o Amazon.com, Inc.
Attention:  Real Estate Manager (NA Ops: DPL4)
Attention:  General Counsel (Real Estate (NA Ops): DPL4)
Attention:  NA Ops Asset Management (DPL4)

Each with an address of:
410 Terry Ave. N
Seattle, WA 98109-5210
Telephone: (206) 266-1000

RE:    Lease Agreement dated September 24, 2020, between AG-EIP 1 GEOFFREY DRIVE, L.L.C. ("Landlord"), and AMAZON.COM SERVICES LLC ("Tenant"), concerning the Premises located at 1 Geoffrey Drive, Fairless Hills, Bucks County, Pennsylvania (the "Lease").

Capitalized terms used herein, but which are not defined herein, will have the meanings given to such terms in the Lease.

In accordance with the Lease, Landlord represents the following:

1.    That Tenant has possession of the Premises and acknowledges that under the provisions of the Lease the Lease Term will commence as of October 1, 2020 for a term of 17 months ending on February 28, 2022.

2.    That, in accordance with the Lease, Base Rent commences to accrue on October 1, 2020.

3.    That the Base Rent Schedule is as follows:

| Time Period | Annual Base Rent Per Sq. Ft. | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| October 1, 2020 – February 28, 2022 | $▮ | $▮ | $▮ |

**LANDLORD**:
AG-EIP 1 GEOFFREY DRIVE, L.L.C.
a Delaware limited liability company
By: AG-EIP Industrial 6, L.L.C., its sole member
By: AG Real Estate Manager, Inc., its manager

By: _____
Name: Bruce Levine
Title: Manager
Date: 11/25/2020

Acknowledged:

**TENANT**:
AMAZON.COM SERVICES LLC
a Delaware limited liability company
By: _____
Name: Craig Brandt
Title: Authorized Signatory
Date: November 21, 2020

AMAZON_00053
CONFIDENTIAL
DPL4

## LIMITED PARENT GUARANTY

This Limited Parent Guaranty (this "Guaranty"), effective as of the date of the Contract (as defined below), is made by Amazon.com, Inc., a Delaware corporation ("Amazon.com"), to and for the benefit of **AG-EIP 1 GEOFFREY DRIVE, L.L.C.** (the "Beneficiary"). Capitalized terms not otherwise defined herein have the meanings specified in the Contract (defined below).

### Recitals

A.       Amazon.com Services LLC, a directly or indirectly wholly owned subsidiary of Amazon.com ("Subsidiary"), and Beneficiary are parties to that certain Lease Agreement (the "Contract") for property located at 1 Geoffrey Drive, Falls Township, Pennsylvania.

B.       In order to be assured of payment under the Contract, Beneficiary desires that Amazon.com guaranty the performance of certain payment obligations as set forth herein.

### Guaranty

In consideration of the foregoing and to induce Beneficiary to enter into the Contract, Amazon.com agrees as follows.

1.       Amazon.com unconditionally and absolutely guarantees to Beneficiary Subsidiary's performance when due and owing of all present and future payment obligations, which are not paid in accordance with the terms of the Contract by Subsidiary. Notwithstanding anything to the contrary set forth in this Guaranty, Amazon.com's maximum cumulative liability under this Guaranty will be 100% of remaining aggregate Base Rent (as defined in the Contract) owing under the Contract, but not less than the Base Rent due during the final twelve (12) months of the then current term of the Contract.  Notwithstanding the foregoing, Amazon.com shall pay (or cause Subsidiary to pay), which obligation shall not be subject to the limitation on liability set forth in this Paragraph 1, (i) all amounts that are required to be paid by Subsidiary pursuant to Section 9 of the Contract if Subsidiary elects to self-insure in accordance with the terms of the Contract, and (ii) all amounts which are due and payable in connection with any indemnification obligations by Subsidiary in favor of Beneficiary pursuant to the Contract.

2.       Under this Guaranty, Amazon.com shall perform (or cause Subsidiary to perform) all payment obligations in accordance with the terms and conditions of the Contract.

3.       Amazon.com promises to pay all amounts guaranteed promptly upon receipt of a written notice from Beneficiary which evidences (a) Subsidiary's non-performance of its payment obligations under the Contract; and (b) Beneficiary's first having demanded payment from Subsidiary in writing, which Subsidiary has not honored. Beneficiary's demand upon Subsidiary does not need to include the initiation of legal proceedings and is deemed satisfied if demand upon Subsidiary would violate any stay of collection in effect in an insolvency proceeding. Except to the extent of the demand requirement set forth in this Section 3, Amazon.com waives protest and notice of dishonor or default. This is a guaranty of payment only, and not of collection.

4.       This Guaranty is governed as to its validity, construction and performance by the laws of the Commonwealth of Pennsylvania, without regard to its conflict of law provisions.

5.       Amazon.com agrees that this Guaranty is a continuing guaranty and will remain in full force and effect until all payment obligations under the Contract have been performed as set forth in the Contract, subject to Section 1 above.

6.       This Guaranty is binding upon and inures to the benefit of Amazon.com and Beneficiary and their respective successors and assigns.

7.       Amazon.com has all rights and defenses that Subsidiary may have to any payment obligation, except that the liability of Amazon.com is not affected by (a) any defense based upon an election of remedies by Beneficiary that destroys or otherwise impairs the subrogation rights of Amazon.com or the right of Amazon.com to proceed against any Subsidiary for reimbursement; (b) any duty on the part of Beneficiary to disclose to Amazon.com any facts Beneficiary may know about any Subsidiary, it being agreed that Amazon.com is fully responsible for being and keeping informed of the financial condition of Subsidiary and of all circumstances bearing on the risk of non-payment of the payment obligations; or (c) any defense arising from the bankruptcy or insolvency of any Subsidiary.

8.       All notices hereunder will be given in writing, will refer to this Guaranty and will be personally delivered or sent by overnight courier, or registered or certified mail (return receipt requested). Notices to Amazon.com will be delivered at the following addresses:

CONFIDENTIAL


AMAZON_00053

AMAZON_00054
CONFIDENTIAL
DPL4

| Mail | Courier |
|---|---|
| Amazon.com, Inc. | Amazon.com, Inc. |
| P.O. Box 81226 | 410 Terry Avenue North |
| Seattle, WA 98108-1226 | Seattle, WA 98109-5210 |
| Attn: Real Estate Manager (NA Ops: DPL4) | Attn: Real Estate Manager (NA Ops: DPL4) |

With a copy to:                                With a copy to:

Amazon.com, Inc.                               Amazon.com, Inc.
P.O. Box 81226                                 410 Terry Avenue North
Seattle, WA 98108-1226                         Seattle, WA 98109-5210
Attn: General Counsel (Real Estate (NA Ops): DPL4)   Attn: General Counsel (Real Estate (NA Ops): DPL4)

Amazon.com may from time to time change such address by giving Beneficiary notice of such change in accordance with the notice provisions of the Contract.

**AMAZON.COM, INC.,**
a Delaware corporation

By: _Antonio Masone_____
     E1317158A242483...

Printed Name: Antonio Masone_____

Its: Treasurer_____

Date Signed: September 22, 2020_____

AMAZON_00054

Exhibit "C"



AG-EIP 1 Geoffrey Drive, L.L.C.
c/o Equity Industrial Partners Corp.
20 Pickering Street, Second Floor
Needham, MA 02492

RE:     Early access to the property located at 1 Geoffrey Drive, Fairless Hills, Pennsylvania, for due diligence and
        move-in activities (the "Site")

To whom it may concern:

        While the lease for the Site is being finalized, Amazon.com Services LLC ("Amazon") would like AG-EIP
1 Geoffrey Drive, L.L.C. ("Landlord") to grant Amazon early access to the Site for the sole purpose of performing
surveys, studies, due diligence (including environmental studies), and work set forth on <u>Exhibit A</u> ("Onsite Work").

Amazon requests access to the Site on the following terms:

- Amazon will be responsible for: (a) paying all costs of the Onsite Work, (b) complying with all laws
  applicable to the Onsite Work, (c) keeping the property free of liens relating to the Onsite Work, and (d)
  promptly repairing and restoring any damage caused by the Onsite Work.
- Notwithstanding anything herein to the contrary, in no event shall Amazon conduct any invasive testing or
  sampling without the prior written consent of Landlord, which consent shall not be unreasonably withheld,
  conditioned or delayed provided that such testing or sampling has been specifically set forth in a scope of
  work document which has been approved in advance by Landlord in writing.
- In addition, notwithstanding anything herein to the contrary, in no event shall Amazon make any alterations,
  improvements or additions to the structural components of the building at the Site or to the systems serving
  such building (as opposed to the mere installation of its furniture, fixtures or equipment therein) without the
  prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.
- Amazon will maintain worker's compensation, employer's liability and commercial general liability
  insurance coverage with limits not less than the minimum amounts required by law. Amazon's commercial
  general liability insurance policy will cover claims for bodily injury, death and property damage and will
  include Landlord as an additional insured and such policy shall be considered primary and non-contributory
  to insurance coverage or self-insurance maintained by Landlord. Visit <u>www.amazon.com/moi</u> to view a
  memorandum of insurance as proof of Amazon's insurance coverage and limits.
- Amazon shall indemnify, defend and hold harmless Landlord and Landlord's affiliates, and their respective
  members, managers, partners, trustees, directors, officers, employees, agents and representatives, and the
  successors and assigns of all of the foregoing (collectively, "Landlord Indemnitees"), against and from any
  and all losses, liabilities, and damages (collectively, "Claims") occasioned by, arising in connection with, or
  incident to any Onsite Work, or the presence at the Site of Amazon or any of its affiliates' or their respective
  officers, directors, lenders, inspectors, appraisers, engineers, attorneys, representatives, agents, contractors,
  consultants, employees, servants or licensees, or arising in connection with the breach of this letter agreement
  by Amazon or its enforcement by Landlord; provided, however, that Amazon's obligations hereunder shall
  not apply to (i) the mere discovery of a pre-existing environmental or physical condition at the Site provided
  that such condition is not exacerbated thereby, or (ii) any and all Claims arising from or caused by the
  negligence or willful misconduct of Landlord or any Landlord Indemnitee.
- The prevailing party in any action to enforce this letter agreement will be entitled to receive from the other
  party all reasonable expenses, including legal fees and disbursements paid or incurred by the prevailing party
  in such action.
- Landlord and Amazon each waive any rights against one another arising from any loss or damage of property
  at the Site to the extent such loss or damage could be insured against by the ISO Causes of Loss-Special
  Form Coverage, including deductibles (whether or not actually insured, recovered under insurance, or self-
  insured); except that the foregoing waiver will not apply to any loss or damage caused by the other party's
  negligence or willful misconduct.





- This letter agreement does not obligate Amazon or Landlord to enter into a lease and each party accepts the risk that no such lease or other contract or agreement will be executed.  If either Amazon or Landlord provides written notice to the other of its decision not to proceed with the lease, Amazon shall remove its items from the Site and repair and restore the Site from the Onsite Work to the condition the Site is in as of the date immediately prior to Amazon's access within 15 days (or a reasonable period of time, if 15 days is not reasonably sufficient, but in no event more than 45 days in the aggregate; provided that Amazon commences such removal and restoration work within such 15-day period and thereafter diligently prosecutes the same to completion) following receipt of such notice, after which Amazon's right to access the Site will automatically expire.

Thank you.

[Signatures on next page.]

37371939.4





**Amazon.com Services LLC**

By: _Joshua Abells_
Name: Joshua Abells
Title: Authorized Signatory
Date: August 28, 2020

Landlord agrees to grant Site access to Amazon, effective as of the signature date below, on the terms described above.

**AG-EIP 1 Geoffrey Drive, L.L.C.**

By:      AG-EIP Industrial 6, L.L.C., its sole member

　　　By:      AG Real Estate Manager, Inc., its manager

　　　　　　By: _Bruce Levine_
　　　　　　Name: Bruce Levine
　　　　　　Title: manager
　　　　　　Date: August 31, 2020

DocuSign Envelope ID: E58FE2CC-AEB7-4FDD-8DA1-B671D7654386



Exhibit A

**SITE**
- Limit site work; Leave existing gravel paving as is; restriping of pavement if it is in good condition. Patching where required
- Do not provide a standard AMZL canopy for exterior loading, but investigate clear span tensile structures (look at lease options); tensile structure must be snow rated; review for township permitting requirements; Consider lighting options at the tensile structures

**ARCHITECTURE**
- Reuse existing docks, pits, and levelers and replace dock door locks and mechanics.
- Reuse existing mezzanine office area. Remove partitions as required and provide program for breakroom, mothers room, multi-faith, HR, and typical offices. Patch/Repair existing finishes.
- Close off the part of the warehouse that will not be needed for MHE operation
- Provide cast-in-place concrete or Dockzilla (or equal) load out ramps. Note these will likely trigger site plan approval/zoning.
- Provide AMZL signage (directional, interior, and exterior wall sign); Confirm if this requires any special township reviews (Note: modify stock signs to meet township requirements and do not request variances)
- Reuse existing breakrooms in lieu of providing a new breakroom. This would save time on demo, new MEP, and fit out.
- Confirm if there are roof leaks as there are several stained ceiling panels throughout the office and break areas
- Highlight the Associates entrance with vinyl window film (perhaps bright Amazon blue)

**MECHANICAL**
- Reuse existing RTUs and service as required; Design a cooling option with fixed units and an option for rental units for air temperature cooling; Provide Big Ass Fans to supplement air conditioning; Stantec's early review projects that we could not provide additional RTUs without additional structural support; Consider where on the ground we might place the units; Consider the addition of cooling may be a Day 2 element to be added after Launch
- Our current plan is to reuse existing HVAC system controls to the greatest extent possible. Existing controls were mostly provided with the equipment they serve.  For example, rooftop units have their own thermostats which do not appear to interface with a central control system. We will continue this approach. Anything new we provide will also have its own packaged controls. The alternative would be to provide either their standard control or a "lite" control system. Both of these approaches would be a significant cost increase over re-using existing
- Heating will reuse the existing units; MAU will be required and are not anticipated to be too much procurement lead time; Stantec is to provide specifications and quantities ahead of CD package release so Gilbane can start procurement

**ELECTRICAL**
- Zelus is capturing the interior and exterior light levels; we will re-lamp with LEDs and supplement interior lighting as needed (Note: this should be considered as tenant maintenance items and completed without permit); Consider lighting modifications will trigger energy code compliance.
- GC to modify existing lighting in field; we need to re-verify the lamp light levels after modifications are made.
- Current electrical service is 2000amps; this service is not sufficient to support additional warehouse AC even with the removal of the battery charging equipment; additional electrical service will be provided Day 2
- New panel boards are expected to take 4-6 weeks to procure; Stantec is to provide specifications and quantities ahead of CD package release so Gilbane can start procurement

**PLUMBING**

37371939.4





- We will reuse existing lines

FIRE PROTECTION/FIRE ALARM
- The sprinkler is not EFSR which is ok as this is not AMZL required; sprinklers may need to be modified at the office areas;
- Stantec was unable to find the main FA panel during our walk through; we may need to add one



Exhibit "D"

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GRETA ROUBERT                                     :
                                                  :
                                              :
                            -vs.-                 :
                        :
AMAZON                                  :
                            -and-                 :     No. *2:21-cv-03091*
GILBANE BUILDING COMPANY
                                        :
                            -and-                 :
Equity Industrial Partners
                                        :
                            -and                  :
KELLERMEYERS BERGENSON SERVICES, LLC :

## PLAINTIFF'S AMENDED CIVIL ACTION COMPLAINT
## NEGLIGENCE  -  PREMISES LIABILITY

1.     Plaintiff, Great Roubert, is an adult individual and at all times material hereto resided at the above captioned address.

2.     Defendant Amazon is a business for profit and incorporated at the captioned address and at all times material hereto did own, maintain, control, lease, operate and/or was contractually obligated to clean, repair and/or make safe the property located at 1 Geoffrey Drive, Fairless Hills, PA 19030.

3.     Defendant Gilbane Building Company is a business for profit and incorporated at the captioned address and at all times material hereto did own, maintain, control, lease, operate and/or was contractually obligated to clean, repair and/or make safe the property located at 1 Geoffrey Drive, Fairless Hills, PA 19030.

4.     Defendant Equity Industrial Partners is a business for profit and incorporated at the captioned address and at all times material hereto did own, maintain, control, lease, operate and/or was contractually obligated to clean, repair and/or make safe the property located at 1 Geoffrey Drive, Fairless Hills, PA 19030.

5.     Defendant Kellermeyers Bergenson Services, LLC is a business for profit and incorporated at the captioned address and at all times material hereto did own, maintain, control, lease, operate and/or was contractually obligated to clean, repair and/or make safe the property located at 1 Geoffrey Drive, Fairless Hills, PA 19030.

6.      On October 2, 2020, Plaintiff Greta Roubert was an employee of an independent contractor invited upon the premises of the Defendants when she slipped, tripped, stumbled and fell as a result of a defective and dangerous condition on the property in the form of a cut-off lag bolt left haphazardly and inconspicuously on Defendants' walking surface which caused Plaintiff to suffer serious and permanent injuries the extent of which will be described more fully hereinafter.



7.      Defendants knew and/or should have known of this dangerous and defective condition in light of its location and legal duty owed to Plaintiff.

8.      As a result of the fall, Plaintiff sustained traumatic injuries to her shoulder, knee and back which have resulted in surgery to the shoulder and likely has permanently disabled Plaintiff.

**COUNT I –
PLAINTIFF, GRETA ROUBERT v. DEFENDANT AMAZON
NEGLIGENCE**

9.      Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as thought the same were fully set forth at length herein.

10.  The aforesaid incident was solely and proximately caused by the Defendant, Amazon, their agents, servants, workmen, representatives and/or employees, which negligence consisted of, but was not necessarily limited to the following;

(a)  Failing to maintain said property in a safe condition;

(b)  Failing to properly inspect and remedy the unsafe condition upon the property with notice, actual or constructive, of its dangerous condition;

(c)  Failing to give proper and adequate notice of the defective and dangerous condition of said property;

(d)  Failing to erect and maintain appropriate barriers or safeguards around the defective and dangerous portion of the said property;

(e)  Disregarding the rights and safety of those persons lawfully on their premises;

(f)  Permitting said property to remain in a dangerous state of disrepair and neglect to the prejudice of plaintiff, including but not limited to failing to properly maintain the floors of the premises;

(g)  Failing to properly train employees to recognize dangerous and defective conditions about the mall and to protect business patrons;

(h)  Negligently selecting its employees, workmen and/or supervisors;

(i)  Hiring and employing negligent and incompetent agents, servants, workmen, employees and/or sub-contractors that Defendants knew or should have known were not competent and who could not properly perform their job duties;

(j)  Permitting and allowing, by and through its agents, servants, workmen, employees and/or supervisors, dangerous and hazardous conditions, to wit, a wet floor surface, to exist when Defendant knew or should have known that such negligence and carelessness of its workmen, employees and/or supervisors would create a severe risk of physical harm to those persons walking thereon;

(k)  Failing to set forth adequate, proper and reasonable safety standards;

(l)  Failing to properly supervise its employees' actions, physical conduct and job performance;

(m)  Failing to properly supervise and inspect the area at all times to ensure safety to all persons therein;

(n)     Failing to properly supervise and inspect the area at all times in an effort to remove and clean up hazards which may present a dangerous condition to exist thereby causing unnecessary accidents to those persons thereon;

(o)     Failing to conduct usual, regular and normal inspections of said premises to assure that said premises was kept in a safe and hazard-free condition for those lawfully thereon;

(p)     Failing to warn all persons lawfully within said facility, one of whom was Plaintiff herein, of the dangerous and hazardous conditions which there and then existed at the time and place of the accident herein;

(q)     Entrusting the premises to persons and/or corporations and/or other entities or associations which Defendants knew or should have known would act in a negligent and careless manner as previously described in this Complaint;

(r)     Allowing persons, corporations, associations and/or other entities to act in a negligent and careless manner on the premises as previously described;

(s)     Failing to properly supervise, control or otherwise prevent persons, corporations, associations and/or other entities from conducting themselves in a negligent and careless manner on said premises as previously described;

(t)     Failing to properly investigate the qualifications of persons, corporations, associations and/or other entities that were allowed to work and/or be on said premises and to properly prevent said persons, corporations, associations and/or other entities from acting in the negligent and careless manner as previously described;

11.     Solely as a result of the aforesaid occurrence, Plaintiff has been rendered sick, sore, lame and prostrate and has sustained multiple injuries to the back, neck, legs, knees, limbs, feet and hands resulting in a possible injury to the muscles, nerves, disks, bones and ligaments connected thereto; and a shock to the nerves and nervous system.  Plaintiff has endured and continues to endure great pain and suffering and/or aggravation of pre-existing conditions.

12.     As a further result of this accident, plaintiff has been or will be obliged to receive and undergo medical attention and care, and to expend various sums of money and/or incur expenses for the injuries she has suffered; and she may be obliged to continue to expend such sums for an indefinite period of time in the future, perhaps permanently.

13.     As an additional result of the accident aforesaid, plaintiff has suffered injuries which are or may be permanent in nature, and has suffered and will in the future continue to suffer great pain and agony, and has, will and may be unable to attend to daily duties, occupations, labors and employment, thereby losing the emoluments of her industry, and has suffered a loss, diminution and depreciation of her earnings and future earning capacity, and which will continue for an indefinite time in the future, all to her great and continuing detriment and loss.

**WHEREFORE**, Plaintiff, Greta Roubert, hereby respectfully requests this Honorable Court to enter judgment against Defendant, Amazon, individually, jointly and/or severally in an amount in excess of Fifty Thousand ($50,000.00) Dollars, together with costs, attorney fees and such other relief as this Honorable Court may deem just and appropriate.

## COUNT II –
## PLAINTIFF, GRETA ROUBERT v. DEFENDANT GILBAINE BUILDING COMPANY
## NEGLIGENCE

13.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as thought the same were fully set forth at length herein.

14.     The aforesaid incident was solely and proximately caused by the Defendant, Gilbaine Building Company, their agents, servants, workmen, representatives and/or employees, which negligence consisted of, but was not necessarily limited to the following;

a) Failing to maintain said property in a safe condition;

b) Failing to properly inspect and remedy the unsafe condition upon the property with notice, actual or constructive, of its dangerous condition;

c) Failing to give proper and adequate notice of the defective and dangerous      condition of said property;

d) Failing to erect and maintain appropriate barriers or safeguards around the defective and dangerous portion of the said property;

e) Disregarding the rights and safety of those persons lawfully on their premises;

f) Permitting said property to remain in a dangerous state of disrepair and neglect to the prejudice of plaintiff, including but not limited to failing to properly maintain the floors of the premises;

g) Failing to properly train employees to recognize dangerous and defective conditions about the mall and to protect business patrons;

h) Negligently selecting its employees, workmen and/or supervisors;

i) Hiring and employing negligent and incompetent agents, servants, workmen, employees and/or sub-contractors that Defendants knew or should have known were not competent and who could not properly perform their job duties;

j) Permitting and allowing, by and through its agents, servants, workmen, employees and/or supervisors, dangerous and hazardous conditions, to wit, a wet floor surface, to exist when Defendant knew or should have known that such negligence and carelessness of its workmen, employees and/or supervisors would create a severe risk of physical harm to those persons walking thereon;

k) Failing to set forth adequate, proper and reasonable safety standards;

l) Failing to properly supervise its employees' actions, physical conduct and job performance;

m) Failing to properly supervise and inspect the area at all times to ensure safety to all persons therein;

n) Failing to properly supervise and inspect the area at all times in an effort to remove and clean up hazards which may present a dangerous condition to exist thereby causing unnecessary accidents to those persons thereon;

o) Failing to conduct usual, regular and normal inspections of said premises to assure that said premises was kept in a safe and hazard-free condition for those lawfully thereon;

p) Failing to warn all persons lawfully within said facility, one of whom was Plaintiff herein, of the dangerous and hazardous conditions which there and then existed at the time and place of the accident herein;

q) Entrusting the premises to persons and/or corporations and/or other entities or associations which Defendants knew or should have known would act in a negligent and careless manner as previously described in this Complaint;

r) Allowing persons, corporations, associations and/or other entities to act in a negligent and careless manner on the premises as previously described;

s) Failing to properly supervise, control or otherwise prevent persons, corporations, associations and/or other entities from conducting themselves in a negligent and careless manner on said premises as previously described;

t) Failing to properly investigate the qualifications of persons, corporations, associations and/or other entities that were allowed to work and/or be on said premises and to properly prevent said persons, corporations, associations and/or other entities from acting in the negligent and careless manner as previously described;

15. Solely as a result of the aforesaid occurrence, Plaintiff has been rendered sick, sore, lame and prostrate and has sustained multiple injuries to the back, neck, legs, knees, limbs, feet and hands resulting in a possible injury to the muscles, nerves, disks, bones and ligaments connected thereto; and a shock to the nerves and nervous system. Plaintiff has endured and continues to endure great pain and suffering and/or aggravation of pre-existing conditions.

16. As a further result of this accident, plaintiff has been or will be obliged to receive and undergo medical attention and care, and to expend various sums of money and/or incur expenses for the injuries she has suffered; and she may be obliged to continue to expend such sums for an indefinite period of time in the future, perhaps permanently.

17. As an additional result of the accident aforesaid, plaintiff has suffered injuries which are or may be permanent in nature, and has suffered and will in the future continue to suffer great pain and agony, and has, will and may be unable to attend to daily duties, occupations, labors and employment, thereby losing the emoluments of her industry, and has suffered a loss, diminution and depreciation of her earnings and future earning capacity, and which will continue for an indefinite time in the future, all to her great and continuing detriment and loss.

**WHEREFORE**, Plaintiff, Greta Roubert, hereby respectfully requests this Honorable Court to enter judgment against Defendant, Gilbaine Building Company, individually, jointly and/or severally in an amount in excess of Fifty Thousand ($50,000.00) Dollars, together with costs, attorney fees and such other relief as this Honorable Court may deem just and appropriate.

**COUNT III–**
**PLAINTIFF, GRETA ROUBERT v. DEFENDANT EQUITY INDUSTRIAL PARNTERS**
**NEGLIGENCE**

18.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as thought the same were fully set forth at length herein.

19.     The aforesaid incident was solely and proximately caused by the Defendant, Equity Industrial Partners, their agents, servants, workmen, representatives and/or employees, which negligence consisted of, but was not necessarily limited to the following;

a)  Failing to maintain said property in a safe condition;

b)  Failing to properly inspect and remedy the unsafe condition upon the property with notice, actual or constructive, of its dangerous condition;

c)  Failing to give proper and adequate notice of the defective and dangerous     condition of said property;

d)  Failing to erect and maintain appropriate barriers or safeguards around the defective and dangerous portion of the said property;

e)  Disregarding the rights and safety of those persons lawfully on their premises;

f)  Permitting said property to remain in a dangerous state of disrepair and neglect to the prejudice of plaintiff, including but not limited to failing to properly maintain the floors of the premises;

g)  Failing to properly train employees to recognize dangerous and defective conditions about the mall and to protect business patrons;

h)  Negligently selecting its employees, workmen and/or supervisors;

i)  Hiring and employing negligent and incompetent agents, servants, workmen, employees and/or sub-contractors that Defendants knew or should have known were not competent and who could not properly perform their job duties;

j)  Permitting and allowing, by and through its agents, servants, workmen, employees and/or supervisors, dangerous and hazardous conditions, to wit, a wet floor surface, to exist when Defendant knew or should have known that such negligence and carelessness of its workmen, employees and/or supervisors would create a severe risk of physical harm to those persons walking thereon;

k)  Failing to set forth adequate, proper and reasonable safety standards;

l)   Failing to properly supervise its employees' actions, physical conduct and job performance;

m)  Failing to properly supervise and inspect the area at all times to ensure safety to all persons therein;

n)   Failing to properly supervise and inspect the area at all times in an effort to remove and clean up hazards which may present a dangerous condition to exist thereby causing unnecessary accidents to those persons thereon;

o)   Failing to conduct usual, regular and normal inspections of said premises to assure that said premises was kept in a safe and hazard-free condition for those lawfully thereon;

p)   Failing to warn all persons lawfully within said facility, one of whom was Plaintiff herein, of the dangerous and hazardous conditions which there and then existed at the time and place of the accident herein;

q)   Entrusting the premises to persons and/or corporations and/or other entities or associations which Defendants knew or should have known would act in a negligent and careless manner as previously described in this Complaint;

r)   Allowing persons, corporations, associations and/or other entities to act in a negligent and careless manner on the premises as previously described;

s)   Failing to properly supervise, control or otherwise prevent persons, corporations, associations and/or other entities from conducting themselves in a negligent and careless manner on said premises as previously described;

t)   Failing to properly investigate the qualifications of persons, corporations, associations and/or other entities that were allowed to work and/or be on said premises and to properly prevent said persons, corporations, associations and/or other entities from acting in the negligent and careless manner as previously described;
.

20.     Solely as a result of the aforesaid occurrence, Plaintiff has been rendered sick, sore, lame and prostrate and has sustained multiple injuries to the back, neck, legs, knees, limbs, feet and hands resulting in a possible injury to the muscles, nerves, disks, bones and ligaments connected thereto; and a shock to the nerves and nervous system.  Plaintiff has endured and continues to endure great pain and suffering and/or aggravation of pre-existing conditions.

21.     As a further result of this accident, plaintiff has been or will be obliged to receive and undergo medical attention and care, and to expend various sums of money and/or incur expenses for the injuries she has suffered; and she may be obliged to continue to expend such sums for an indefinite

period of time in the future, perhaps permanently.

22.     As an additional result of the accident aforesaid, plaintiff has suffered injuries which are or may be permanent in nature, and has suffered and will in the future continue to suffer great pain and agony, and has, will and may be unable to attend to daily duties, occupations, labors and employment, thereby losing the emoluments of her industry, and has suffered a loss, diminution and depreciation of her earnings and future earning capacity, and which will continue for an indefinite time in the future, all to her great and continuing detriment and loss.

**WHEREFORE**, Plaintiff, Greta Roubert, hereby respectfully requests this Honorable Court to enter judgment against Defendant, Equity Industrial Partners, individually, jointly and/or severally in an amount in excess of Fifty Thousand ($50,000.00) Dollars, together with costs, attorney fees and such other relief as this Honorable Court may deem just and appropriate.

**COUNT IV–**
**PLAINTIFF, GRETA ROUBERT v. DEFENDANT KELLERMEYERS BERGENSONS**
**SERVICES, LLC**
**NEGLIGENCE**

23.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as thought the same were fully set forth at length herein.

24.     The aforesaid incident was solely and proximately caused by the Defendant, Kellermeyers Bergensons Services, LLC, their agents, servants, workmen, representatives and/or employees, which negligence consisted of, but was not necessarily limited to the following;

a) Failing to maintain said property in a safe condition;

b) Failing to properly inspect and remedy the unsafe condition upon the property with notice, actual or constructive, of its dangerous condition;

c) Failing to give proper and adequate notice of the defective and dangerous      condition of said property;

d) Failing to erect and maintain appropriate barriers or safeguards around the defective and dangerous portion of the said property;

e) Disregarding the rights and safety of those persons lawfully on their premises;

f) Permitting said property to remain in a dangerous state of disrepair and neglect to the prejudice of plaintiff, including but not limited to failing to properly maintain the floors of the premises;

g) Failing to properly train employees to recognize dangerous and defective conditions about the mall and to protect business patrons;

h) Negligently selecting its employees, workmen and/or supervisors;

i) Hiring and employing negligent and incompetent agents, servants, workmen, employees and/or sub-contractors that Defendants knew or should have known were not competent and who could not properly perform their job duties;

j) Permitting and allowing, by and through its agents, servants, workmen, employees and/or supervisors, dangerous and hazardous conditions, to wit, a wet floor surface, to exist when Defendant knew or should have known that such negligence and carelessness of its workmen, employees and/or supervisors would create a severe risk of physical harm to those persons walking thereon;

k) Failing to set forth adequate, proper and reasonable safety standards;

l) Failing to properly supervise its employees' actions, physical conduct and job performance;

m) Failing to properly supervise and inspect the area at all times to ensure safety to all persons therein;

n) Failing to properly supervise and inspect the area at all times in an effort to remove and clean up hazards which may present a dangerous condition to exist thereby causing unnecessary accidents to those persons thereon;

o) Failing to conduct usual, regular and normal inspections of said premises to assure that said premises was kept in a safe and hazard-free condition for those lawfully thereon;

p) Failing to warn all persons lawfully within said facility, one of whom was Plaintiff herein, of the dangerous and hazardous conditions which there and then existed at the time and place of the accident herein;

q) Entrusting the premises to persons and/or corporations and/or other entities or associations which Defendants knew or should have known would act in a negligent and careless manner as previously described in this Complaint;

r) Allowing persons, corporations, associations and/or other entities to act in a negligent and careless manner on the premises as previously described;

s) Failing to properly supervise, control or otherwise prevent persons, corporations, associations and/or other entities from conducting themselves in a negligent and careless manner on said premises as previously described;

t)  Failing to properly investigate the qualifications of persons, corporations, associations and/or other entities that were allowed to work and/or be on said premises and to properly prevent said persons, corporations, associations and/or other entities from acting in the negligent and careless manner as previously described;

25.     Solely as a result of the aforesaid occurrence, Plaintiff has been rendered sick, sore, lame and prostrate and has sustained multiple injuries to the back, neck, legs, knees, limbs, feet and hands resulting in a possible injury to the muscles, nerves, disks, bones and ligaments connected thereto; and a shock to the nerves and nervous system.  Plaintiff has endured and continues to endure great pain and suffering and/or aggravation of pre-existing conditions.

26.     As a further result of this accident, plaintiff has been or will be obliged to receive and undergo medical attention and care, and to expend various sums of money and/or incur expenses for the injuries she has suffered; and she may be obliged to continue to expend such sums for an indefinite period of time in the future, perhaps permanently.

27.     As an additional result of the accident aforesaid, plaintiff has suffered injuries which are or may be permanent in nature, and has suffered and will in the future continue to suffer great pain and agony, and has, will and may be unable to attend to daily duties, occupations, labors and employment, thereby losing the emoluments of her industry, and has suffered a loss, diminution and depreciation of her earnings and future earning capacity, and which will continue for an indefinite time in the future, all to her great and continuing detriment and loss.

**WHEREFORE**, Plaintiff, Greta Roubert, hereby respectfully requests this Honorable Court to enter judgment against Defendant, Kellermeyer Bergensons Services, Inc., individually, jointly and/or severally in an amount in excess of Fifty Thousand ($50,000.00) Dollars, together with costs, attorney fees and such other relief as this Honorable Court may deem just and appropriate

RODDEN RODDEN & BRESLIN,

By: _____*David Brian Rodden*_____
DAVID BRIAN RODDEN, ESQ.
Attorney for Plaintiff

Dated: July 28, 2021

## <u>VERIFICATION</u>

David Brian Rodden, Esquire, attorney for Plaintiff in the foregoing matter, hereby verifies that he has been authorized to take this Verification on his client's behalf; is familiar with the facts and circumstances surrounding this matter; and that the facts set forth in the foregoing document are true and correct to the best of his knowledge, information and belief.

Further, he is aware that any false statements made herein are subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification made to authorities.


_____*David Brian Rodden*_____
David Brian Rodden, Esquire

Dated:   July 29, 2021

## CERTIFICATE OF SERVICE

The undersigned hereby certify that a true and correct copy of the foregoing pleading has been forwarded to all counsel of record via Pennsylvania Eastern District Court of Pennsylvania efiling system on this same date.

RODDEN & RODDEN

By:  ____*David Brian Rodden*_____
David Brian Rodden, Esquire
Attorney for Plaintiff(s)

Dated:  July 29, 2021

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Greta Roubert

## DEFENDANTS
Amazon, et al

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David Brian Rodden
125 North 20th Street

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[x] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>[ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | **CIVIL RIGHTS**<br>[ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>[ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | **SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [x] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ 

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE: 7-30-2021

SIGNATURE OF ATTORNEY OF RECORD
David Brian Rodden

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.** **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.

Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.

**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

Exhibit "E"

# CLINTON & CLINTON

Attorneys at Law
**_Philadelphia Office_**

1315 Walnut Street, Suite 601, Philadelphia, Pennsylvania 19107
Telephone (267) 800-1897
Facsimile (267) 800-1898
Firm Website: www.clinton-clinton.com
Writer's Direct Dial No.: (562) 216-5027
Writer's E-mail Address: jmcdevitt@clinton-clinton.com

October 4, 2021

Salvatore A. Clemente, Esq.
Wilson Elser Moskowitz Edelman & Dicker, LLP
Two Commerce Square
2001 Market Street
Suite 3100
Philadelphia, PA 19103

RE:     _Greta Roubert v. Amazon, et al.;_ United States District Court, E.D. Penna.; Case
         No. 2:21-cv-03091
         Date of Accident:  10/02/2020
         C&C File No.:  155-21-010

Dear Mr. Clemente:

Clinton & Clinton is defending the interests of Equity Industrial Partners ("EIP") in the above-referenced slip and fall personal injury action.  This letter will supplement the tender letter issued to Amazon by Sompo International's claims administrator under date of July 20, 2021.  A true and correct copy of that letter is enclosed herein.

We write to renew and reiterate EIP's tender to Amazon of all obligations for defense and indemnification of EIP in regard to the claims asserted in the above-referenced lawsuit (hereinafter "the Roubert Lawsuit"). Our demand for defense and indemnification of EIP is predicated upon the provisions contained in the Lease Agreement entered into between EIP and Amazon for occupancy of the building and realty situated at 1 Geoffrey Drive, Falls Township, Bucks County, Pennsylvania.  Section 9(b) of that Agreement obligates Amazon to procure at Amazon's expense commercial general liability insurance covering the Leased Premises and Amazon's use thereof against claims for bodily injury or death and property damage, and include EIP and any mortgage lienholder as an additional insured.  Section 9(c) of the Lease Agreement recites that the CGL policies procured by Amazon shall provide coverage with a per occurrence limit of not less than $5,000,000, which limit may be satisfied by any combination of primary and excess or umbrella policies, insure on an occurrence and not a claims-made basis, and provide contractual liability coverage. Please advise whether Amazon has notified all relevant liability insurers of EIP's prior tender dated July 20, 2021. Further, we request that Amazon provide true and complete copies of all CGL primary policies and excess or umbrella policies

Salvatore A. Clemente, Esq.
Wilson Elser Moskowitz Edelman & Dicker, LLP
October 4, 2021
Page 2

that were in force on the date of the accident that is the subject of the Roubert Lawsuit.  We also ask that Amazon provide the names and the contact information for any and all claims professionals who are handling the claims asserted against Amazon in the Roubert Lawsuit, and furnish copies of any and all Certificates of Insurance evidencing the liability policies procured by Amazon and in force on the date of the accident that is the subject of the Roubert Lawsuit.

The accident that is the subject of the Roubert Lawsuit occurred on October 2, 2020. As noted in the enclosed letter, the Lease Agreement between Amazon and EIP commenced on September 22, 2020.  Amazon had taken occupancy of the leased premises prior to the date of Plaintiff's accident.  The Amended Complaint filed by Plaintiff alleges she was an employee of an independent contractor who was invited upon the premises when she slipped, tripped, stumbled, and fell as a result of a defective condition on the property in the form of a cut-off lag bolt left haphazardly and inconspicuously on Defendants' walking surface.  As Plaintiff's accident occurred after Amazon took possession and control of the Leased Premises and as the Plaintiff was an employee of an independent contractor hired by Amazon, EIP qualifies as an additional insured under Amazon's CGL policy or policies applicable and in force on the date of the accident.

In addition to our tender of defense and indemnification of EIP as an additional insured under any relevant Amazon CGL policy or policies, we tender defense and indemnification of EIP as a contractual indemnitee of Amazon.  Section 18(a) of the Lease Agreement imposes a broad indemnity obligation on Amazon that includes an obligation to indemnify, defend, and hold harmless EIP and its affiliates… "from and against any and all losses, liabilities, damages, cost, and expenses ( including reasonable attorneys' fees… claims by third parties occasioned by (i) death, injuries to any person or damage to, or theft or loss of, property occurring in or about the Premises to the extent caused or alleged to be caused by the violation of Legal Requirements, fraud, negligence or willful misconduct of tenant or of any member, partner, manager, affiliate, contractor or subcontractor of tenant." The entire indemnification provision contained in XVIII(a) of the Lease Agreement is quoted in Sompo's tender letter dated July 20, 2021.

As you are aware, we have recently filed on behalf of EIP an answer to the amended complaint that includes Crossclaims against Amazon for contractual indemnity and breach of duty to insure.  We will promptly withdraw those Crossclaims upon receipt of notice that Amazon accepts this tender and agrees to pay cost and expenses incurred for defense of EIP from date of tender.

On behalf of EIP, Angelo Gordon & Company, and all entities associated with the ownership and management of the property upon which this accident occurred, we hereby tender all claims to you for handling to conclusion and to protect the interests of EIP, Angelo Gordon & Company, and all entities listed on the Certificate of Insurance issued by and on behalf of Amazon.  Nothing in this letter should be construed as a waiver of any rights on the part of EIP or its affiliates.

Salvatore A. Clemente, Esq.
Wilson Elser Moskowitz Edelman & Dicker, LLP
October 4, 2021
Page 3


Lastly, we request that Amazon respond in writing to this tender within twenty (20) days of the date of this correspondence.  We thank you in advance of your courtesy in responding promptly to this tender letter.


Very Truly Yours,

**CLINTON & CLINTON**

BY:   *John F. McDevitt, Jr.*
John F. McDevitt, Jr., Esq.

CC:   James A. Cracolice
Lead Resolution Specialist
Sompo Global Risk Solutions Adjusting Unit
P.O. Box 2971
Clinton, IA 52733-2971

# CLINTON & CLINTON

Attorneys at Law
**_Philadelphia Office_**

1315 Walnut Street, Suite 601, Philadelphia, Pennsylvania 19107
Telephone (267) 800-1897
Facsimile (267) 800-1898
Firm Website: www.clinton-clinton.com
Writer's Direct Dial No.: (562) 216-5027
Writer's E-mail Address: jmcdevitt@clinton-clinton.com

October 11, 2022

Salvatore A. Clemente, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
Two Commerce Square
Suite 3100
2001 Market Street
Philadelphia, PA 19103

      RE:    Greta Roubert v. Amazon, et al.; U.S.D.C, Eastern District of Penna.; Civil
               Action No. 2:21-CV-03091-CMR
               Date of Accident:     October 2, 2020
               C&C File No.:         155-21-010

Dear Mr. Clemente:

        As you are aware, Clinton & Clinton is defending the interests of AG-EIP 1 Geoffrey Drive, LLC ("AG-EIP") in the above-referenced slip and fall personal injury action. This letter will supplement the tender letters that were sent to Amazon by Sompo International's claims administrator under date of July 20, 2021, and tender letters sent by the undersigned attorney under dates of October 4, 2021 and November 22, 2021. True and correct copies of the tender letters are enclosed herein.

        In the letters we forwarded to you on the above-referenced dates, we tendered the defense and indemnification of AG-EIP as an additional insured under any applicable CGL policy or policies affording coverage to Amazon for the causes of action asserted in the First Amended Complaint in this matter. Additionally, we tendered defense and indemnification of AG-EIP under the indemnity provisions set forth in Section 18(a) of the Lease Agreement between AG-EIP and Amazon, and the indemnity and additional insured provisions set forth in the Early Access Agreement between AG-EIP and Amazon. Amazon has failed to date to respond to any of the tender letters referenced above.

        On October 6, 2021, you produced on behalf of Amazon a copy of a CGL policy issued to Amazon by Zurich American Insurance Company ("the Zurich Policy") that was in force on the date of Plaintiff's accident. The CGL policy you produced is identified by Policy No. GLO-7367714-01 and has effective dates of 4/1/2020 to 4/1/2021. The Zurich policy provides liability coverage up to a per occurrence limit of $8,000,000, and identifies Amazon.com, Inc. as the named

# CLINTON & CLINTON

Attorneys at Law
**_Philadelphia Office_**

1315 Walnut Street, Suite 601, Philadelphia, Pennsylvania 19107
Telephone (267) 800-1897
Facsimile (267) 800-1898
Firm Website: www.clinton-clinton.com
Writer's Direct Dial No.: (562) 216-5027
Writer's E-mail Address: jmcdevitt@clinton-clinton.com

November 22, 2021

Salvatore A. Clemente, Esq.
Wilson Elser Moskowitz Edelman & Dicker, LLP
Two Commerce Square
2001 Market Street                                                    *via email*
Suite 3100
Philadelphia, PA 19103

RE:    *Greta Roubert v. Amazon, et al.;*  United States District Court, E.D. Penna.; Case
No. 2:21-cv-03091
Date of Accident:  10/02/2020
C&C File No.:  155-21-010

Dear Mr. Clemente:

As you are aware, Clinton & Clinton is defending the interests of Equity Industrial Partners ("EIP") in the above referenced Lawsuit (the "Roubert Lawsuit"). This letter will supplement our letter dated October 4, 2021, tendering to Amazon all obligations for defense and indemnification of EIP for the claims asserted in the Roubert Lawsuit.

In our earlier correspondence, we tendered to Amazon all obligations for defense and indemnification of EIP in the Roubert Lawsuit.  The purpose of this letter is to tender to Amazon all obligations for defense and indemnification of all claims that are or may be asserted against AG-EIP 1 Geoffrey Drive, LLC, in the Roubert Lawsuit.  In that correspondence, we tendered to Amazon based upon the terms of the Lease Agreement entered into between Amazon and AG-EIP 1 Geoffrey Drive, LLC for occupancy of the premises at 1 Geoffrey Drive, Falls Township, Bucks County, Pennsylvania. The contents of that tender letter are incorporated by reference herein and made a part hereof.

Additionally, AG-EIP 1 Geoffrey Drive, LLC ("AG-EIP") and EIP make demand upon Amazon for defense and indemnification of all claims that have been or may be asserted against them in the Roubert Lawsuit based upon the provisions of the attached Early Access Agreement entered into between Amazon and AG-EIP for early occupancy of the leased property at 1 Geoffrey Drive, Falls Township, Bucks County, Pennsylvania.  The enclosed Agreement is signed by a representative of Amazon on August 28, 2020, and by a representative of AG-EIP on August 31,

Salvatore A. Clemente, Esq.
Wilson Elser Moskowitz Edelman & Dicker, LLP
November 22, 2021
Page 2

2020.  The Early Access Agreement authorizes Amazon to access the lease site to perform surveys, studies, due diligence, and work set forth in Exhibit A to that Agreement.  The Early Access Agreement contains an insurance provision obligating Amazon to maintain CGL insurance coverage and include the landlord as an additional insured.  Further, the Agreement contains the following broadly worded indemnity provision:

> Amazon shall indemnify, defend and hold harmless Landlord and Landlord's affiliates, and their respective members, managers, partners, trustees, directors, officers, employees, agents and representatives, and the successors and signs of all of the foregoing (collectively, "Landlord Indemnitees"), against and from any and all losses, liabilities, and damages (collectively, "Claims") occasioned by, arising in connection with, or incident to any Onsite Work, or the presence at the Site of Amazon or any of its affiliates' or their respective officers, directors, lenders, inspectors, appraisers, engineers, attorneys, representatives, agents, contractors, consultants, employees, servants or licensees, or arising in connection with the breach of this letter agreement by Amazon or its enforcement by Landlord; provided, however, that Amazon's obligations hereunder shall not apply to (i) the mere discovery of a pre-existing environmental or physical condition at the Site provided that such condition is not exacerbated thereby, or (ii) any and all Claims arising from or caused by the negligence or willful misconduct of Landlord or any Landlord Indemnitee.

On behalf of AG-EIP, EIP, Angelo Gordon & Company, and all other entities associated with the ownership and management of the property whereon this accident allegedly occurred, we hereby tender to Amazon for defense and indemnification all claims asserted against AG-EIP and/or EIP and all other entities listed on the Certificate of Insurance issued by and on behalf of Amazon.  Nothing in this letter should be construed as a waiver of any rights on the part of AG-EIP or EIP, or their affiliates.

We reiterate our request that Amazon provide the identities and contact information for any and all claims professionals who are handling the claims asserted against Amazon in the Roubert Lawsuit, and furnish copies of any and all Certificates of Insurance evidencing the liability policies procured by Amazon and in force on the date of the accident that is the subject of the Roubert Lawsuit.  We further request that Amazon provide a full and complete copy of any such liability policies.

Lastly, we request that Amazon respond in writing to this tender on or before December 13, 2021.  We thank you in advance for your courtesy in responding promptly to this correspondence.

Salvatore A. Clemente, Esq.
Wilson Elser Moskowitz Edelman & Dicker, LLP
November 22, 2021
Page 3


``                    Very Truly Yours,

                **CLINTON & CLINTON**

            BY:    *John F. McDevitt, Jr.*
                   John F. McDevitt, Jr., Esq.

CC:    James A. Cracolici
       Lead Resolution Specialist
       Sompo Global Risk Solutions Adjusting Unit

Salvatore A. Clemente, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
October 11, 2022
Page 2

insured.  The Zurich policy includes a Self-Insured Retention Endorsement obligating Amazon to pay a $2,000,000 per "incident" SIR, which includes payment of all defense costs.  Additionally, the Zurich policy includes an Endorsement titled **ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES**, which pertains to all leased premises and which adds the following as an additional insured:

> Any person or organization to whom or to which you are required to provide additional insured status in a written contract or written agreement executed to prior to loss, except where such contract or agreement is prohibited by law.

The coverage afforded under the **ADDITIONAL INSURED—MANAGERS OR LESSORS OF PREMISES E**ndorsement is limited to the amount of liability insurance that the named insured is required by the contract or agreement to provide for such additional insured. Paragraph 9(c) of the Lease Agreement between AG-EIP and Amazon obligates Amazon to procure and maintain commercial general liability policies that provide coverage with a per occurrence limit of not less than $5,000,000.  Paragraph 9(b) of the Lease Agreement requires that Amazon name the landlord and mortgage lienholder as an additional insured by endorsement.

The Early Access Agreement between Amazon and AG-EIP contains a similar obligation on the part of Amazon to procure a commercial general liability insurance policy covering claims for bodily injury, death and property damage and including the Landlord as an additional insured under the policy.

Thus, by virtue of the terms of the Early Access Agreement, Lease Agreement and the Zurich policy, Amazon and Zurich are obligated to defend and indemnify AG-EIP with respect to the causes of action that have been asserted in the First Amended Complaint.

This letter is the fourth tender letter AG-EIP has directed to you and Amazon with regard to the claims asserted against AG-EIP in the above-referenced litigation.  Amazon has failed to respond to any of the prior tender letters.  We request that Amazon issue a formal written response to this tender within twenty (20) days of the date of this correspondence.  We thank you in advance for your courtesy in complying with this request.

Very Truly Yours,

**CLINTON & CLINTON**

BY:    *John F. McDevitt, Jr.*
          John F. McDevitt, Jr., Esq.
          Attorney for Defendant,
          AG-EIP 1 Geoffrey Drive, LLC

Salvatore A. Clemente, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
October 11, 2022
Page 3


CC:     Daniel J. Mirarchi, Esq.

        James A. Cracolice
        Lead Resolution Specialist
        Sompo Global Risk Solutions Adjusting Unit
        P.O. Box 2971
        Clinton, IA 52733-2971